# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ANGEL ENRIQUE NUNEZ ESCOBAR, JESUS )
ANTONIO SANCHEZ VILLALOBOS, JORGE )
PALENCIA SARMIENTO, JOSE ARSENIO )
QUINTANILLA GOMEZ, JAVIER ORLANDO )
DERAS, JUAN BAUTISTA MENDEZ )
MARTINEZ, GERARDO MORTEO MENDEZ, )
ISIAS RAXCACO CAJBON, EDUARDO )
CAHUEC GARCIA, MARVIN BENJAMIN )
LOPEZ RAXICO, COSMER JUAREZ CAJBON, )
CARLOS ROBERTO MENDEZ MARTINEZ, )
DAVID SALGADO FIGUEROA, KIMBERLY )
CUSTIS, and SHANNON NORIEGA LUCAS, )
as parent and next friend of her child, B.B., a minor,)
                                                    )
        *Plaintiffs,*                         )
                                                    )
        *v.*                                 )    Civil Action No. _____
                                                    )
LEE GAINES, Supervisory Detention and               )
Deportation Officer, Immigration and Customs        )
Enforcement ("ICE") Nashville Fugitive Operations )
Team ("NVLFOT"), CHRISTOPHER KOSHAR, )    JURY DEMAND
ICE Nashville Homeland Security Investigations )
("NVLHSI") Group Supervisor, ICE NVLFOT )
Deportation Officers LEE C. WORSHAM, )
BRADLEY EPLEY, ERIC H. LIM, and BRIAN )
ABRAHAMSON, ICE NVLHSI Senior Special )
Agents PATRICK RYAN HUBBARD, )
JONATHON ANDREW HENDRIX, and )
STEPHEN F. MCCORMICK, ICE NSVHSI )
Special Agents WAYNE DICKEY and )
CHRISTOPHER LANE, DANIEL HASTINGS, )
ICE Immigration Enforcement Agent, JANE DOE )
ICE AGENTS 1-2, JOHN DOE ICE AGENTS )
1-13, GARY KEMPER, Sergeant, Metropolitan )
Nashville Police Department ("MNPD") Gang )
Unit, SHAUN HARDIN, Detective, MPND Gang )
Unit, JANE ROE MNPD OFFICERS 1-5, JOHN )
ROE MNPD OFFICERS 1-5, GREYSTAR )
REAL ESTATE PARTNERS, LLC, TRITEX )
REAL ESTATE ADVISORS, TRACY HALL, )
CRIME SUPPRESSION SERVICES, and )

PAUL WEST,                                             )
                                                       )
                    *Defendants.*                      )

## **COMPLAINT**

1.       Beginning in early 2010, the Clairmont Apartment complex in Nashville, Tennessee ("Clairmont") fell into disrepair, was sold in bankruptcy proceedings and taken over by a company that allowed conditions to deteriorate in Clairmont units in what appears to be an effort to chase away its current residents, many of whom are of Latino ethnicity. The new management company that took over the Clairmont was hired to "clean house, and get the Hispanics gone." Within the course of one rental cycle, the management company abandoned its on-site offices, hired a notoriously harsh security company, allowed 2 buildings to lose hot water, began demanding social security numbers in order to sign a lease agreement and saw a large-scale, highly coordinated immigration/law enforcement raid that led to at least 20 immigration related detentions (but no criminal arrests) and caused scores of apartments to become vacant. The consequences of which effectively resulted in the mass exodus of Latino residents from Clairmont.

2.       This is an action by 15 individuals (collectively, "Plaintiffs") who were victims of the large-scale, warrantless raid by Immigration and Customs Enforcement ("ICE"), the Metropolitan Nashville Police Department ("MNPD"), and private security guards at Clairmont on October 20, 2010 ("Clairmont raid").

3.       Plaintiffs in this case include United States citizens. All but one of the Plaintiffs are Latino, and all were residents of Clairmont on October 20, 2010. Each Plaintiff was at Clairmont on the evening of October 20, 2010, when a team of ICE agents, MNPD officers, and private security guards raided numerous private residences without search warrants

Case 3:11-cv-00994   Document 1   Filed 10/19/11   Page 2 of 37 PageID #: 2

or consent from the residents and without the existence of any exigent circumstances that would justify a warrantless search. Once inside the homes, agents and officers detained the occupants without judicial warrant or other legal justification, searched throughout the homes, and arrested several Plaintiffs without probable cause. Officers and agents also detained and interrogated, and in some cases arrested without any lawful justification, Plaintiffs as they sat in their lawfully parked cars or played outside.

4.      Without cause or reasonable suspicion, ICE agents and MNPD officers detained, interrogated and arrested Clairmont residents based on their ethnicity, skin color, physical appearance and national origin.

5.      Some of the Plaintiffs were subjected to physical and verbal abuse; others were interrogated, threatened or had firearms pointed at them. Many Plaintiffs were subjected to this illegal conduct in front of their families, including small children. Each Plaintiff suffered and continues to suffer from the effects of that abusive conduct.

6.      No criminal charges have been brought against any of the Plaintiffs.

7.      Tracy Hall, acting on behalf of Defendants Greystar Real Estate Partners, LLC and TriTex Real Estate Advisors, conspired with the ICE agents, MNPD officers, and Defendant Crime Suppression Services to aid in the unlawful raid. Hall was motivated by animus toward Plaintiffs based on their ethnicity, skin color, physical appearance, and perceived national origin.

8.      Plaintiffs bring this action to secure and vindicate their rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and federal civil rights laws.

## JURISDICTION AND VENUE

9.        The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question),
28 U.S.C. § 1343 (civil rights), and 28 U.S.C. §§ 2201–02 (declaratory relief). Venue is proper
in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving
rise to Plaintiffs' claims occurred in this district, and also under 28 U.S.C. § 1391(e)(3), because
at least one of the plaintiffs resides in this district.

## PARTIES

### Plaintiffs

### *Apartment F-106*

10.        Plaintiff **Angel Enrique Nuñez Escobar** ("Plaintiff Nuñez Escobar") is a
resident of Nashville and of Latino ethnicity. He resided in Apartment F-106 at Clairmont on
October 20, 2010.

11.        Plaintiff **Jorge Palencia Sarmiento** ("Plaintiff Palencia Sarmiento") is a
resident of Nashville and of Latino ethnicity. He resided in Apartment F-106 at Clairmont on
October 20, 2010.

12.        Plaintiff **Jose Arsenio Quintanilla Gomez** ("Plaintiff Quintanilla Gomez")
was a resident of Nashville on October 20, 2010. He is of Latino ethnicity. He resided in
Apartment F-106 at Clairmont on October 20, 2010.

13.        Plaintiff **Javier Orlando Deras** ("Plaintiff Deras") was a resident of
Nashville on October 20, 2010. He is of Latino ethnicity. He resided in Apartment F-106 at
Clairmont on October 20, 2010.

