**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

ANGEL ENRIQUE NUNEZ ESCOBAR, JESUS )
ANTONIO SANCHEZ VILLALOBOS, JORGE )
PALENCIA SARMIENTO, JAVIER ORLANDO )
DERAS, JUAN BAUTISTA  MENDEZ )
MARTINEZ, GERARDO MORTEO MENDEZ, )
ISAIAS RAXCACO CAJBON, EDUARDO )
CAHUEC GARCIA, MARVIN BENJAMIN )
LOPEZ RAXCACO, COSMER JUAREZ )
CAJBON, CARLOS ROBERTO MENDEZ )
MARTINEZ, DAVID SALGADO FIGUEROA, )
KIMBERLY CUSTIS, and SHANNON NORIEGA )
LUCAS, as parent and next friend of her child, )
B.B., a minor )
 )
       *Plaintiffs,* )
 )
   *v.* )      No. 3: 11-cv-994
 )      Judge Campbell/Bryant
 )
 )
LEE GAINES, Supervisory Detention and )
Deportation Officer, Immigration and Customs )
Enforcement ("ICE") Nashville Fugitive Operations )
Team ("NVLFOT"), CHRISTOPHER KOSHAR, )      JURY DEMAND
ICE Nashville Homeland Security Investigations )
 ("NVLHSI") Group Supervisor, ICE NVLFOT )
Deportation Officers LEE C. WORSHAM, )
BRADLEY EPLEY, ERIC H. LIM, and BRIAN )
ABRAHAMSON, ICE NVLHSI Senior Special )
Agents PATRICK RYAN HUBBARD, )
JONATHAN ANDREW HENDRIX, and )
STEPHEN F. MCCORMICK, ICE NSVHSI )
Special Agents WAYNE DICKEY and )
CHRISTOPHER LANE, DANIEL HASTINGS, )
ICE Immigration Enforcement Agent, )
GARY KEMPER, Sergeant, Metropolitan )
Nashville Police Department ("MNPD") Gang )
Unit, SHAUN HARDIN, Detective, MPND Gang )
Unit, GREYSTAR MANAGEMENT SERVICES, )
L.P., GREYSTAR REAL ESTATE PARTNERS, )
LLC, TRITEX  REAL ESTATE ADVISORS, )
INC., TRIMONT REAL ESTATE ADVISORS, )

*Page **1** of **40***

INC., TRACY HALL, CRIME SUPPRESSION      )
SERVICES,  and PAUL WEST                        )
                                                                        )
       *Defendants.*                                        )

## THIRD AMENDED COMPLAINT

1.            Beginning in early 2010, the Clairmont Apartment complex in Nashville, Tennessee ("Clairmont") fell into disrepair, was sold in bankruptcy proceedings and taken over by a company that allowed conditions to deteriorate in the Clairmont units in an effort to chase away its current residents, many of whom were of Latino ethnicity.  The new management company that took over Clairmont was hired to "clean house, and get the Hispanics gone." Within the course of one rental cycle, the management company abandoned its on-site offices, hired a notoriously harsh security company, allowed 2 buildings to lose hot water, began demanding social security numbers, and conspired to effectuate a large-scale, highly coordinated immigration/law enforcement raid that led to at least 20 immigration related detentions (but no criminal arrests).  The consequences of these and other actions resulted in the mass exodus of Latino residents from Clairmont.

2.            This is an action by 14 individuals (collectively, "Plaintiffs") who were victims of the large-scale, warrantless raid by Immigration and Customs Enforcement ("ICE"), the Metropolitan Nashville Police Department ("MNPD"), and private security guards at Clairmont on October 20, 2010 ("Clairmont raid").

3.            All but one of the Plaintiffs are Latino, and all were residents of Clairmont on October 20, 2010.  Each plaintiff was at Clairmont on the evening of October 20, 2010, when a team of ICE agents, MNPD officers, and private security guards raided numerous private residences without search warrants or consent from the residents and without the existence of any exigent circumstances that would justify a warrantless search.  Once inside the homes,

agents and officers detained the occupants without judicial warrant or other legal justification, searched throughout the homes, and arrested several Plaintiffs without probable cause. Officers and agents also detained and interrogated, and in some cases arrested without any lawful justification, Plaintiffs as they sat in their lawfully parked cars or played outside.

4.        Without cause or reasonable suspicion, ICE agents and MNPD officers detained, interrogated and arrested Clairmont residents based on their race, ethnicity, skin color and/or perceived national origin.

5.        Some of the Plaintiffs were subjected to physical and verbal abuse; others were interrogated, threatened or had firearms pointed at them. Many Plaintiffs were subjected to this illegal conduct in front of their families, including small children. Each Plaintiff suffered and continues to suffer from the effects of that abusive conduct.

6.        No criminal charges have been brought against any of the Plaintiffs.

7.        Tracy Hall, acting on behalf of Defendants Greystar Management Services, L.P., Greystar Real Estate Partners, LLC, TriMont Real Estate Advisors, Inc. and TriTex Real Estate Advisors, Inc., conspired with the ICE agents, MNPD officers, Crime Suppression Services, and Paul West to aid in the unlawful raid. Hall was motivated by animus toward Plaintiffs based on their race, ethnicity, skin color, and/or perceived national origin.

8.        Plaintiffs bring this action to secure and vindicate their rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and federal civil rights laws.

Case 3:11-cv-00994   Document 329   Filed 01/28/14   Page 3 of 40 PageID #: 3831

## JURISDICTION AND VENUE

9. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. §§ 2201–02 (declaratory relief). Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and also under 28 U.S.C. § 1391(e)(3), because at least one of the Plaintiffs resides in this district.

## PARTIES

### Plaintiffs

#### *Apartment F-106*

10. Plaintiff **Angel Enrique Nuñez Escobar** ("Plaintiff Nuñez Escobar") was a resident of Nashville on October 20, 2010 and is of Latino ethnicity. He resided in Apartment F-106 at Clairmont on October 20, 2010.

11. Plaintiff **Jorge Palencia Sarmiento** ("Plaintiff Palencia Sarmiento") is a resident of Nashville and of Latino ethnicity. He resided in Apartment F-106 at Clairmont on October 20, 2010.

12. Plaintiff **Javier Orlando Deras** ("Plaintiff Deras") was a resident of Nashville on October 20, 2010. He is of Latino ethnicity. He resided in Apartment F-106 at Clairmont on October 20, 2010.

13. Plaintiff **Gerardo Morteo Mendez** ("Plaintiff Morteo Mendez") is a resident of Nashville and of Latino ethnicity. He resided in Apartment F-106 at Clairmont on October 20, 2010.

14.     Plaintiff **Jesus Antonio Sanchez Villalobos** ("Plaintiff Sanchez Villalobos") is a resident of Nashville and of Latino ethnicity. He resided in Apartment F-102 at Clairmont on October 20, 2010.

### *Apartment I-4*

15.     Plaintiff **Carlos Roberto Mendez Martinez** ("Plaintiff Carlos Mendez Martinez") is a resident of Nashville and of Latino ethnicity. He resided in Apartment I-4 at Clairmont on October 20, 2010.

16.     Plaintiff **Juan Bautista Mendez Martinez** ("Plaintiff Juan Mendez Martinez") was a resident of Nashville on October 20, 2010. He is of Latino ethnicity. He resided in Apartment I-4 at Clairmont on October 20, 2010.