Case 3:11-cv-00994   Document 1   Filed 10/19/11   Page 4 of 37 PageID #: 4

14.     Plaintiff **Gerardo Morteo Mendez** ("Plaintiff Morteo Mendez") is a resident of Nashville and of Latino ethnicity. He resided in Apartment F-106 at Clairmont on October 20, 2010.

15.     Plaintiff **Jesus Antonio Sanchez Villalobos** ("Plaintiff Sanchez Villalobos") is a resident of Nashville and of Latino ethnicity. He resided in Apartment F-102 at Clairmont on October 20, 2010.

### *Apartment I-4*

16.     Plaintiff **Carlos Roberto Mendez Martinez** ("Plaintiff Carlos Mendez Martinez") is a resident of Nashville and of Latino ethnicity. He resided in Apartment I-4 at Clairmont on October 20, 2010.

17.     Plaintiff **Juan Bautista Mendez Martinez** ("Plaintiff Juan Mendez Martinez") was a resident of Nashville on October 20, 2010. He is of Latino ethnicity. He resided in Apartment F-106 at Clairmont on October 20, 2010.

### *Apartment E-101*

18.     Plaintiff **David Salgado Figueroa** ("Plaintiff Salgado Figueroa") was a resident of Nashville on October 20, 2010, and is currently a resident of Antioch, Tennessee. He is of Latino ethnicity. He resided at Clairmont on October 20, 2010.

### *Clairmont Parking Lot Near Building L*

19.     Plaintiff **Isias Raxcaco Cajbon** ("Plaintiff Raxcaco Cajbon") is a resident of Nashville and of Latino ethnicity. He resided in Apartment L-3 at Clairmont on October 20, 2010.

20.     Plaintiff **Eduardo Cahuec Garcia** ("Plaintiff Cahuec Garcia) is a resident of Nashville and of Latino ethnicity.  He resided in Apartment L-3 at Clairmont on October 20, 2010.

21.     Plaintiff **Marvin Benjamin Lopez Raxico** ("Plaintiff Lopez Raxico") is a resident of Nashville and of Latino ethnicity.  He resided in Apartment L-3 at Clairmont on October 20, 2010.

22.     Plaintiff **Cosmer Juarez Cajbon** ("Plaintiff Juarez Cajbon") is a resident of Nashville and of Latino ethnicity.  He resided in Apartment L-3 at Clairmont on October 20, 2010.

23.     Plaintiffs Nuñez Escobar, Palencia Sarmiento, Quintanilla Gomez, Deras, Morteo Mendez, Sanchez Villalobos, Carlos Mendez Martinez, Juan Mendez Martinez, Salgado Figueroa, Raxcaco Cajbon, Cahuec Garcia, Lopez Raxico, and Juarez Cajbon shall collectively be referred to as "Arrestee Plaintiffs."

### *Apartment F-102*

24.     Plaintiff **Kimberly Custis** ("Plaintiff Custis") is a Nashville resident and United States citizen.  She resided in Apartment F-102 at Clairmont on October 20, 2010.

25.     Plaintiffs Nuñez Escobar, Palencia Sarmiento, Quintanilla Gomez, Deras, Morteo Mendez, Carlos Mendez Martinez, Juan Mendez Martinez, and Custis shall collectively be referred to as "Home Raid Plaintiffs."

### *Playground*

26.     Plaintiff **Shannon Noriega Lucas** ("Plaintiff Noriega Lucas") is a Nashville resident and United States citizen who brings this action as parent and next friend of her child **B.B.**, a Latino child who is also a United States citizen.  B.B., a minor, was playing soccer at the

Clairmont playground when he was unlawfully stopped, detained, and interrogated by an ICE agent on October 20, 2010.

**Defendants**

**ICE Defendants**

27.     Defendant **Lee Gaines** ("Defendant Gaines") was at all times relevant to this action a Supervisory Detention and Deportation Officer with the ICE Nashville Fugitive Operations Team ("NVLFOT"). On information and belief, he was an on-site supervisor of the Clairmont raid. Defendant Gaines is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Gaines acted under color of federal law.

28.     Defendant **Christopher Koshar** ("Defendant Koshar") was at all times relevant to this action a Group Supervisor of Nashville Homeland Security Investigations ("NVLHSI"). Homeland Security Investigations ("HSI") is the investigative arm of ICE. On information and belief, he was an on-site supervisor of the Clairmont raid. Defendant Koshar is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Koshar acted under color of federal law.

29.     Defendant **Lee C. Worsham** ("Defendant Worsham") was at all times relevant to this action a Deportation Officer of the NVLFOT. He participated in the planning and execution of the Clairmont raid. Defendant Worsham is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Worsham acted under color of federal law.

30.     Defendant **Bradley Epley** ("Defendant Epley") was at all times relevant to this action a Deportation Officer of the NVLFOT. He participated in the Clairmont raid.

Defendant Epley is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Epley acted under color of federal law.

31.     Defendant **Eric H. Lim** ("Defendant Lim") was at all times relevant to this action a Deportation Officer of the NVLFOT. He participated in the Clairmont raid. Defendant Lim is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Lim acted under color of federal law.

32.     Defendant **Brian Abrahamson** ("Defendant Abrahamson") was at all times relevant to this action a Deportation Officer of the NVLFOT. He participated in the Clairmont raid. Defendant Abrahamson is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Abrahamson acted under color of federal law.

33.     Defendant **Patrick Ryan Hubbard** ("Defendant Hubbard") was at all times relevant to this action a Senior Special Agent of the NVLHSI group. He participated in the planning and execution of the Clairmont raid. Defendant Hubbard is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Hubbard acted under color of federal law.

34.     Defendant **Jonathon Andrew Hendrix** ("Defendant Hendrix") was at all times relevant to this action a Senior Special Agent of the NVLHSI group. He participated in the Clairmont raid. Defendant Hendrix is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Hendrix acted under color of federal law.

35.     Defendant **Stephen F. McCormick** ("Defendant McCormick") was at all times relevant to this action a Senior Special Agent of the NVLHSI group. He participated in the Clairmont raid. Defendant McCormick is sued in his individual capacity. During all times mentioned in this Complaint, Defendant McCormick acted under color of federal law.

36.        Defendant **Wayne Dickey** ("Defendant Dickey") was at all times relevant to this action a Special Agent of the NVLHSI group. He participated in the Clairmont raid. Defendant Dickey is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Dickey acted under color of federal law.

37.        Defendant **Christopher Lane** ("Defendant Lane") was at all times relevant to this action a Special Agent of the NVLHSI group. He participated in the Clairmont raid. Defendant Lane is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Lane acted under color of federal law.

38.        Defendant **Daniel Hastings** ("Defendant Hastings") was at all times relevant to this action an ICE Immigration Enforcement Agent based in Nashville, Tennessee. Defendant Hastings took part in the Clairmont raid and the arrest, processing, and detention of Plaintiffs. Defendant Hastings is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Hastings acted under color of federal law.

39.        Defendants **Jane Does 1 and 2** were at all times relevant to this action ICE agents and/or ICE supervisors. Defendant Jane Does 1 and 2 personally participated in the Clairmont raid. They are sued in their individual capacities. During all times mentioned in this Complaint, Defendant Jane Does 1 and 2 acted under color of federal law.