### *Apartment E-101*

17.     Plaintiff **David Salgado Figueroa** ("Plaintiff Salgado Figueroa") was a resident of Nashville on October 20, 2010, and is currently a resident of Antioch, Tennessee. He is of Latino ethnicity. He resided at Clairmont on October 20, 2010.

### *Clairmont Parking Lot Near Building L*

18.     Plaintiff **Isaias Raxcaco Cajbon** ("Plaintiff Raxcaco Cajbon") is a resident of Nashville and of Latino ethnicity. He resided in Apartment L-3 at Clairmont on October 20, 2010.

19.     Plaintiff **Eduardo Cahuec Garcia** ("Plaintiff Cahuec Garcia) is a resident of Nashville and of Latino ethnicity. He resided in Apartment L-3 at Clairmont on October 20, 2010.

20.　　　Plaintiff **Marvin Benjamin Lopez Raxcaco** ("Plaintiff Lopez Raxcaco") is a resident of Nashville and of Latino ethnicity. He resided in Apartment L-3 at Clairmont on October 20, 2010.

21.　　　Plaintiff **Cosmer Juarez Cajbon** ("Plaintiff Juarez Cajbon") was a resident of Nashville on October 20, 2010. He is of Latino ethnicity. He resided in Apartment L-3 at Clairmont on October 20, 2010.

22.　　　Plaintiffs Nuñez Escobar, Palencia Sarmiento, Deras, Morteo Mendez, Sanchez Villalobos, Carlos Mendez Martinez, Juan Mendez Martinez, Salgado Figueroa, Raxcaco Cajbon, Cahuec Garcia, Lopez Raxcaco, and Juarez Cajbon shall collectively be referred to as "Arrestee Plaintiffs."

### *Apartment F-102*

23.　　　Plaintiff **Kimberly Custis** ("Plaintiff Custis") is a Nashville resident and United States citizen. She resided in Apartment F-102 at Clairmont on October 20, 2010.

24.　　　Plaintiffs Nuñez Escobar, Palencia Sarmiento, Deras, Morteo Mendez, Carlos Mendez Martinez, Juan Mendez Martinez, and Custis shall collectively be referred to as "Home Raid Plaintiffs."

### *Playground*

25.　　　Plaintiff **Shannon Noriega Lucas** ("Plaintiff Noriega Lucas") is a Nashville resident and United States citizen who brings this action as parent and next friend of her child **B.B.**, a Latino child who is also a United States citizen. B.B., a minor, was playing soccer at the Clairmont playground when he was unlawfully stopped, detained, and interrogated by an ICE agent on October 20, 2010.

**ICE Defendants**

26.      Defendant **Lee Gaines** ("Defendant Gaines") was at all times relevant to this action the Supervisory Detention and Deportation Officer with the ICE Nashville Fugitive Operations Team ("NVLFOT"). He was an on-site supervisor of the Clairmont raid. Defendant Gaines is sued in his individual capacity.

27.      Defendant **Christopher Koshar** ("Defendant Koshar") was at all times relevant to this action the Group Supervisor of Nashville Homeland Security Investigations ("NVLHSI"). Homeland Security Investigations ("HSI") is the investigative arm of ICE. He was an on-site supervisor of the Clairmont raid. Defendant Koshar is sued in his individual capacity.

28.      Defendant **Lee C. Worsham** ("Defendant Worsham") was at all times relevant to this action a Deportation Officer of the NVLFOT. He participated in the planning and execution of the Clairmont raid. Defendant Worsham is sued in his individual capacity.

29.      Defendant **Bradley Epley** ("Defendant Epley") was at all times relevant to this action a Deportation Officer of the NVLFOT. He participated in the Clairmont raid. Defendant Epley is sued in his individual capacity.

30.      Defendant **Eric H. Lim** ("Defendant Lim") was at all times relevant to this action a Deportation Officer of the NVLFOT. He participated in the Clairmont raid. Defendant Lim is sued in his individual capacity.

31.      Defendant **Brian Abrahamson** ("Defendant Abrahamson") was at all times relevant to this action a Deportation Officer of the NVLFOT. He participated in the Clairmont raid. Defendant Abrahamson is sued in his individual capacity.

32.      Defendant **Patrick Ryan Hubbard** ("Defendant Hubbard") was at all times relevant to this action a Senior Special Agent of the NVLHSI group.  He participated in the planning and execution of the Clairmont raid.  Defendant Hubbard is sued in his individual capacity.

33.      Defendant **Jonathon Andrew Hendrix** ("Defendant Hendrix") was at all times relevant to this action a Senior Special Agent of the NVLHSI group.  He participated in the Clairmont raid.  Defendant Hendrix is sued in his individual capacity.

34.      Defendant **Stephen F. McCormick** ("Defendant McCormick") was at all times relevant to this action a Senior Special Agent of the NVLHSI group.  He participated in the Clairmont raid.  Defendant McCormick is sued in his individual capacity.

35.      Defendant **Wayne Dickey** ("Defendant Dickey") was at all times relevant to this action a Special Agent of the NVLHSI group.  He participated in the Clairmont raid. Defendant Dickey is sued in his individual capacity.

36.      Defendant **Christopher Lane** ("Defendant Lane") was at all times relevant to this action a Special Agent of the NVLHSI group.  He participated in the Clairmont raid. Defendant Lane is sued in his individual capacity.

37.      Defendant **Daniel Hastings** ("Defendant Hastings") was at all times relevant to this action an ICE Immigration Enforcement Agent based in Nashville, Tennessee.  He took part in the Clairmont raid and the arrest, processing, and detention of Plaintiffs.  Defendant Hastings is sued in his individual capacity.

38.      Defendants Dickey, Hendrix, Hubbard, Gaines, Lane, Lim, and McCormick, shall collectively be referred to as "F-106 Agents."

39.     Defendants Epley, Hendrix, and McCormick, shall collectively be referred to as "I-4 Agents."

40.     Defendants Gaines, Hubbard, Koshar, Lane, and Worhsam shall collectively be referred to as "E-101 Agents."

41.     Defendants Lim, Gaines, and Worsham, and shall collectively be referred to as "Parking Lot Agents."

42.     Defendants Lane, McCormick, and Worsham shall collectively be referred to as "F-102 Agents."

## MNPD Defendants

43.     Defendant **Sergeant Gary Kemper** ("Defendant Kemper") was at all times relevant to this action a supervisory officer of the MNPD's Gang Unit.  He participated in planning, supervising, and executing the Clairmont raid.  He is sued in his individual capacity.

44.     Defendant **Shaun Hardin** ("Defendant Hardin") was at all times relevant to this action a detective with the MNPD's Gang Unit.  He participated in the planning and execution of the Clairmont raid.  He is sued in his individual capacity.

## Private Party Defendants

45.     Defendants **Greystar Management Services, L.P. and Greystar Real Estate Partners, LLC** (collectively, "Greystar") are headquartered in Charleston, South Carolina.  At all times relevant to this action, Greystar managed Clairmont.  Greystar's management responsibilities at Clairmont included the hiring, training, supervision, and payment of on-site leasing, management, security, and maintenance staff.

46.     Defendant **TriMont Real Estate Advisors, Inc.** ("TriMont') is a Georgia corporation headquartered in Atlanta, Georgia.  Defendant **TriTex Real Estate Advisors, Inc.**

("TriTex") is a Delaware corporation headquartered in Atlanta, Georgia. TriTex is wholly owned by TriMont. TriTex, acting through or in conjunction with TriMont, assumed duties as the asset manager and *de facto* owner of the Clairmont in 2010. TriTex, acting through or in conjunction with TriMont, replaced Clairmont's previous management company with Greystar shortly after assuming asset management responsibilities for the property.