40.        Defendants **John Does 1 through 13** were at all times relevant to this action ICE agents and/or ICE supervisors. Defendant John Does 1 through 13 personally participated in the Clairmont raid. They are sued in their individual capacities. During all times mentioned in this Complaint, Defendant John Does 1 through 13 acted under color of federal law.

41.        Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendants Jane Doe 1 and 2 or Defendants John Doe 1 through 13, inclusive, and

therefore sue those Defendants by fictitious names. These Doe Defendants are responsible and liable for the acts and/or damages alleged in this Complaint. Plaintiffs will amend this Complaint to allege the Doe Defendants' true names and capacities when they have been ascertained.

42. Defendants Lane, Lim, McCormick, Worsham, Abrahamson, Epley, Hastings and Jane Doe 1 shall collectively be referred to as "F-106 Agents."

43. Defendants Hubbard, Hendrix, Abrahamson, and John Does 1 and 2 shall collectively be referred to as "I-4 Agents."

44. Defendants Lim, Abrahamson, Epley, Worhsam, John Does 3 through 6, and Jane Doe 2 shall collectively be referred to as "E-101 Agents."

45. Defendants Lim, Hendrix, Worsham, Abrahamson, Epley, and Hastings shall collectively be referred to as "Parking Lot Agents."

46. Defendants John Does 7 through 12 shall collectively be referred to as "F-102 Agents."

### MNPD Defendants

47. Defendant **Sergeant Gary Kemper** ("Defendant Kemper") was, on information and belief, at all times relevant to this action a supervisory officer of the MNPD's Gang Unit. He participated in the planning, supervision, and execution of the Clairmont raid. He is sued in his individual capacity. During all times mentioned in this Complaint, Defendant Kemper acted under color of state or federal law.

48. Defendant **Shaun Hardin** ("Defendant Hardin") was, on information and belief, at all times relevant to this action a detective with the MNPD's Gang Unit. He participated in the planning and execution of the Clairmont raid. He is sued in his individual

Case 3:11-cv-00994   Document 1   Filed 10/19/11   Page 10 of 37 PageID #: 10

capacity. During all times mentioned in this Complaint, Defendant Hardin acted under color of state or federal law.

49.     Defendants **Jane Roe 1 through 5** were, on information and belief, at all times relevant to this action officers of the MNPD who participated in the Clairmont raid. Defendants Jane Roe 1 through 5 are sued in their individual capacities. During all times mentioned in this Complaint, Defendants Jane Roe 1 through 5 acted under color of state or federal law.

50.     Defendants **John Roe 1 through 5** were, on information and belief, at all times relevant to this action officers of the MNPD who participated in the Clairmont raid. Defendants John Roe 1 through 5 are sued in their individual capacities. During all times mentioned in this Complaint, Defendants John Roe 1 through 5 acted under color of state or federal law.

51.     Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendants Jane Roe 1 through 5 or Defendants John Roe 1 through 5, inclusive, and therefore sue those Defendants by fictitious names. These Roe Defendants are responsible and liable for the acts and/or damages alleged in this Complaint. Plaintiffs will amend this Complaint to allege the Roe Defendants' true names and capacities when they have been ascertained.

### Private Party Defendants

52.     Defendant **Greystar Real Estate Partners, LLC** ("Greystar") is a limited liability corporation headquartered in Charleston, South Carolina. At all times relevant to this action, Greystar managed Clairmont. Greystar's management responsibilities at Clairmont included the hiring, training, supervision, and payment of on-site leasing, management, security,

Case 3:11-cv-00994   Document 1   Filed 10/19/11   Page 11 of 37 PageID #: 11

and maintenance staff. At all times mentioned in this complaint, Defendant Greystar and its employees acted under color of state or federal law.

53.     Defendant **TriTex Real Estate Advisors, Inc.** ("TriTex") is a Delaware corporation headquartered in Atlanta, Georgia. TriTex purchased Clairmont in 2010. TriTex replaced Clairmont's previous management company with Greystar shortly after purchasing the property. At all times mentioned in this complaint, Defendant Tritex and its employees acted under color of state or federal law.

54.     Defendant **Tracy Hall** ("Defendant Hall") was at all times relevant to this action a Greystar regional manager with responsibility for Clairmont. She was under the employment and supervision of Defendant Greystar, its agents and employees. At all times mentioned in this complaint, Defendant Hall acted under color of state or federal law.

55.     Defendant **Crime Suppression Services** ("Defendant CSS") is a private security company headquartered in Nashville, Tennessee. Defendants Greystar and/or TriTex hired Defendant CSS to provide 24-hour on-site patrol and security services at Clairmont beginning in October 2010. CSS was on site and assisted in the October 20, 2010 raid at the Clairmont. At all times mentioned in this complaint, Defendant CSS and its employees acted under color of state or federal law.

56.     Defendant **Paul West** ("Defendant West") is the "Chief" and owner of Defendant CSS. Defendant West personally patrolled Clairmont in his CSS uniform with a firearm during and after October 2010. Defendant West performed armed security guard duties at Clairmont during October 2010, including, but not limited to, detaining individuals and contacting MNPD to request their arrest. Defendant West's security license expired on July 31, 2010. Upon information and belief, Defendant West knew of and assisted with the preparation

Case 3:11-cv-00994   Document 1   Filed 10/19/11   Page 12 of 37 PageID #: 12

for and execution of the October 20, 2010 raid. At all times mentioned in this complaint, Defendant West acted under color of state or federal law.

## STATEMENT OF FACTS

57.      Clairmont is comprised of multiple two and three-story residential apartment buildings, and has more than 200 rental units. On October 20, 2010, on information and belief, Clairmont's residents were predominately Latino.

### *Apartment F-106*

58.      Up to and including October 20, 2010, Plaintiffs Deras, Nuñez Escobar, Morteo Mendez, Palencia Sarmiento, and Quintanilla Gomez lived in Apartment F-106 at Clairmont.

59.      Apartment F-106 is a small, two-bedroom, one-bathroom apartment.

60.      Plaintiff Sanchez Villalobos lived just down the hall in Apartment F-102 with his fiancée, Plaintiff Custis.

61.      Plaintiff Sanchez Villalobos entered Apartment F-106 shortly before the apartment was raided.

62.      On information and belief, the F-106 Agents surrounded Apartment F-106 sometime after the raid of the apartment complex began.

63.      All doors and all windows in Apartment F-106 were closed and locked at the time ICE agents surrounded the apartment.

64.      One or more of the F-106 Agents in the interior hallway banged loudly on the door. One male voice yelled, "Police! Police!" Another voice shouted, "Policía! Policía!"

Case 3:11-cv-00994   Document 1   Filed 10/19/11   Page 13 of 37 PageID #: 13

65.     When no one answered the agents' shouts and bangs against the hallway door, one or more of the F-106 Agents slammed against it repeatedly and turned the door's handle vigorously, attempting to force the door open.