47.     Defendant **Tracy Hall** was a Greystar senior property manager with responsibility for Clairmont. She was under the employment and supervision of Defendant Greystar, its agents and employees.

48.     Defendant **Crime Suppression Services** ("Defendant CSS") is a private security company headquartered in Nashville, Tennessee. Defendants Greystar, TriMont and/or TriTex hired Defendant CSS to provide 24-hour on-site patrol and security services at Clairmont beginning in October 2010. CSS was on site and participated in the Clairmont raid.

49.     Defendant **Paul West** ("Defendant West") is the owner of Defendant CSS. Defendant West personally patrolled Clairmont in his CSS uniform with a firearm during and after October 2010. Defendant West performed armed security guard duties at Clairmont during October 2010, including, but not limited to, detaining individuals and contacting MNPD to request their arrest. Defendant West's security license expired on July 31, 2010.

50.     During all times mentioned in this Complaint, all Defendants acted under color of federal and/or state law.

## STATEMENT OF FACTS

51.        Clairmont is comprised of multiple two and three-story residential apartment buildings, and has more than 200 rental units. During all times mentioned in this Complaint, Clairmont's residents were predominately Latino.

### *Apartment F-106*

52.        Up to and including October 20, 2010, Plaintiffs Deras, Nuñez Escobar, Morteo Mendez, and Palencia Sarmiento and Jose Arsenio Quintanilla Gomez lived in Apartment F-106 at Clairmont.

53.        Apartment F-106 is a small, two-bedroom, one-bathroom apartment.

54.        Plaintiff Sanchez Villalobos lived just down the hall in Apartment F-102 with his fiancée, Plaintiff Custis.

55.        Plaintiff Sanchez Villalobos entered Apartment F-106 shortly before the apartment was raided.

56.        The F-106 Agents (Defendants Dickey, Hendrix, Hubbard, Gaines, Lane, Lim, and McCormick) and other ICE agents surrounded Apartment F-106 sometime after the raid of the apartment complex began.

57.        All doors and all windows in Apartment F-106 were closed and locked at the time the F-106 Agents surrounded the apartment.

58.        One or more of the F-106 Agents in the interior hallway banged loudly on the door. One male voice yelled, "Police! Police!" Others shouted things including, "Policía! Policía!"

59.     When no one answered the agents' shouts and bangs against the hallway door, one or more of the F-106 Agents slammed against it repeatedly and turned the door's handle vigorously, attempting to force the door open.

60.     When the banging began, Plaintiff Nuñez Escobar was on his bed. Plaintiff Palencia Sarmiento was lying asleep in his bed on the other side of the bedroom. Plaintiff Morteo Mendez and Quintanilla Gomez joined Nuñez Escobar and Palencia Sarmiento in the first bedroom and closed the door behind them.

61.     Plaintiffs Sanchez Villalobos and Deras went into the second bedroom. They closed the bedroom door behind them.

62.     One or more of the F-106 Agents slammed objects against the exterior side of each bedroom's window, attempting to break or pry them open.

63.     One or more of the F-106 Agents also shined flashlights through the bedroom windows.

64.     From the second bedroom, Plaintiff Sanchez Villalobos could see flashlights shining through the bedroom window. Plaintiff Sanchez Villalobos then hid in a closet and Plaintiff Deras locked himself in the apartment's only bathroom.

65.     Without a search warrant, the existence of exigent circumstances, or consent to do so, Defendants Dickey and McCormick climbed into the apartment through the window of the second bedroom.

66.      Defendant Dickey then unlocked and opened the rear entry to the apartment – a sliding glass door – to allow the entry of the Defendants and agents who were outside on the patio.

67.    Several of the F-106 Agents stood outside the first bedroom.  One of the agents shouted, "Abren la puerta, putos!" ("Open the door, bitches!").

68.    Defendant McCormick forced open the door to the first bedroom and entered the bedroom with his gun drawn.

69.    Immediately after forcing open the door to the first bedroom, Defendant McCormick yelled things including, "We have four here!  Four Mexican sons of bitches!"

70.    Defendant McCormick pointed his gun at Plaintiffs Morteo Mendez, Nuñez Escobar, and Palencia Sarmiento and at Quintanilla Gomez.  None of the Plaintiffs (or Quintanilla Gomez) were armed, and none attempted to flee.

71.    Plaintiffs Morteo Mendez, Nuñez Escobar, and Palencia Sarmiento did not feel free to leave.

72.    While pointing his gun at Plaintiffs and Quintanilla Gomez, Defendant McCormick taunted Plaintiffs by saying, something to the effect of "You didn't think we could get in."

73.    Defendant Hendrix and two other ICE Agents entered the first bedroom after Defendant McCormick.  They entered with their weapons out of their holsters and in their hands.

74.    Three or more F-106 Agents grabbed Plaintiffs Palencia Sarmiento,  Morteo Mendez, and Nuñez Escobar and Quintanilla Gomez, and forced them into the hallway of the apartment and then into the living room.

75.    Once in the living room, some of the F-106 Agents placed Plaintiffs Palencia Sarmiento, Morteo Mendez, and Nuñez Escobar and Quintanilla Gomez in handcuffs.

76.     At no time before placing Plaintiffs Palencia Sarmiento, Morteo Mendez, and Nuñez Escobar and Quintanilla Gomez under arrest did any of the F-106 Agents ask any Plaintiff about his legal right to be in the United States.

77.     A short time later, Plaintiffs Palencia Sarmiento, Morteo Mendez, and Nuñez Escobar and Quintanilla Gomez were taken to transport vans waiting in the Clairmont parking lot.

*Second Bedroom*

78.     Around the time that Defendants McCormick and Hendrix and other ICE Agents entered the first bedroom, Defendant Dickey kicked down the door to the apartment's only bathroom.

79.     Defendants Dickey and Lane entered the bathroom. Defendant Dickey put his gun to Plaintiff Deras's head. Plaintiff Deras was unarmed and was not attempting to flee.

80.     While pointing a gun to the back of Plaintiff Deras's head, Defendants Dickey and Lane forced him through the apartment and out the front door into the interior hallway of Building F where he was held by one or more agents.

81.     Then, Defendant Dickey and/or Lane located plaintiff Sanchez Villalobos hiding in a closet and pointed his gun at Plaintiff Sanchez Villalobos's head at close range. The agent had his finger on the trigger. Plaintiff Sanchez Villalobos was unarmed and was not attempting to flee.

82.     Defendant Dickey and/or Lane pulled Plaintiff Sanchez Villalobos's hands behind his back.

83.     While pointing a gun to the back of his head, Defendant Dickey or Lane forced Plaintiff Sanchez Villalobos through the apartment and out the front door into the interior

hallway of Building F. Around this time, one of the F-106 Agents said something to the effect of "these fucking wetbacks didn't think we were going to be able to come in."

84.      Defendant Dickey or Lane handcuffed Plaintiff Sanchez Villalobos with his hands behind his back.

85.      One of the F-106 Agents forced Plaintiff Sanchez Villalobos to face the wall of the hallway.

86.      One of the F-106 Agents asked Plaintiffs Sanchez Villalobos and Deras where they were from.

87.      Plaintiff Sanchez Villalobos did not respond.  One of the F-106 Agents shouted at Plaintiff Sanchez Villalobos, "where the fuck are you from?"  The agent then shouted the question once or twice more.  Each time he asked the question, the agent pressed Plaintiff Sanchez Villalobos's head into a wall, causing his face to painfully strike the wall, which was made of stucco.