66.     When the banging began, Plaintiff Nuñez Escobar was on his bed. Plaintiff Palencia Sarmiento was lying asleep in his bed on the other side of the bedroom. Plaintiffs Quintanilla Gomez and Morteo Mendez joined Nuñez Escobar and Palencia Sarmiento in the first bedroom and closed the door behind them.

67.     When the banging on their door began, Plaintiffs Sanchez Villalobos and Deras went into the second bedroom. They closed the bedroom door behind them.

68.     As the occupants went into the apartment's bedrooms, one or more of the F-106 Agents slammed objects against the exterior side of each bedroom's window, attempting to break or pry them open.

69.     One or more of the F-106 Agents also shined flashlights through the bedroom windows.

70.     Plaintiff Sanchez Villalobos hid in a closet and Plaintiff Deras locked himself in the apartment's only bathroom.

71.     Without a search warrant, the existence of exigent circumstances, or consent to do so, several F-106 Agents forced their entry through the apartment's hallway door.

72.     Upon information and belief, the F-106 Agents who forced entry through the hallway door then unlocked and opened the rear entry to the apartment – a sliding glass door – to allow the entry of additional ICE agents standing outside on the patio.

73.     Several of the F-106 Agents stood outside the first bedroom. One of the agents shouted, "Abren la puerta, putos!" ("Open the door, bitches!").

74.     Seconds later, one of the F-106 Agents opened the door to the first bedroom and entered the bedroom with his gun drawn.

75.     Immediately after forcing open the door, the ICE agent yelled, "We have four here! Four Mexican sons of bitches!"

76.     The ICE agent who entered the bedroom pointed his gun at Plaintiffs Quintanilla Gomez, Morteo Mendez, Nuñez Escobar and Palencia Sarmiento. None of the Plaintiffs were armed, and none attempted to flee.

77.     Plaintiffs Quintanilla Gomez, Morteo Mendez, Nuñez Escobar and Palencia Sarmiento did not feel free to leave.

78.     While pointing his gun at Plaintiffs, the agent taunted Plaintiffs by saying, "You didn't think we could get in."

79.     Two or more additional F-106 Agents entered the first bedroom after the ICE agent who entered first. They entered with their weapons out of their holsters and in their hands.

80.     Three or more F-106 Agents grabbed Plaintiffs Palencia Sarmiento, Quintanilla Gomez, Morteo Mendez, and Nuñez Escobar, and forced them into the hallway of the apartment and then into the living room.

81.     Once in the living room, some of the F-106 agents placed Plaintiffs Palencia Sarmiento, Quintanilla Gomez, Morteo Mendez, and Nuñez Escobar in handcuffs.

82.     At no time before placing Plaintiffs Palencia Sarmiento, Quintanilla Gomez, Morteo Mendez, and Nuñez Escobar under arrest did any of the ICE agents ask any Plaintiff about his legal right to be in the United States.

83.     A short time later, Plaintiffs Palencia Sarmiento, Quintanilla Gomez, Morteo Mendez, and Nuñez Escobar were taken to transport vans waiting in the Clairmont parking lot.

*Second Bedroom*

84.     At approximately the same time that several of the F-106 Agents were entering the first bedroom, on information and belief, other F-106 Agents broke the window of the second bedroom from the outside and at least two of the F-106 Agents climbed into the apartment through the broken window without a warrant, without the existence of exigent circumstance and without consent to do so.

85.     One of the F-106 Agents pointed his gun at Plaintiff Sanchez Villalobos's head at close range. The agent had his finger on the trigger. Plaintiff Sanchez Villalobos was unarmed and was not attempting to flee.

86.     One of the F-106 Agents pulled Plaintiff Sanchez Villalobos's hands behind his back.

87.     While pointing a gun to the back of his head, one or more of the F-106 Agents forced Plaintiff Sanchez Villalobos through the apartment and out the front door into the interior hallway of Building F.

88.     One of the F-106 Agents handcuffed Plaintiff Sanchez Villalobos with his hands behind his back.

89.     One of the F-106 Agents forced Plaintiff Sanchez Villalobos to face the wall of the hallway.

90.     While two of the F-106 Agents forced Plaintiff Sanchez Villalobos out of the apartment, two different F-106 Agents kicked in the hallway door to the bathroom.

91.     One of the F-106 Agents entered the bathroom and immediately put his gun to Plaintiff Deras's head. Plaintiff Deras was unarmed and was not attempting to flee.

92.     While pointing a gun to the back of his head, one or more of the F-106 Agents forced Plaintiff Deras through the apartment and out the front door into the interior hallway of Building F.

93.     While in the hallway, one of the F-106 Agents handcuffed Plaintiff Sanchez Villalobos with his hands behind his back.

94.     One of the F-106 Agents asked Plaintiffs Sanchez Villalobos and Deras where they were from.

95.     Plaintiff Sanchez Villalobos did not respond. One of the F-106 Agents shouted at Plaintiff Sanchez Villalobos, "where the fuck are you from?" The agent then repeated the question once or twice more. Each time he asked the question, the agent pressed Plaintiff Sanchez Villalobos's head into a wall, causing his face to painfully strike the wall, which was made of stucco.

96.     Plaintiff Sanchez Villalobos told Plaintiff Deras not to answer the agent's question. One of the F-106 Agents shouted at Plaintiff Sanchez Villalobos to "shut the fuck up."

97.     Ultimately, out of fear, Plaintiff Sanchez Villalobos responded to the agent's question. Plaintiff Deras also responded to the agent's question because he was afraid.

98.     Plaintiff Sanchez Villalobos asked one of the F-106 Agents if ICE had a warrant. The agent said something to the effect of "we don't need a warrant, we're ICE." The

agent also gestured at his genitals and said something like "the warrant is coming out of my balls."

99.     Without a judicial warrant and without obtaining the consent of any of the residents, the F-106 Agents searched Apartment F-106.

100.     While in Apartment F-106, one or more of the F-106 Agents made numerous ethnically-derogatory and insulting statements in Spanish and in English, including:

    a.  "These fucking wetbacks!  They are stupid!"

    b.  "Assholes"

    c.  "Little Mexicans"

    d.  "Little Indians"

    e.  "Idiots"

101.     At no time did any apartment resident consent to the entry of ICE agents or any other law enforcement officer, nor did Defendants have a judicial warrant to search or enter the premises.

102.     No agent ever possessed or presented any warrant of any kind.

103.     Nothing illegal was found in F-106.  No criminal charges were filed against any of the Plaintiffs in Apartment F-106.

104.     Plaintiffs Deras, Nuñez Escobar, Morteo Mendez, Palencia Sarmiento, Quintanilla Gomez, and Sanchez Villalobos were each arrested, transported to the Nashville ICE office at 247 Venture Circle, and ultimately charged with alleged administrative violations of civil immigration law.

105.     Up to and including October 20, 2010, Plaintiffs Carlos Mendez Martinez and Juan Mendez Martinez lived in Clairmont Apartment F-106 with Rene Antonio Bu Portillo and Pedro Jacinto Rodriguez Cruz.