88.      Plaintiff Sanchez Villalobos told Plaintiff Deras not to answer the agent's question.  One of the F-106 Agents shouted at Plaintiff Sanchez Villalobos to "shut the fuck up."

89.      Ultimately, out of fear, Plaintiff Sanchez Villalobos responded to the agent's question.  Plaintiff Deras also responded to the agent's question because he was afraid.

90.      Plaintiff Sanchez Villalobos asked one of the F-106 Agents if ICE had a warrant.  The agent said something to the effect of "we don't need a warrant, we're ICE."  The agent also gestured at his genitals and said something like "the warrant is coming out of my balls."

91.      Without a judicial warrant and without obtaining the consent of any of the residents, the F-106 Agents and other ICE agents searched Apartment F-106.

92. While in Apartment F-106, one or more of the F-106 Agents made numerous ethnically-derogatory and insulting statements in Spanish and in English, including:

   a. "These fucking wetbacks! They are stupid!"

   b. "Assholes"

   c. "Little Mexicans"

   d. "Little Indians"

   e. "Idiots"

93. At no time did any apartment resident or owner consent to the entry of F-106 Agents or any other law enforcement officer, nor did Defendants have a judicial warrant to search or enter the premises.

94. No agent ever possessed or presented any warrant of any kind.

95. Nothing illegal was found in Apartment F-106. No criminal charges were filed against any of the Plaintiffs in Apartment F-106.

96. Plaintiffs Deras, Nuñez Escobar, Morteo Mendez, Palencia Sarmiento, and Sanchez Villalobos were each arrested, transported to the Nashville ICE office at 247 Venture Circle, and ultimately charged with alleged administrative violations of civil immigration law.

### *Apartment I-4*

97. Up to and including October 20, 2010, Plaintiffs Carlos Mendez Martinez and Juan Mendez Martinez lived in Clairmont Apartment I-4 with Rene Antonio Bu Portillo and, at times, Pedro Jacinto Rodriguez Cruz.

98. Apartment I-4 is a small, two-bedroom, two-bathroom apartment.

99. The I-4 Agents (Defendants Epley, Hendrix, and McCormick) and MNPD Officer Boelter knocked on the door of Apartment I-4.

100.    Plaintiff Mendez Martinez opened the door slightly to see who was knocking.

101.    As soon as Plaintiff Carlos Mendez-Martinez opened the door a few inches, he saw four men standing outside with black vests that said, "POLICE" and "ICE" on them.

102.    One of the I-4 Agents forced the door open and pushed his way inside the apartment, followed by one or two of the I-4 Agents and MNPD officer Boelter.

103.    No agent ever asked Plaintiff Carlos Mendez Martinez for his permission to enter the apartment.

104.    At no time did any apartment resident or owner consent to the entry of I-4 Agents or any other law enforcement officer, nor did Defendants have a warrant to search or enter the premises.

105.    No agent ever possessed or presented any warrant of any kind authorizing entry.

106.    One of the I-4 Agents instructed Plaintiffs Carlos Mendez Martinez and Juan Mendez Martinez to sit down as several I-4 Agents began searching the apartment.

107.    One of the I-4 Agents demanded identification from Plaintiffs Carlos Mendez Martinez and Juan Mendez Martinez.

108.    Neither Plaintiff Carlos Mendez Martinez nor Plaintiff Juan Mendez Martinez felt free to refuse the I-4 Agent's demand for their identification.

109.    When Plaintiffs Carlos Mendez Martinez and Juan Mendez Martinez were unable to produce identification acceptable to the agents, they were arrested.

110.    Nothing illegal was found in Apartment I-4. No criminal charges were filed against the Plaintiffs in Apartment I-4.

111.     Plaintiffs Carlos Mendez Martinez and Juan Mendez Martinez were transported to the Nashville ICE office at 247 Venture Circle, and ultimately charged with alleged administrative violations of civil immigration law.

### *Apartment E-101*

112.     Up to and including October 20, 2010, Plaintiff Salgado Figueroa lived at Clairmont with his wife and two minor daughters, his mother Lucina Figueroa, and his niece and nephew.

113.     On October 20, 2010, at approximately 4:30 p.m., Plaintiff Salgado Figueroa went to Apartment E-101, where his sister Juliana Miranda lived with her husband and four minor children.

114.     Apartment E-101 is a small, two-bedroom, one-bathroom apartment.

115.     Juliana, her husband, and their four minor children were at home. Also present in Apartment E-101 were Plaintiff Salgado Figueroa's mother, Lucina Figueroa, his sister Jazmin Miranda, Ms. Jazmin Miranda's friend Bryant Escobar, and five of Plaintiff Salgado Figueroa's nieces and nephews.

116.     Plaintiff Salgado Figueroa and the children came into Apartment E-101 through a sliding glass door that looked out on a small park at the center of several Clairmont buildings. .

117.     Ms. Figueroa began to close the sliding glass door behind Plaintiff Salgado Figueroa and the children.

118.     Plaintiff Salgado Figueroa saw several men wearing bulletproof vests and with weapons in holsters standing outside. Some were wearing uniforms.

119.     Defendant Hardin prevented Ms. Figueroa from closing the door to her home and asked for "Brian."

120.     Ms. Figueroa told Defendant Hardin that "Brian" was in one of the bedrooms.

121.     Defendant Hardin placed his hand on his gun in his holster, and used his radio.

122.     Some of the E-101 Agents, Defendant Hardin, and other agents and/or officers entered the apartment through the sliding glass door.  The E-101 Agents, Defendant Hardin, and each agent and/or officer had his or her hand on a holstered gun when he or she entered the apartment.

123.     Approximately four MNPD officers and/or E-101 Agents remained outside the apartment, standing on the patio, and visible to the people inside the apartment.

124.     Several agents and/or officers and/or E-101 Agents, including Defendant Hardin, went into one of the bedrooms and brought Bryant Escobar out of the room.

125.     Other E-101 Agents, other agents, and/or officers forced everyone in the apartment to stay in the living room and kitchen area of the apartment, and forced most individuals to sit on the couch or stand with his or her back against a wall.  All complied.

126.     Plaintiff Salgado Figueroa and the other individuals in the apartment did not feel free to leave.

127.     The children in the apartment were extremely frightened and upset, and were crying.

128.     Defendant Hardin and/or Defendant Worsham asked Plaintiff Salgado Figueroa and his brother-in-law for identification.     Plaintiff Salgado Figueroa provided identification to the officer or agent.

129.     Defendant Hardin and/or Defendant Worsham instructed Plaintiff Salgado Figueroa and his brother-in-law to go outside to the patio.

130.     Plaintiff Salgado Figueroa did not feel free to refuse Defendant Hardin's and/or Defendant Worsham's instruction and complied.

131.     Defendant Hardin and/or Defendant Worsham forced Plaintiff Salgado Figueroa and his brother-in-law to sit on chairs on the patio.

132.     Plaintiff Salgado Figueroa and his brother-in-law did not feel free to leave.

133.     Defendant Hardin and/or Defendant Worsham demanded that Plaintiff Salgado Figueroa and his brother-in-law provide information about Bryant Escobar and threatened that they would be arrested if they did not provide information.