106.     Apartment I-4 is a small, two-bedroom, one-bathroom apartment.

107.     After detaining Pedro Jacinto Rodriquez Cruz and Rene Antonio Bu Portillo outside of the apartment, several of the I-4 Agents knocked on the door of Apartment I-4.

108.     None of the I-4 Agents identified themselves while knocking on the door.

109.     Believing Mr. Bu Portillo had locked himself out of the apartment, and unaware of what had taken place outside, Plaintiff Carlos Mendez-Martinez came to the door.

110.     He opened the door slightly to see who was knocking.

111.     As soon as Plaintiff Carlos Mendez-Martinez opened the door a few inches, he saw four or five men standing outside with black vests that said, "POLICE" and "ICE" on them.

112.     One of the I-4 Agents immediately forced the door open and pushed his way inside the apartment, followed by two or three more of the I-4 Agents.

113.     No agent ever asked Plaintiff Carlos Mendez Martinez for his permission to enter the apartment.

114.     At no time did any apartment resident consent to the entry of ICE agents or any other law enforcement officer, nor did Defendants have a warrant to search or enter the premises.

115.     No agent ever possessed or presented any warrant of any kind authorizing entry.

116.     One of the I-4 Agents instructed Plaintiffs Carlos Mendez Martinez and Juan Mendez Martinez to sit down as several I-4 Agents began searching the apartment.

117.     One of the I-4 Agent demanded identification from Plaintiffs.

118.     Neither Plaintiff felt free to refuse the ICE agent's demand for their identification.

119.     When Plaintiffs Carlos Mendez Martinez and Juan Mendez Martinez were unable to produce identification acceptable to the agents, they were arrested and ultimately charged with alleged administrative violations of civil immigration laws.

120.     Nothing illegal was found in the I-4 apartment. No criminal charges were filed against the Plaintiffs in Apartment I-4.

121.     Plaintiffs Carlos Mendez Martinez and Juan Mendez Martinez were transported to the Nashville ICE office at 247 Venture Circle.

### *Apartment E-101*

122.     Up to and including October 20, 2010, Plaintiff Salgado Figueroa lived at Clairmont with his wife and two daughters, his mother Lucina Figueroa, and his niece and nephew.

123.     On October 20, 2010, at approximately 4:30 p.m., Plaintiff Salgado Figueroa went to Apartment E-101, where his sister Juliana Miranda lived with her husband and four minor children.

124.     Apartment E-101 is a small, two-bedroom, one-bathroom apartment.

125.     Juliana, her husband, and their four minor children were at home. Also present in Apartment E-101 were Plaintiff Salgado Figueroa's mother, Lucina Figueroa, his

sister Jazmin Miranda, Ms. Miranda's friend Brian Escobar, and five of Plaintiff Salgado Figueroa's nieces and nephews.

126.     Shortly after arriving at Apartment E-101, Plaintiff Salgado Figueroa was in the kitchen when his mother told the children to come inside the apartment.

127.     The children came into the apartment through a sliding glass door that looked out on a small park at the center of several Clairmont buildings.

128.     Ms. Figueroa began to close the sliding glass door behind the children.

129.     Plaintiff Salgado Figueroa saw several men wearing bulletproof vests and with weapons in holsters standing outside. Some were wearing uniforms.

130.     One of the officers prevented Ms. Figueroa from closing the door to her home and asked for "Brian."

131.     On information and belief, Defendant Hardin was the officer who prevented Ms. Figueroa from closing the door and asked for "Brian."

132.     Ms. Figueroa told Defendant Hardin that Brian was in one of the bedrooms.

133.     Defendant Hardin placed his hand on his gun in his holster, and used his radio.

134.     Approximately six other MNPD officers and/or ICE agents entered the apartment through the sliding glass door. Each officer and/or agent had his or her hand on a holstered gun when he or she entered the apartment.

135.     Approximately four MNPD officers and/or ICE agents remained outside the apartment, standing on the patio, and visible to the people inside the apartment.

136.     Several officers and/or agents, including Defendant Hardin, went into one of the bedrooms and brought Brian Escobar out of the room.

137.     Other agents and/or officers forced everyone in the apartment to stay in the living room and kitchen area of the apartment, and forced most individuals to sit on the couch or stand with his or her back against a wall. All complied.

138.     Plaintiff Salgado Figueroa and the other individuals in the apartment did not feel free to leave.

139.     The children in the apartment were extremely frightened and upset, and were crying.

140.     One of the officers and/or agents asked Plaintiff Salgado Figueroa and his brother-in-law for identification. Plaintiff Salgado Figueroa provided identification to the officer or agent.

141.     The officer or agent instructed Plaintiff Salgado Figueroa and his brother-in-law to go outside to the patio.

142.     Plaintiff Salgado Figueroa did not feel free to refuse the officer or agent's instruction and complied.

143.     The officer or agent forced Plaintiff Salgado Figueroa and his brother-in-law to sit on chairs on the patio.

144.     Plaintiff Salgado Figueroa and his brother-in-law did not feel free to leave.

145.     The officer or agent demanded that Plaintiff Salgado Figueroa and his brother-in-law provide information about Brian Escobar and threatened that they would be arrested if they did not provide information.

146.     Plaintiff Salgado Figueroa and his brother-in-law did not provide information about Brian Escobar, and they were handcuffed, arrested and ultimately charged with alleged administrative violations of civil immigration law.

147.     They were led from the patio to a vehicle in the Clairmont parking lot.

148.     Plaintiff Salgado Figueroa's handcuffs were very tight and hurt his wrists. He asked one of the agents to loosen the handcuffs a little bit. The agent responded by threatening to make the handcuffs even tighter.

149.     Nothing illegal was found in Apartment E-101. No criminal charges were filed against Plaintiff Salgado Figueroa.

150.     Plaintiff Salgado Figueroa was transported to the Nashville ICE office at 247 Venture Circle.

### *Clairmont Parking Lot Near Building L*

151.     When the raid began, Plaintiffs Raxaco Cajbon, Cahuec Garcia, Lopez Raxico, and Juarez Cajbon were inside their residence, Apartment L-3.

152.     Plaintiffs Lopez Raxico, Juarez Cajbon, and Raxcaco Cajbon walked outside to get into Plaintiff Lopez Raxico's vehicle which was parked nearby in the complex's parking lot.

153.     Plaintiff Cahuec Garcia, who was inside the apartment changing his clothing, followed moments later.

154.     Almost instantly after Plaintiff Cahuec Garcia got into the vehicle, four or five of the Parking Lot Agents, without any suspicion of any unlawful activity or lawful justification, converged on the vehicle and surrounded it from the front, back, and on both sides.

155.     Several of the agents had their hands on their holstered pistols.

156.     One of the Parking Lot Agents tapped on Plaintiff Lopez Raxico's driver-side window with a flashlight. The agent motioned to Plaintiff Lopez Raxico to roll down the

window. Plaintiff Lopez Raxico complied. The agent motion for Plaintiff Lopez Raxico to put his hands on the steering wheel, and Plaintiff Lopez Raxico again complied.