134.     Plaintiff Salgado Figueroa and his brother-in-law did not provide information about Bryant Escobar, and they were handcuffed, arrested and ultimately charged with alleged administrative violations of civil immigration law.

135.     They were led from the patio to a vehicle in the Clairmont parking lot.

136.     Plaintiff Salgado Figueroa's handcuffs were very tight and hurt his wrists. He asked one of the E-101 Agents to loosen the handcuffs a little bit.  The E-101 Agent responded by threatening to make the handcuffs even tighter.

137.     Nothing illegal was found in Apartment E-101.  No criminal charges were filed against Plaintiff Salgado Figueroa.

138.     Plaintiff Salgado Figueroa was transported to the Nashville ICE office at 247 Venture Circle.

### *Clairmont Parking Lot Near Building L*

139.     When the raid began, Plaintiffs Raxcaco Cajbon, Cahuec Garcia, Lopez Raxcaco, and Juarez Cajbon were inside their residence, Apartment L-3.

140.     Plaintiffs Lopez Raxcaco, Juarez Cajbon, and Raxcaco Cajbon walked outside to get into Plaintiff Lopez Raxcaco's vehicle which was parked nearby in the complex's parking lot.

141.     Plaintiff Cahuec Garcia, who was inside the apartment changing his clothing, followed moments later.

142.     Almost instantly after Plaintiff Cahuec Garcia got into the vehicle, the Parking Lot Agents (Defendants Lim, Gaines, and Worsham), without any suspicion of any unlawful activity or lawful justification, converged on the vehicle and surrounded it.

143.     Several of the Parking Lot Agents had their hands on their holstered pistols.

144.     Defendant Worsham tapped on Plaintiff Lopez Raxcaco's driver-side window with a flashlight. Defendant Worsham motioned to Plaintiff Lopez Raxcaco to roll down the window. Plaintiff Lopez Raxcaco complied. Defendant Worsham motioned for Plaintiff Lopez Raxcaco to put his hands on the steering wheel, and Plaintiff Lopez Raxcaco again complied.

145.     Without any lawful justification, Plaintiff Lopez Raxcaco was handcuffed through the open window, with his hands still on the steering wheel.

146.     Defendant Worsham asked Plaintiff Lopez Raxcaco if he was in the country lawfully. Plaintiff Lopez did not respond.

147. Without any lawful justification, the other three occupants of the vehicle were handcuffed, taken from the vehicle by one or more of the Parking Lot Agents, and arrested.

148. Nothing illegal was found in the vehicle. No criminal charges were filed against Plaintiffs Raxcaco Cajbon, Cahuec Garcia, Lopez Raxcaco, and Juarez Cajbon.

149. Plaintiffs Raxcaco Cajbon, Cahuec Garcia, Lopez Raxcaco, and Juarez Cajbon were transported to the Nashville ICE office at 247 Venture Circle and ultimately charged with alleged administrative violations of civil immigration law.

150. While handcuffed, Plaintiffs Raxcaco Cajbon, Cahuec Garcia, Lopez Raxcaco, and Juarez Cajbon were pushed into a very crowded white van. The van was so full of other detainees that it was difficult to close the van doors. After placing Plaintiffs inside the van, a nearby agent yelled "Goddamn Mexicans."

151. While in the van, Plaintiff Juarez Cajbon complained to Defendant Lim that his handcuffs were too tight and were causing him pain.

152. Defendant Lim responded by making the handcuffs even tighter, causing Plaintiff Juarez Cajbon additional pain and discomfort.

153. Defendant Lim also made Plaintiff Lopez Raxcaco's handcuffs unnecessarily tight.

154. At one point, one of the handcuffed men shouted to Defendant Lim and/or other Defendants in the van, "Please don't treat us like animals."

155. One of the defendants and/or other ICE agents told the arrestees to "shut up" and then the defendants and/or other ICE agents all laughed.

156.     Up to and including October 20, 2010, Plaintiff Custis resided with Plaintiff Sanchez Villalobos and Roberto Banales Ramirez in Apartment F-102.

157.     Plaintiff Custis was not at Clairmont when the raid began on October 20, 2010. She was running errands with her neighbor, Dany Flores, who is of Latino ethnicity, and their friend, Stacy Perez.

158.     When Plaintiff Custis arrived at Clairmont in her car, her vehicle was immediately surrounded by the F-102 Agents (Defendants Lane, McCormick, and Worsham), Defendant Koshar, and one to three other defendants. The F-102 Agents, Defendant Koshar, and/or other defendants demanded identification from Plaintiff Custis, Mr. Flores, and Ms. Perez. The F-102 Agents, Defendant Koshar, and/or other defendants acted without lawful justification.

159.     One or more of the F-102 Agents, Defendant Koshar, and/or other defendants demanded identification from Mr. Flores, and when he could not produce identification acceptable to the agents, he was arrested immediately and ultimately charged with alleged administrative violations of civil immigration law.

160.     Several of the F-102 Agents, Defendant Koshar, and/or other defendants detained and questioned Plaintiff Custis regarding her identity and her right to be at Clairmont. Plaintiff Custis did not feel free to leave during this detention and questioning.

161.     After presenting identification and answering the agents' questions, Plaintiff Custis and Ms. Perez were allowed to walk back toward Plaintiff Custis's apartment, Apartment F-102. As they began walking down the sidewalk toward the apartment, they were joined by Mr. Banales Ramirez. While they were walking, the F-102 Agents followed them.

162.     As Plaintiff Custis and her companions entered her residence through the sliding glass door, the F-102 Agents followed her in.

163.     None of the F-102 Agents who entered asked permission before coming into Apartment F-102.

164.     Plaintiff Custis asked, "Do you have a warrant?"  One of the F-102 Agents who was already inside the apartment replied, "We're searching for fugitives."

165.     Another of the F-102 Agents then said to Plaintiff Custis, "You need to just be quiet, Ma'am.  Be quiet and sit down right there."  He motioned to the sofa.  Plaintiff Custis, Mr. Banales Ramirez, and Ms. Perez sat down because they believed they had no choice.

166.     Plaintiff Custis did not feel free to leave during the encounter in her living room.

167.     The F-102 Agents searched the kitchen, both bedrooms, and the bathroom.

168.     No fugitives were found in Apartment F-102.  Nothing illegal was found in Apartment F-102.  No criminal charges were filed against Plaintiff Custis.

### *Playground*

169.     On October 20, 2010, B.B., a 13 year old Latino child, was playing soccer at the playground of the Clairmont with his cousin.

170.     When he saw the ICE agents and MNPD officers arrive at the Clairmont, B.B. started walking home.

171.     As he was walking, B.B. was approached by an ICE Agent Defendant, who blocked B.B.'s path and ordered him to "stop right there."

172.     The agent demanded to know where he was from, where his was born, and his date of birth.

173. Once B.B. told the ICE Agent Defendant that he was a United States citizen and that he was born in the United States, the agent said that B.B. was "okay" and that he was free to leave.

174. B.B. was frightened during this detention and questioning and did not feel free to leave.

### *Conspiracy and Campaign of Harassment to Drive Out Latino Residents*

### *Campaign of Harassment*

175. Soon after becoming involved with Clairmont, Defendants TriMont, TriTex, Greystar and Hall began a campaign of hostility, harassment, intimidation and coercion aimed at the Latino residents of Clairmont, with the goal of forcing Latinos to move out. The October 20, 2010 raid was the culmination of the campaign.