157.    One of the Parking Lot Agents asked Plaintiff Lopez Raxico if he was in the country lawfully. Plaintiff Lopez did not respond.

158.    Without any lawful justification, Plaintiff Lopez Raxico was handcuffed through the open window, with his hands still on the steering wheel.

159.    Without any lawful justification, the other three occupants of the vehicle were then taken from the vehicle by one or more of the Parking Lot Agents, handcuffed, arrested and ultimately charged with alleged administrative violations of civil immigration law.

160.    Nothing illegal was found in the vehicle. No criminal charges were filed against Plaintiffs Raxaco Cajbon, Cahuec Garcia, Lopez Raxico, and Juarez Cajbon.

161.    Plaintiffs Raxaco Cajbon, Cahuec Garcia, Lopez Raxico, and Juarez Cajbon were transported to the Nashville ICE office at 247 Venture Circle.

162.    While handcuffed, Plaintiffs Raxcaco Cajbon, Cahuec Garcia, Lopex Raxico, and Juarez Cajbon were pushed into a very crowded white van. The van was so full of other detainees that it was difficult to close the van doors. After placing Plaintiffs inside the van, a nearby agent yelled "Goddamn Mexicans."

163.    While in the van, Plaintiff Juarez Cajbon complained to an ICE agent that his handcuffs were too tight and were causing him pain.

164.    On information and belief, the agent to whom Plaintiff Juarez Cajbon complained was Defendant Lim.

165.    Defendant Lim responded by making the handcuffs even tighter, causing Plaintiff Juarez Cajbon additional pain and discomfort.

166.    Defendant Lim also made Plaintiff Raxcaco Cajbon's handcuffs unnecessarily tight.

167.    At one point, one of the handcuffed men shouted to the agents and/or officers in the van, "Please don't treat us like animals."

168.    One of agents and/or officers told the arrestees to "Shut up" and then the agents and/or officers all laughed.

### *Apartment F-102*

169.    Up to and including October 20, 2010, Plaintiff Custis resided with Plaintiff Sanchez and Roberto Banales Ramirez in Apartment F-102.

170.    Plaintiff Custis was not at Clairmont when the raid began on October 20, 2010. She was running errands with her neighbor, Dany Flores, who is of Latino ethnicity, and their friend, Stacy Perez.

171.    When Plaintiff Custis arrived at Clairmont in her car, her vehicle was immediately surrounded by between four and six of the F-102 Agents, acting without lawful justification, who demanded identification from her, Mr. Flores, and Ms. Perez.

172.    One or more of the F-102 Agents demanded identification from Mr. Flores and when he could not produce identification acceptable to the agents, he was arrested immediately and ultimately charged with alleged administrative violations of civil immigration law.

173.    Several of the F-102 Agents detained and questioned Plaintiff Custis regarding her identity and her right to be at Clairmont. Plaintiff Custis did not feel free to leave during this detention and questioning.

Case 3:11-cv-00994   Document 1   Filed 10/19/11   Page 25 of 37 PageID #: 25

174.     After presenting identification and answering the agents' questions, Plaintiff Custis and Ms. Perez were allowed to walk back toward Plaintiff Custis' apartment. As they began walking down the sidewalk toward the apartment, they were joined by Mr. Banales Ramirez. While they were walking, between four and six F-102 Agents followed them.

175.     As Plaintiff Custis and her companions entered her residence through the sliding glass door, several of the F-102 Agents followed her in. Two more F-102 Agents stood outside on the patio.

176.     None of the agents who entered asked permission before coming into Apartment F-102.

177.     Plaintiff Custis asked, "Do you have a warrant?" One of the F-102 Agents who was already inside the apartment replied, "We're searching for fugitives."

178.     Another of the F-102 Agents then said to Plaintiff Custis, "You need to just be quiet, Ma'am. Be quiet and sit down right there." He motioned to the sofa. Plaintiff Custis, Mr. Banales Ramirez, and Ms. Perez sat down because they believed they had no choice.

179.     Plaintiff Custis did not feel free to leave during the encounter in the living room.

180.     Two of the F-102 Agents went into the kitchen. Other F-102 Agents searched through both bedrooms and the bathrooms.

181.     No fugitives were found in Plaintiff Custis' apartment. Nothing illegal was found in Plaintiff Custis' home. No criminal charges were filed against Plaintiff Custis.

### *Playground*

182.     On October 20, 2010, B.B., a 13 year old Latino child, was playing soccer at the playground of the Clairmont with his cousin.

183.     When he saw the ICE agents and MNPD officers arrive at the Clairmont, B.B. started walking home.

184.     As he was walking, B.B. was approached by ICE agent Defendant John Doe 13, who blocked B.B.'s path and ordered him to "stop right there."

185.     The agent demanded to know where he was from, where his was born, and his date of birth.

186.     Once B.B. told Defendant John Doe 13 that he was a United States citizen and that he was born in the United States, the agent said that B.B. was "okay" and that he was free to leave.

187.     B.B. was frightened during this detention and questioning and did not feel free to leave.

### *Conspiracy Between All Defendants*

188.     Beginning at least as early as September 23, 2010, Defendant Hall, on behalf of Defendants TriTex and Greystar, communicated to MNPD her intention to "clean house" and rid Clairmont of certain residents based on their ethnicity, skin color, physical appearance, and/or perceived national origin.

189.     In furtherance of her goal and at Defendant Hall's request, CSS employees or agents conducted surveillance of Clairmont apartments, residents, and guests beginning on or around October 4, 2010 and relayed information to Defendants Hall, Worsham, Hubbard and/or Hardin, including the license plate numbers, whereabouts, and comings and goings of Clairmont residents and guests.

190.     When they patrolled the Clairmont, CSS patrol cars and CSS employees and agents appeared indistinguishable from the vehicles and agents of several local, public law

enforcement agencies. Defendant CSS provided patrol vehicles equipped with lights and sirens; the driver's side door of each CSS patrol unit displayed a shield that read "Crime Suppression Unit" (which were nearly identical to the markings on MNPD police vehicles); CSS guards wore black or dark blue uniforms with shields, badges, rankings, and radios; and they displayed firearms, handcuffs, and other weapons.

191.    Also in furtherance of her goal, Defendant Hall communicated multiple times with MNPD Defendants, including, but not limited to, Defendants Hardin and Kemper, ICE Defendants, including, but not limited to, Defendants Hubbard and Worsham, and Defendant Paul West.

192.    Defendants Worsham, Hardin, Hall and West, met and/or communicated regularly in the weeks leading up the October 20, 2010.

193.    On information and belief, during these multiple conversations, Defendants Worsham, Hardin and Hall and others devised a plan to fulfill Defendant Hall's goal to "clean house" and rid Clairmont of the Latino residents.

194.    Upon information and belief, and at Defendant Hall's instruction, Defendant CSS officers made copies of apartment keys available to Defendant ICE agents and/or MNPD Officers before and during the October 20, 2010 raid to give Defendant ICE agents and/or MNPD officers access to the apartments.