176. TriTex, acting through or in conjunction with TriMont, assumed duties as the asset manager and *de facto* owner of the Clairmont in May 2010, and shortly thereafter hired Greystar to replace the previous management company. Defendant Hall was a senior property manager for Greystar with responsibility over Clairmont in August, September, and October 2010.

177. On approximately May 24, 2010, a TriMont, TriTex or Greystar manager visited the Clairmont on-site office and said to Andrea Holland, an onsite Greystar manager, something to the effect of "Greystar was brought in to clean house, and get the Hispanics gone."

178. Between May 2010 and October 2010, at least two Greystar employees or agents were told by Greystar, TriMont, or TriTex supervisors not to speak Spanish in the office.

179. Sometime after May 2010, Greystar began demanding that current tenants provide Social Security numbers in order to renew their leases. This requirement was not

imposed by Clairmont management prior to TriMont, TriTex and Greystar's ownership and management. This new demand by TriMont, Tritex and Greystar was intended to specifically frighten and intimidate Latino residents.

180.      Beginning in approximately early October 2010, there was no hot water in at least two buildings at Clairmont, and intermittent water problems at other buildings at Clairmont. Regular water service was not fully restored until after the October 20, 2010 raid.

181.      During the first week of October 2010, Greystar replaced the security company at Clairmont with Defendant CSS, which assigned armed security guards to patrol Clairmont 24 hours a day and seven days a week.

182.      CSS patrol cars and CSS employees and agents appeared indistinguishable from the vehicles and agents of several local, public law enforcement agencies when they patrolled Clairmont. Defendant CSS provided patrol vehicles equipped with lights and sirens; the driver's side door of each CSS patrol unit displayed a shield that read "Crime Suppression Unit" (which were nearly identical to the markings on MNPD police vehicles); CSS guards wore black or dark blue uniforms with shields, badges, rankings, and radios; and they displayed firearms, handcuffs, and other weapons.

183.      CSS officers regularly stopped Latino residents of Clairmont and their guests and interrogated them about their presence on the property. CSS officers also monitored and recorded vehicles entering and exiting the property. These practices were not imposed by the previous security company or by Clairmont management prior to TriMont, TriTex and Greystar's ownership and management.

184.      In approximately the first week of October 2010, without advance notice to residents and without making any provisions for resident services, Greystar closed its on-site

office, and moved all employees off-site.  Only the armed CSS officers remained on-site with the Clairmont residents.

185.     At all times relevant to this action, many Latino residents of Clairmont spoke predominantly Spanish and none of the armed CSS officers assigned to patrol Clairmont spoke Spanish.

186.     Residents were not provided with an explanation for the closing of the on-site Greystar office, and often no one answered at the phone number posted on the door of the closed office.  As a result, maintenance and any other urgent requests and inquiries from residents went unanswered for weeks.

187.     Greystar never re-opened its on-site office.

188.     Just after the October 20, 2010 raid, Greystar was replaced by a new management company.

189.     Several Plaintiffs and many other Latino residents of Clairmont were intimidated, frightened, threatened, and coerced to leave Clairmont by Defendants Greystar, TriMont, TriTex, Hall, CSS, and West's campaign of harassment.

### *Conspiracy Between All Defendants*

190.     Beginning at least as early as September 23, 2010, Defendant Hall communicated to MNPD the intention of Hall, Greystar, TriMont and TriTex to "clean house" and rid Clairmont of certain residents based on their race, ethnicity, skin color, and/or perceived national origin.

191.     On October 1, 2010, agents or employees of Greystar, TriMont, and TriTex allowed ICE agents, including Defendant Worsham, access to an apartment occupied by a Latino

Case 3:11-cv-00994   Document 329   Filed 01/28/14   Page 27 of 40 PageID #: 3855

family without the residents' consent. Worsham subsequently entered the apartment, and two residents were removed from the apartment in handcuffs and thereafter detained.

192.     In furtherance of Greystar, TriMont, TriTex, and Hall's goal of ridding Clairmont of its Latino residents, and at Defendant Hall's request, CSS employees or agents conducted surveillance of Clairmont apartments, residents, and guests beginning on or around October 6, 2010 and relayed information to Defendant Hall and/or Defendants Worsham, Hubbard and/or Hardin, including the license plate numbers, whereabouts, and comings and goings of Clairmont residents and guests.

193.     Also in furtherance of the goal, Defendant Hall communicated multiple times with MNPD Defendants, including, but not limited to, Defendants Hardin and Kemper; ICE Defendants, including, but not limited to, Defendants Hubbard and Worsham; and Defendant West.

194.     Defendants Worsham, Hardin, Hall and West, met and/or communicated regularly in the weeks leading up to the October 20, 2010 raid.

195.     On information and belief, during these multiple conversations, Defendants Worsham, Hardin and Hall and others devised a plan to fulfill Greystar, TriMont, TriTex and Hall's goal to "clean house" and rid Clairmont of the Latino residents.

196.     Defendant Hall and/or Defendant CSS officers at Hall's instruction, made copies of apartment keys available to Defendant ICE agents and/or MNPD Officers before and/or during the October 20, 2010 raid to give Defendant ICE agents and/or MNPD officers access to the apartments.

197.     In furtherance of that agreement and under the guise of searching for alleged gang members, Defendants Hardin, Worsham, Hall and others jointly developed a plan to rid the

apartment complex of Latino residents. In the inception, planning, and preparation of the October 20, 2010 raid, MNPD served as the "lead" and initiating agency. MNPD gathered intelligence, and Defendant Hardin conveyed complaints regarding the complex to ICE Defendants prior to October 20, 2010. On the day of the raid, Defendants Hardin, Worsham, and Hubbard served as lead agents and assigned the ICE agents and MNPD officers to teams with representation from both agencies, and the raid was a "collaborative effort".

198. As was the plan, no arrest or search warrants were ever obtained for any resident or alleged gang members at the Clairmont on October 20, 2010. Instead, without judicial or administrative warrants, ICE and MNPD Defendants (and with the knowledge and consent of Defendant Hall), stopped, detained and arrested over 20 individuals based on their race, ethnicity, skin color, and/or perceived national origin without cause or consent and in violation of their constitutional rights.

199. Defendant CSS employees or agents accompanied Defendant ICE agents and MNPD officers around Clairmont during the raid on October 20, 2010.

200. The conspiracy amongst all Defendants to rid Clairmont of its Latino residents, and stop, detain and arrest individuals based on race, ethnicity, skin color, and/or national origin was planned and executed under color of state law, federal law, or both.

201. Following the October 20, 2010 raid, CSS guards informed residents that ICE was coming back soon to "finish the job."

202. As a result of the campaign of harassment and conspiracy, culminating in the October 20, 2010 raid, several of the Plaintiffs and many other Latino residents of Clairmont immediately vacated the premises.

**FIRST CAUSE OF ACTION**
**Illegal Entry into Homes in Violation of Fourth Amendment**
*Home Raid Plaintiffs*
(**Bivens** *claim against Defendants F-106 Agents, I-4 Agents, and F-102 Agents*)

203.　　　　Home Raid Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

204.　　　　Defendants F-106 Agents (Defendants Dickey, Hendrix, Hubbard, Gaines, Koshar, Lane, Lim, and McCormick), I-4 Agents (Defendants Epley, Hendrix, and McCormick), and F-102 Agents (Defendants Lane, McCormick, and Worsham) entered the Home Raid Plaintiffs' residences without search warrants or consent, and without probable cause or the presence of any exigent circumstances, in violation of the Plaintiffs' right to be free from unreasonable searches under the Fourth Amendment to the United States Constitution.