195.    In furtherance of that agreement and under the guise of searching for alleged gang members, Defendants Hardin, Worsham, Hall and others jointly developed a plan to rid the apartment complex of Latino residents.

196.    As was the plan, no arrest or search warrants were ever obtained for any resident or alleged gang members at the Clairmont on October 20, 2010. Instead, without

judicial or administrative warrants, ICE Defendants, supported by MNPD Defendants (and with the knowledge and consent of Defendant Hall), stopped, detained and arrested over 20 individuals based on their ethnicity, skin color, and physical appearance without cause or consent and in violation of their constitutional rights.

197. Defendant CSS employees or agents accompanied Defendant ICE agents and MNPD officers around the Clairmont during the raid on October 20, 2010.

198. The conspiracy amongst all the Defendants to rid Clairmont of its Latino residents, and stop, detain and arrest individuals based on ethnicity, skin color, and physical appearance was planned and executed under color of state law, federal law, or both.

199. Following the October 20, 2010 raid, CSS guards informed residents that ICE was coming back soon to "finish the job."

200. As a result of the October 20, 2010 raid, many Latino Clairmont residents immediately vacated the premises, accomplishing Defendant Hall's stated goal.

### FIRST CAUSE OF ACTION
**Illegal Entry into Homes in Violation of Fourth Amendment**
*Home Raid Plaintiffs*
(Bivens *claim against Defendants F-106 Agents, I-4 Agents, and F-102 Agents*)

201. Home Raid Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

202. Defendants F-106 Agents, I-4 Agents, and F-102 Agents entered the Home Raid Plaintiffs' residences without search warrants or consent, and without probable cause or the presence of any exigent circumstances, in violation of the Plaintiffs' right to be free from unreasonable searches under the Fourth Amendment to the United States Constitution.

203. By entering the homes of Home Raid Plaintiffs without a valid search warrant, without consent, and without probable cause and exigency that would render such

intrusion reasonable, Defendants F-106 Agents, I-4 Agents, and F-102 Agents violated the Fourth Amendment rights of the Home Raid Plaintiffs.

204. As a result of the ICE Defendants' actions, the Home Raid Plaintiffs suffered damages, including, but not limited to, humiliation, fear, loss of liberty, and emotional distress.

## SECOND CAUSE OF ACTION
### Unreasonable Search of Homes in Violation of Fourth Amendment
### *Home Raid Plaintiffs*
### (Bivens *claim against Defendants F-106 Agents, I-4 Agents, and F-102 Agents*)

205. The Home Raid Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206. By searching the homes of Home Raid Plaintiffs without a valid search warrant, without consent, and without probable cause and exigency that would render such intrusion reasonable, Defendants F-106 Agents, I-4 Agents, and F-102 Agents violated the Fourth Amendment rights of the Home Raid Plaintiffs to be free from unreasonable searches and seizures, including unreasonable intrusions into their homes by government officers.

207. As a result of the ICE Defendants' actions, Home Raid Plaintiffs suffered damages, including, but not limited to, humiliation, fear, loss of liberty, and emotional distress.

## THIRD CAUSE OF ACTION
### Unreasonable Seizures in Violation of Fourth Amendment
### *All Plaintiffs*
### (Bivens *claim against all ICE Defendants*)

208. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

209. By detaining Plaintiffs without a valid deportation warrant, arrest warrant or probable cause and exigency that would render such seizures reasonable, the ICE Defendants violated the Fourth Amendment rights of Plaintiffs to be free from unreasonable seizures.

210.     As a result of these seizures, Plaintiffs suffered damages, including but not limited to, loss of liberty, humiliation, fear and emotional distress.

### FOURTH CAUSE OF ACTION
**Excessive Force in Violation of Fourth Amendment**
*Plaintiffs Sanchez Villalobos, Deras, Quintanilla Gomez, Morteo Mendez, Palencia Sarmiento, Nuñez Escobar, Juarez Cajbon and Raxcaco Cajbon*
(**Bivens** *claim against one or more of the F-106 Agents and Defendant Lim*)

211.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

212.     By needlessly pointing guns directly at Plaintiffs Sanchez Villalobos, Deras, Quintanilla Gomez, Morteo Mendez, Palencia Sarmiento, and Nunez Escobar, one or more of the F-106 Agents used excessive force against Plaintiffs Sanchez Villalobos, Deras, Quintanilla Gomez, Morteo Mendez, Palencia Sarmiento, and Nuñez Escobar, and in doing so, violated their Fourth Amendment rights to be free from the use of unreasonable or excessive force.

213.     By physically seizing Plaintiff Sanchez Villalobos and needlessly shoving his face into the wall, even though he had offered no resistance to the agents, one of the F-106 Agents used excessive force against Plaintiff Sanchez Villalobos, and in doing so, violated his Fourth Amendment rights to be free from the use of unreasonable or excessive force.

214.     By needlessly tightening the handcuffs of Plaintiffs Juarez Cajbon and Raxcaco Cajbon, Defendant Lim used excessive force against Plaintiffs, and in doing so, violated their Fourth Amendment rights to be free from the use of unreasonable or excessive force.

215.     As a result of the use of excessive force, Plaintiffs Sanchez Villalobos, Deras, Quintanilla Gomez, Morteo Mendez, Palencia Sarmiento, Nuñez Escobar, Juarez Cajbon and Raxcaco Cajbon suffered damages, including, but not limited to, loss of liberty, humiliation, pain, fear and emotional distress.

## FIFTH CAUSE OF ACTION
### Equal Protection in Violation of Fifth Amendment
### *All Plaintiffs*
### (Bivens *claim against all ICE Defendants*)

216.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

217.    ICE Defendants stopped, detained, searched, seized and/or arrested the Plaintiffs solely on the basis of the Plaintiffs' race, ethnicity, and/or perceived national origin, or association with individuals based on their race, ethnicity, and/or perceived national origin, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution. ICE Defendants did so knowingly and intentionally, and motivated by a discriminatory animus towards Plaintiffs' race, ethnicity, and/or perceived national origin.

218.    The actions of the ICE Defendants were intentional, malicious, reckless, and reflect a callous disregard or indifference to the civil rights of Plaintiffs.

219.    As a result of these seizures, Plaintiffs suffered damages, including but not limited to, loss of liberty, humiliation, fear and emotional distress.

## SIXTH CAUSE OF ACTION
### Conspiracy to Violate Fourth and Fourteenth Amendments
### *All Plaintiffs*
### (*§ 1983 claim against All Defendants*)

220.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

221.    The MNPD Defendants, the ICE Defendants, Defendant Hall (acting on behalf of Defendants Greystar and TriTex), Defendant CSS, and Defendant West, acting under color of state law, conspired with each other, worked in concert and agreed or reached a mutual

Case 3:11-cv-00994   Document 1   Filed 10/19/11   Page 32 of 37 PageID #: 32

understanding to rid Clairmont of Latino residents by entering Plaintiffs' homes, searching Plaintiffs' homes, and seizing Plaintiffs without probable cause.