205.　　　　By entering the homes of Home Raid Plaintiffs without a valid search warrant, without consent, and without probable cause and exigency that would render such intrusion reasonable, Defendants F-106 Agents, I-4 Agents, and F-102 Agents violated the Fourth Amendment rights of the Home Raid Plaintiffs.

206.　　　　As a result of Defendants F-106 Agents, I-4 Agents, and F-102 Agents' actions, Home Raid Plaintiffs suffered damages, including, but not limited to, actual damages, humiliation, fear, loss of liberty, and emotional distress.

**SECOND CAUSE OF ACTION**
**Unreasonable Search of Homes in Violation of Fourth Amendment**
*Home Raid Plaintiffs*
(**Bivens** *claim against Defendants F-106 Agents, I-4 Agents, and F-102 Agents*)

207.　　　　Home Raid Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

208.     By searching the homes of Home Raid Plaintiffs without a valid search warrant, without consent, and without probable cause and exigency that would render such intrusion reasonable, one or more Defendants F-106 Agents (Defendants Dickey, Hendrix, Hubbard, Gaines, Koshar, Lane, Lim, and McCormick), I-4 Agents (Defendants Epley, Hendrix, and McCormick), and/or F-102 Agents (Defendants Lane, McCormick, and Worsham) violated the Fourth Amendment rights of Home Raid Plaintiffs to be free from unreasonable searches and seizures, including unreasonable intrusions into their homes by government officers.

209.     As a result of the Defendants F-106 Agents, I-4 Agents, and F-102 Agents' actions, Home Raid Plaintiffs suffered damages, including, but not limited to, actual damages, humiliation, fear, loss of liberty, and emotional distress.

### THIRD CAUSE OF ACTION
**Unreasonable Seizures in Violation of Fourth Amendment**
*All Plaintiffs*
**(Bivens** *claim against all ICE Defendants***)**

210.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

211.     By detaining Plaintiffs without a valid deportation warrant, arrest warrant or probable cause and exigency that would render such seizures reasonable, ICE Defendants violated the Fourth Amendment rights of Plaintiffs to be free from unreasonable seizures.

212.     As a result of these seizures, Plaintiffs suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, fear and emotional distress.

## FOURTH CAUSE OF ACTION
### Excessive Force in Violation of Fourth Amendment
### *Plaintiffs Sanchez Villalobos, Deras, Morteo Mendez, Palencia Sarmiento, Nuñez Escobar, Juarez Cajbon and Lopez Raxcaco*
### (Bivens *claim against one or more of the F-106 Agents and Defendant Lim*)

213.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

214.     By needlessly pointing guns directly at Plaintiffs Sanchez Villalobos, Deras, Morteo Mendez, Palencia Sarmiento, and Nunez Escobar, one or more of the F-106 Agents (Defendants Dickey, Hendrix, Hubbard, Gaines, Koshar, Lane, Lim, and McCormick) used excessive force against Plaintiffs Sanchez Villalobos, Deras, Morteo Mendez, Palencia Sarmiento, and Nuñez Escobar, and in doing so, violated their Fourth Amendment rights to be free from the use of unreasonable or excessive force.

215.     By physically seizing Plaintiff Sanchez Villalobos and needlessly shoving his face into a wall, even though he had offered no resistance to the agents, one of the F-106 Agents used excessive force against Plaintiff Sanchez Villalobos, and in doing so, violated his Fourth Amendment rights to be free from the use of unreasonable or excessive force.

216.     By needlessly tightening the handcuffs of Plaintiffs Juarez Cajbon and Lopez Raxcaco, Defendant Lim used excessive force against Plaintiffs, and in doing so, violated their Fourth Amendment rights to be free from the use of unreasonable or excessive force.

217.     As a result of the use of excessive force, Plaintiffs Sanchez Villalobos, Deras, Morteo Mendez, Palencia Sarmiento, Nuñez Escobar, Juarez Cajbon and Lopez Raxcaco suffered damages, including, but not limited to, actual damages, loss of liberty, humiliation, pain, fear and emotional distress.

## FIFTH CAUSE OF ACTION
### Equal Protection in Violation of Fifth Amendment
#### *All Plaintiffs*
#### (Bivens *claim against all ICE Defendants*)

218. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

219. ICE Defendants stopped, detained, searched, seized and/or arrested Plaintiffs solely on the basis of Plaintiffs' race, ethnicity, skin color, and/or perceived national origin, or association with individuals based on their race, ethnicity, skin color, and/or perceived national origin, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution.

220. The actions of the ICE Defendants were intentional, malicious, reckless, and reflect a callous disregard or indifference to the civil rights of Plaintiffs.

221. As a result of these seizures, Plaintiffs suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, fear and emotional distress.

## SIXTH CAUSE OF ACTION
### Conspiracy to Violate Fourth and Fourteenth Amendments
#### *All Plaintiffs*
#### (§ 1983 claim against All Defendants)

222. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

223. The MNPD Defendants, the ICE Defendants, Defendant Hall (acting on behalf of Defendants Greystar, TriMont, and TriTex), Defendant CSS, and Defendant West, all acting under color of state law, conspired with each other, worked in concert and agreed or reached a mutual understanding to rid Clairmont of Latino residents by entering Plaintiffs' homes, searching Plaintiffs' homes, and seizing Plaintiffs without probable cause. In the

inception, planning, and preparation of the October 20, 2010 raid, MNPD served as the "lead" agency and played a significant role in the raid, and the ICE Defendants became involved to achieve the objectives of the conspiracy.

224.	In furtherance of that agreement, no search, arrest or administrative warrants were obtained or presented to Plaintiffs.

225.	In furtherance of that agreement, Defendants worked together to subvert the probable cause and warrant requirements of the criminal justice system and accomplished Defendants' goal of "cleaning house" and ridding Clairmont of its Latino residents by engaging MNPD and ICE's NVLFOT to assist in the execution of a large-scale, warrantless raid which resulted in the mass detention and/or arrest of individuals based on nothing other than their race, ethnicity, skin color, and/or perceived national origin, or association with individuals based on race, ethnicity, skin color, and/or perceived national origin, in violation of the Fourth and Fourteenth Amendments.

226.	Defendants acted willfully, deliberately, maliciously or with reckless disregard of Plaintiffs' constitutional rights.

227.	As a result of the above-named Defendants' actions, Plaintiffs suffered damages, including, but not limited to, actual damages, loss of liberty, humiliation, fear and emotional distress.

**SEVENTH CAUSE OF ACTION**
**Conspiracy to Violate Fourth and Fifth Amendments**
*All Plaintiffs*
(**Bivens c***laim against all Defendants*)

228.	Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

229.     The MNPD Defendants, the ICE Defendants, Defendant Hall (acting on behalf of Defendants Greystar, TriMont, and TriTex), Defendant CSS, and Defendant West, acting under color of federal law, conspired with each other, worked in concert and agreed or reached a mutual understanding to rid Clairmont of its Latino residents by entering Plaintiffs' homes, searching Plaintiffs' homes, and seizing Plaintiffs without probable cause.

230.     In furtherance of that agreement, no search, arrest or administrative warrants were obtained or presented to Plaintiffs.