222.     In furtherance of that agreement, no search, arrest or administrative warrants were obtained or presented to Plaintiffs.

223.     In furtherance of that agreement, Defendants worked together to subvert the probable cause and warrant requirements of the criminal justice system and accomplished Defendant Hall's goal of "cleaning house" and ridding Clairmont of its Latino residents by engaging MNPD and ICE's NVLFOT to assist in the execution of a large-scale, warrantless raid which resulted in the mass detention and/or arrest of individuals based on nothing other than their ethnicity, skin color, physical appearance, and/or perceived national origin, or association with individuals based on ethnicity, skin color, physical appearance, and/or perceived national origin, in violation of the Fourth and Fourteenth Amendments.

224.     Defendants acted willfully, deliberately, maliciously or with reckless disregard of the Plaintiffs' constitutional rights.

225.     As a result of the above-named Defendants' actions, the Plaintiffs suffered damages, including, but not limited to, loss of liberty, humiliation, fear and emotional distress.

**SEVENTH CAUSE OF ACTION**
**Conspiracy to Violate Fourth and Fifth Amendments**
*All Plaintiffs*
**(Bivens *claim against all Defendants*)**

226.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

227.     The MNPD Defendants, the ICE Defendants, Defendant Hall (acting on behalf of Defendants Greystar and TriTex), Defendant CSS, and Defendant West, acting under color of federal law, conspired with each other, worked in concert and agreed or reached a

mutual understanding to rid Clairmont of its Latino residents by entering Plaintiffs' homes, searching Plaintiffs' homes, and seizing Plaintiffs without probable cause.

228.    In furtherance of that agreement, no search, arrest or administrative warrants were obtained or presented to Plaintiffs.

229.    In furtherance of that agreement, Defendants worked together to subvert the probable cause and warrant requirements of the criminal justice system and accomplished Defendant Hall's goal of "cleaning house" and ridding Clairmont of its Latino residents by engaging MNPD and ICE's NVLFOT to assist in the execution of a large-scale, warrantless raid which resulted in the mass detention and/or arrest of individuals based on nothing other than their ethnicity, skin color, physical appearance, and/or perceived national origin, or association with individuals based on their ethnicity, skin color, physical appearance, and/or perceived national origin, in violation of the Fourth and Fifth Amendments.

230.    Defendants acted willfully, deliberately, maliciously or with reckless disregard of the Plaintiffs' constitutional rights.

231.    As a result of the above-named Defendants' actions, the Plaintiffs suffered damages, including, but not limited to, loss of liberty, humiliation, fear and emotional distress.

**EIGHTH CAUSE OF ACTION**
**Conspiracy to Deprive of Equal Protection Rights**
*All Plaintiffs*
**(42 U.S.C. § 1985(3)** *Claim Against all Defendants)*

232.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

233.    Defendants entered into an agreement to act in concert for the purpose of ridding Clairmont of its Latino residents, thereby depriving the Plaintiffs of the equal protection of the laws.  The conspiracy included, but was not limited to, an agreement to detain, interrogate,

and arrest Plaintiffs in furtherance of the plan and scheme to rid Clairmont of its Latino residents.

234.      Defendants performed several overt acts in furtherance of this conspiracy, including, but not limited to, planning the October 20, 2010 raid, facilitating the October 20, 2010 raid, unlawfully entering Plaintiffs' homes, usually by force, and arbitrarily detaining and arresting Plaintiffs without reasonable suspicion or probable cause justifying Defendants' actions.

235.      Defendants' plan and scheme, and the overt acts taken in furtherance of their conspiracy, were motivated by a discriminatory animus against Plaintiffs based on their ethnicity, physical appearance, and/or perceived national origin, and/or their association with individuals based on ethnicity, physical appearance, and/or perceived national origin.

236.      As a result of the conspiracy between and amongst the Defendants and the overt actions taken in furtherance thereof, Plaintiffs suffered damages, including, but not limited to, loss of liberty, humiliation, fear and emotional distress.

### NINTH CAUSE OF ACTION
**Violation of the Equal Protection Clause of the Fourteenth Amendment**
***All Plaintiffs***
**(§ 1983 *claim against all MNPD Defendants, and***
***Defendants Greystar, TriTex, Hall, CSS, and West)***

237.      Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

238.      With the assistance, encouragement, participation and facilitation of Defendants Greystar, TriTex, Hall, CSS, and West, the MNPD Defendants stopped, detained, searched, seized and/or arrested the Plaintiffs solely on the basis of the Plaintiffs' race, ethnicity, and/or perceived national origin, and/or Plaintiffs' association with individuals based on their

Case 3:11-cv-00994   Document 1   Filed 10/19/11   Page 35 of 37 PageID #: 35

race, ethnicity, and/or perceived national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. ICE Defendants did so knowingly and intentionally, and motivated by a discriminatory animus towards Plaintiffs' race, ethnicity, and/or perceived national origin.

239.     As a result of these seizures, Plaintiffs suffered damages, including, but not limited to, loss of liberty, humiliation, fear and emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court grant the following relief:

(a)     Enter a declaratory judgment that Defendants violated Plaintiffs' rights under the U.S. Constitution and civil rights laws;

(b)     Award Plaintiffs their nominal and actual damages;

(c)     Award Plaintiffs compensatory damages in an amount to be determined at trial, and hold Defendants jointly and severally liable for compensatory damages;

(d)     Award Plaintiffs punitive damages in an amount to be determined at trial;

(e)     Award Plaintiffs pre-judgment and post-judgment interest as allowed by law;

(f)     Award Plaintiffs their reasonable costs, expenses and attorneys' fees; and

(g)     Grant such further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues as to which a jury trial is available.

Dated:  October 19, 2011                              Respectfully submitted,

                                                      Tricia Herzfeld (BPR #026014)
                                                      Legal Director
                                                      ACLU Foundation of Tennessee
                                                      P.O. Box 120160
                                                      Nashville, TN 37212

*Page 36 of 37*

T: (615) 320-7143
*tricia@aclu-tn.org*

*On behalf of Attorneys for Plaintiffs*

Andre Segura*
Lee Gelernt*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
T: (212) 549-2660
*asegura@aclu.org*
*lgelernt@aclu.org*

Matthew J. Piers*
José J. Behar*
Jenna L. Miara*
Hughes, Socol, Piers, Resnick & Dym, Ltd.
70 W. Madison St., Suite 4000
Chicago, IL 60602
T: (312) 580-0100
*mpiers@hsplegal.com*
*jbehar@hsplegal.com*
*jmiara@hsplegal.com*

Cecillia D. Wang*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
T: (415) 343-0775
*cwang@aclu.org*

Elliott Ozment (BPR #4331)
Law Offices of Elliott Ozment
1214 Murfreesboro Pike
Nashville, TN 37217
T: (615) 321-8888
*elliott@ozmentlaw.com*

*ACLU-TN Cooperating Attorney*

\* *pro hac vice* admission forthcoming