231.     In furtherance of that agreement, Defendants worked together to subvert the probable cause and warrant requirements of the criminal justice system and accomplished Defendants' goal of "cleaning house" and ridding Clairmont of its Latino residents by engaging MNPD and ICE's NVLFOT to assist in the execution of a large-scale, warrantless raid which resulted in the mass detention and/or arrest of individuals based on nothing other than their race, ethnicity, skin color, and/or perceived national origin, or association with individuals based on their race, ethnicity, skin color,  and/or perceived national origin, in violation of the Fourth and Fifth Amendments.

232.     Defendants acted willfully, deliberately, maliciously or with reckless disregard of the Plaintiffs' constitutional rights.

233.     As a result of the above-named Defendants' actions, Plaintiffs suffered damages, including, but not limited to, actual damages, loss of liberty, humiliation, fear and emotional distress.

## EIGHTH CAUSE OF ACTION
### Conspiracy to Deprive of Equal Protection Rights
### *All Plaintiffs*
### (42 .S.C. § 1985(3) *Claim Against all Defendants*)

234.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

235.     Defendants entered into an agreement to act in concert for the purpose of ridding Clairmont of its Latino residents, thereby depriving the Plaintiffs of the equal protection of the laws.  The conspiracy included, but was not limited to, an agreement to detain, interrogate, and arrest Plaintiffs in furtherance of the plan and scheme to rid Clairmont of its Latino residents.

236.     Defendants performed several overt acts in furtherance of this conspiracy, including, but not limited to, planning the October 20, 2010 raid, facilitating the October 20, 2010 raid, unlawfully entering Plaintiffs' homes, usually by force, and arbitrarily detaining and arresting Plaintiffs without reasonable suspicion or probable cause justifying Defendants' actions.

237.     Defendants' plan and scheme, and the overt acts taken in furtherance of their conspiracy, were motivated by a discriminatory animus against Plaintiffs based on their race, ethnicity, skin color and/or perceived national origin, and/or their association with individuals based on race, ethnicity, skin color, and/or perceived national origin.

238.     As a result of the conspiracy between and amongst the Defendants and the overt actions taken in furtherance thereof, Plaintiffs suffered damages, including, but not limited to, actual damages, loss of liberty, humiliation, fear and emotional distress.

## NINTH CAUSE OF ACTION
### Violation of the Equal Protection Clause of the Fourteenth Amendment
### *All Plaintiffs*
### (§ 1983 *claim against all MNPD Defendants, and*
### *Defendants Greystar, TriMont, TriTex, Hall, CSS, and West)*

239.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

240.     With the assistance, encouragement, participation and facilitation of Defendants Greystar, TriMont, TriTex, Hall, CSS, and West, the MNPD Defendants stopped, detained, searched, seized and/or arrested Plaintiffs solely on the basis of Plaintiffs' race, ethnicity, skin color, and/or perceived national origin, and/or Plaintiffs' association with individuals based on their race, ethnicity, skin color, and/or perceived national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

241.     As a result of these seizures, Plaintiffs suffered damages, including, but not limited to, actual damages, loss of liberty, humiliation, fear and emotional distress.

## TENTH CAUSE OF ACTION
### Violation of the Fair Housing Act
### *All Plaintiffs*
### (*42 U.S.C. §§ 3601 et seq. claim against Defendants Greystar,*
### *TriMont, TriTex, Hall, CSS, and West)*

242.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

243.     Defendants' conduct:

a.   Created a severe or pervasive hostile housing environment, which had the effect of making housing unavailable on the basis of race, skin color and/or perceived national origin in violation of 42 U.S.C. § 3604(a);

*Page 37 of 40*

b. Constituted discrimination in the terms, conditions, or privileges of the rental of a dwelling on the basis of race, skin color and/or perceived national origin in violation of 42 U.S.C. § 3604(b);

c. Included or caused to be made statements with respect to the rental of a dwelling that indicated a preference or discrimination based on race, skin color and/or perceived national origin in violation of 42 U.S.C. § 3604(c); and

d. Constituted coercion, intimidation, threats, and interference with individuals in the exercise or enjoyment of rights under the Fair Housing Act, in violation of 42 U.S.C. § 3617.

244.    Defendants' actions were motivated by a discriminatory animus against Plaintiffs based on their race, skin color and/or perceived national origin, and/or their association with individuals based on race, skin color and/or perceived national origin.

245.    Defendants' actions were intentional, malicious, and in wanton or reckless disregard of Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq*.

246.    As a result of these actions, Plaintiffs suffered damages, including, but not limited to, actual damages, humiliation, fear and emotional distress.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court grant the following relief:

(a)    Enter a declaratory judgment that Defendants violated Plaintiffs' rights under the U.S. Constitution and civil rights laws;

(b)    Award Plaintiffs their nominal and actual damages;

(c)    Award Plaintiffs compensatory damages in an amount to be determined at trial, and hold Defendants jointly and severally liable for compensatory damages;

(d)     Award Plaintiffs punitive damages in an amount to be determined at trial;

(e)     Award Plaintiffs pre-judgment and post-judgment interest as allowed by law;

(f)     Award Plaintiffs their reasonable costs, expenses and attorneys' fees; and

(g)     Grant such further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues as to which a jury trial is available.


Dated：January 8, 2013                          Respectfully submitted,


                                                /s/  José J. Behar
                                                 One of Plaintiffs' Attorneys

                                                Andre Segura
                                                Justin Cox
                                                Lee Gelernt
                                                ACLU Foundation Immigrants' Rights Project
                                                125 Broad Street, 18th Floor
                                                New York, New York 10004
                                                T: (212) 549-2660
                                                *asegura@aclu.org*
                                                *jcox@aclu.org*
                                                *lgelernt@aclu.org*

Cecillia D. Wang                                Elliott Ozment
ACLU Foundation Immigrants' Rights              Tricia Herzfeld
Project                                         Ozment Law
39 Drumm Street                                 1214 Murfreesboro Pike
San Francisco, California 94111                 Nashville, TN 37217
T: (415) 343-0775                               T: (615) 321-8888
*cwang@aclu.org*                                *elliott@ozmentlaw.com*
                                                *tricia@ozmentlaw.com*


ATTORNEYS FOR JAVIER  ORLANDO DERAS, JUAN BAUTISTA MENDEZ MARTINEZ, ISAIAS RAXCACO CAJBON, EDUARDO CAHUEC GARCIA, MARVIN BENJAMIN LOPEZ RAXCACO, COSMER JUAREZ CAJBON, CARLOS ROBERTO MENDEZ MARTINEZ, KIMBERLY CUSTIS, AND SHANNON NORIEGA LUCAS, as parent and next friend of her child, B.B.

Matthew J. Piers
José J. Behar
Jenna L. Miara
Caryn L. Lederer
Hughes, Socol, Piers, Resnick & Dym, Ltd.
70 W. Madison St., Suite 4000
Chicago, IL 60602
T: (312) 580-0100
*mpiers@hsplegal.com*
*jbehar@hsplegal.com*
*jmiara@hsplegal.com*
*clederer@hsplegal.com*

Elliott Ozment
Tricia Herzfeld
Ozment Law
1214 Murfreesboro Pike
Nashville, TN 37217
T: (615) 321-8888
*elliott@ozmentlaw.com*
*tricia@ozmentlaw.com*

ATTORNEYS FOR ANGEL ENRIQUE NUNEZ ESCOBAR, DAVID SALGADO FIGUEROA, GERARDO MORTEO MENDEZ, JESUS ANTONIO SANCHEZ VILLALOBOS, AND JORGE PALENCIA SARMIENTO