|  |  |  |
|---|---|---|
| ANGEL ENRIQUE NUNEZ ESCOBAR, *et al.*, | ) ) | |
| *Plaintiffs.* | ) ) | Civil Action No. 3:11-cv-994 |
| *v.* | ) ) ) | Judge Campbell/Bryant |
| LEE GAINES, *et al.*, | ) ) | |
| *Defendants.* | ) ) | |

### PLAINTIFFS' CORRECTED MEMORANDUM IN OPPOSITION TO DEFENDANTS SHAUN HARDIN AND GARY KEMPER'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.01, Plaintiffs submit this memorandum of law in opposition to Defendants Shaun Hardin and Gary Kemper's Motion for Summary Judgment (Dkt. Nos. 360, 361).

### INTRODUCTION

Defendants Hardin and Kemper (collectively, "MNPD Defendants") move for summary judgment on all four causes of action against them, namely conspiracy claims under 42 U.S.C. § 1983, *Bivens*, and 42 U.S.C. § 1985(3), and a separate § 1983 claim that they and Defendants TriTex, TriMont, Greystar Real Estate Partners, Greystar Management Services, and Tracy Hall (collectively, the "Clairmont Defendants") jointly violated the Fourteenth Amendment Equal Protection Clause. In the alternative, the MNPD Defendants argue that they are entitled to qualified immunity for all of Plaintiffs' claims. Finally, the MNPD Defendants argue that Plaintiffs' request for declaratory judgment be denied.

The facts relating to Plaintiffs' § 1983, § 1985(3) and *Bivens* conspiracy claims are numerous and largely disputed by the parties. Beginning in May 2010, when the Clairmont

Defendants first bought and began to manage the Clairmont Apartments ("Clairmont") in Nashville, Plaintiffs allege (and there is ample evidence in the record in support) that they strove to purge the Clairmont of its predominately Hispanic residents – in a Greystar manager's words, "Greystar was brought in by the owners to come in, clean house, and get the Hispanics gone." In late September and lasting throughout October 2010, Defendant Hardin and then Defendant Kemper began actively working, cooperating and conspiring with the Immigration and Customs Enforcement ("ICE") agents (the "Federal Defendants") and Clairmont Defendants to rid the Clairmont of Hispanics through conduct that would violate individuals' civil rights. In furtherance of that goal, on October 20, 2010, through and with the Clairmont Defendants' assistance and facilitation, the MNPD and Federal Defendants jointly stormed the Clairmont, conducting a large-scale warrantless (and unprecedented) raid ("Raid") involving massive Fourth Amendment, Fifth Amendment and Fourteenth Amendment violations, all while shouting racial and ethnic epithets at Plaintiffs and other residents. The Raid had the desired effect of the arrest and removal of twenty Hispanic men from the Clairmont and scaring many of the remaining Hispanic residents out of the Clairmont.

Despite the volume of facts evincing the existence of concerted efforts to effectuate Defendants' conspiratorial and unlawful goals, the MNPD Defendants present an entirely one-sided version of the "facts" that favors Defendants' position rather than that of Plaintiffs, the nonmoving party, and ask the Court to accept their naked assertion that they were motivated by legitimate law enforcement concerns only. In doing so, the MNPD Defendants wholly disregard a multitude of evidence directly contradicting their own version of the facts, as well as mischaracterize or misstate facts proven in the record. When *all* the relevant evidence is presented, the MNPD Defendants' summary judgment motion

must be denied, and the disputed genuine issues of material fact that exist in this case must be resolved by a jury.

## STATEMENT OF MATERIAL FACTS[1]

### TriTex, TriMont, and Greystar Take Over the Clairmont and Develop a Plan to Change the Clairmont's Resident Profile

The Clairmont Apartments are a 233-unit, residential housing complex located at 1019 Patricia Drive in Nashville, Tennessee ("Clairmont"). Plaintiffs' Statement of Additional Facts Requiring the Denial of Summary Judgment ("PSAF") ¶ 1. On May 20, 2010, TriTex acquired title to the Clairmont after the property was foreclosed on by the Federal National Mortgage Association ("Fannie Mae"). Plaintiffs' Response to the Clairmont Defendants' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment on Plaintiffs' Conspiracy Claims, contemporaneously filed ("CDSUF") ¶ 11. At that time, about 90% of the residents of the Clairmont were Hispanic and spoke Spanish. CDSUF ¶ 2; PSAF ¶ 3.

On behalf of TriTex, TriMont became the "asset manager" of the Clairmont, meaning TriMont managed the Clairmont (the "asset") by overseeing rehabilitation of the property and preparing it for resale. CDSUF ¶ 7; PSAF ¶ 4. James Jarrell, became the TriMont "Asset Manager" responsible for the Clairmont, CDSUF ¶ 7, and TriTex contracted with Greystar to serve as the onsite property management company.[2] CSUF ¶ 16; PSAF ¶ 5. As with every

---

[1] Plaintiffs present the following material facts relevant to Plaintiffs' conspiracy claims against the Clairmont, MNPD, and Federal Defendants. Because each set of Defendants filed motions for summary judgment on Plaintiffs' conspiracy claims and the vast majority of facts are applicable to each motion, for the convenience of the Court and to avoid confusion, Plaintiffs have used the identical statement of material facts in their responses to all three motions. Additional facts as necessary to respond to each set of Defendants' particularized legal arguments are contained in the argument section of Plaintiffs' respective responses.

[2] As noted by Defendants, TriTex is a wholly-owned subsidiary of TriMont and TriMont/TriTex handle Real Estate Owned ("REO") properties for Fannie Mae and provide asset management services. Memorandum in Support of Motion for Summary Judgment of TriTex, TriMont, Greystar Management, Greystar Real Estate, and Tracy Hall Concerning Civil Conspiracy Claims (Dkt. No.

property for which he served as Asset Manager, Jarrell's role was to work with the onsite management company "to take over" the Clairmont and work "collaboratively" with Greystar to "put together an operating budget and a capital budget" and "rehabilitate the propert[y] as best we could, and then we would place the propert[y] on the market for sale." PSAF ¶ 9.

On May 24, 2010, Shaun Herskowitz, a Greystar Property Manager, visited the Clairmont as part of the "takeover team," responsible for evaluating the Clairmont and mentoring the onsite staff. PSAF ¶ 10. That very day, Herskowitz informed onsite management staff that "Greystar was brought in by the owners to come in, clean house, and get the Hispanics gone."[3] PSAF ¶ 11. The very next day, on May 25, 2010, Jarrell, the TriMont Asset Manager, visited the Clairmont and personally met with Herskowitz and others to further discuss the property. PSAF ¶ 12.

**<u>Hispanics at the Clairmont Are Subjected to Hostility and Neglect</u>**

In July 2010, Greystar assigned Senior Community Director, Defendant Tracy Hall to manage the Clairmont. PSAF ¶ 13. Hall reported directly to Rich Foster, Greystar Regional Property Manager who worked in Atlanta, Georgia; Foster, in turn, reported directly to Tracy Bowers, Greystar Senior Director, who also worked in Atlanta;[4] each also was responsible for general oversight of the Clairmont. PSAF ¶¶ 14-15. At the time of the assignment, either Foster or Bowers told Hall that the Clairmont "had some deferred maintenance issues," that it "had

---

369) ("Clairmont Defs. Conspiracy Br.") at 4. Hereinafter, references to TriMont include TriTex, unless otherwise specifically noted.

[3] TriMont, as asset manager, was the *de facto* owner of the property and was considered by Greystar to be the Clairmont's "owner" and Jarrell to be the owner's representative. PSAF ¶ 8.

[4] Bowers worked for the "Greystar Real Estate Group." PSAF ¶ 340. She identified the property management company as "Greystar Real Estate Group," saying that all of the Greystar companies were "considered the same." PSAF ¶ 341. Bowers testified that she "might" have worked for "Greystar Management Services," but "it was all under the Greystar umbrella." PSAF ¶ 342. Accordingly, hereinafter, references to "Greystar" include both Defendants Greystar Management and Greystar Real Estate, unless otherwise specifically noted.

occupancy issues," and that she needed to "get the property back on track." During this initial meeting, Hall was also told that the Clairmont was primarily a "Hispanic community." PSAF ¶¶ 16-17. In an email that Hall read, Bowers mentioned "possibly" diversifying away from the Hispanic population at the Clairmont. PSAF ¶ 18.[5]

Hall was physically onsite at the Clairmont at least four days a week, for six to seven hours at a time. PSAF ¶ 20. During the time she managed the Clairmont from July 2010 to October 2010, Hall was the highest ranking and most senior onsite Greystar employee; all other onsite staff ultimately reported to Hall. PSAF ¶21.

Hall was also "a little racist against Hispanics" and her "attitude towards Hispanics was very bad." PSAF ¶ 22. Hall "acted different[ly] towards Hispanics than she did to any other race." With Hispanics, she was "curt, very short" and put on a "tight-lipped" face – a face that she would use only when dealing with Hispanics. PSAF ¶¶ 23-24. Hall's attitude towards Hispanics was so palpable that "you could see that she didn't like Hispanics," because of "the way she looked at them."[6] PSAF ¶ 25. Hall also did not like Spanish being spoken in front of her. She considered it "rude" when two of her Hispanic staff members spoke Spanish in her presence, even though one of them could speak only "broken" English. PSAF ¶ 27. In addition, Hall claimed it was "unprofessional" for staff members to speak

---

[5] Hall explained, "[w]hen we talk about diversify, diversification means a lot. For example, if everyone on the property works for Nissan Motor – Motors, and all of a sudden Nissan Motors has a layoff, you've lost your entire population. Diversify can mean a lot of things. Not having too many people that work for Nissan Motor Corporation. Not having too many people – that is diversification." PSAF ¶ 19.

[6] This evidence concerning Hall's attitude toward and demeanor around Hispanics comes from onsite Greystar employees, namely, Scott Jervis (maintenance supervisor), Jorge Flores (maintenance technician), and Dorothy Duarte (leasing agent), all of whom were supervised by Hall, routinely interacted with her, and personally witnessed her actions and reactions in the presence of Hispanics. PSAF ¶ 26.

Spanish with each other or with Clairmont residents in her presence.[7] PSAF ¶ 28. Indeed, on August 4, 2010, when Foster (Hall's supervisor) told Hall that he would be visiting the Clairmont, referring to it as "little [h]avana," Hall responded by telling him "no espanol [*sic*]. Oh sorry getting ready for work." PSAF ¶ 30.

When Hispanics submitted rental applications, Hall became more involved in their application process than she did for non-Hispanics submitting applications, scrutinizing the Hispanic applicants more closely. PSAF ¶ 31. Dorothy Duarte, the leasing agent at the Clairmont, testified that Hall "interfere[d] with the process" when it came to Hispanic applicants, including by asking Hispanic rental applicants whether they could speak English. PSAF ¶¶ 32-33. Based on her observations, Duarte believed that Hall's conduct caused Hispanic applicants to decide against living at the Clairmont. PSAF ¶ 34. Hall also treated the existing Hispanic residents at the Clairmont coldly and as if they "were beneath her." PSAF ¶ 35. At least a couple of times a week, Hispanic residents complained to Duarte that Hall treated them rudely.[8] PSAF ¶ 36. Moreover, even though the majority of Clairmont residents were Spanish-speakers and a large percentage of them could not speak English, Hall directed Duarte, who speaks English and Spanish, *not* to speak Spanish to the residents at the Clairmont, regardless of the residents' comfort level with the English language. PSAF ¶¶ 3, 38.

The Hispanic residents, including Plaintiffs, also repeatedly complained to Hall and other Greystar personnel about a host of other maintenance and repair problems that were never fixed. Indeed, Hall instructed Jorge Flores, a maintenance technician, "to ignore the work orders for the

---

[7] Dorothy Duarte, a Spanish-speaking Hispanic leasing agent who reported to Hall, told Hall that she thought it was discriminatory to prohibit the staff members from speaking Spanish, because they just "naturally do it" and it was difficult to catch themselves and speak English. In response, Hall said "what [did] I tell you." PSAF ¶29.

[8] Megan Hamilton, a Hispanic tenant who resided in Apartment I-1, also witnessed Hall treat Hispanic residents rudely and poorly. PSAF ¶ 37.

Latino residents' complaints about [lack of] hot water," and Hall even "canceled work orders for repairs that had to be done." PSAF ¶¶ 43-44. "People would come to her [Hall] with a complaint and she would ignore it and tell us [the maintenance staff] not to do anything." PSAF ¶ 45. Instead of fixing the problems when Hispanic residents complained about maintenance issues, Hall tried "to make it look like it was their fault." PSAF ¶ 46. Flores specifically told Plaintiff Angel Enrique Nuñez Escobar that his maintenance requests had not been addressed because "they were going to get all the Hispanics out of there…[and] they didn't want Hispanics there."[9] PSAF ¶ 68.

It became increasingly clear to at least some of the Hispanic residents that they were not welcome at the Clairmont. For example, prior to moving out of the Clairmont in August 2010 because of the deplorable conditions of her apartment, Megan Hamilton, a Hispanic resident who resided in Apartment I-1, heard an African-American maintenance worker employed by Greystar try to convince Hamilton's African-American boyfriend to stay at the Clairmont, because management wanted to change the "feel" or "vibe" of the apartments and planned to make them more "upscale."[10] PSAF ¶¶ 61, 69. Later on, maintenance worker Flores was more to the point with Plaintiff Nuñez Escobar, telling him that Greystar was going to remodel the Clairmont in an effort to convert the complex from being Hispanic to American. PSAF ¶ 83.

---

[9] TriMont, Greystar and Hall also did not correct existing maintenance problems and permitted the living conditions at the Clairmont to deteriorate drastically, ignoring residents' repeated complaints about needed repairs. PSAF ¶ 42. Greystar and TriMont's severe disregard of Clairmont property conditions and maintenance problems, including their disregard of the Hispanic residents' complaints, are detailed in Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Fair Housing Act Claim that is currently filed, and, thus, are only summarized herein.

[10] Although Hamilton does not know the African-American maintenance worker's name, Scott Jervis was the maintenance supervisor at the Clairmont in August 2010; he is African American and was the only African American maintenance worker at the Clairmont during that time period. PSAF ¶¶ 70-71.

**The Clairmont Defendants Bring in MNPD and ICE and All Hispanic Residents are Treated as Potential "Gang Members"**

In 2010, both ICE and MNPD were familiar with the Clairmont and its surrounding area as a neighborhood that had a generalized low level of crime. PSAF ¶ 84. The neighborhood was not immune from the "gang problem" that affected Nashville at large. PSAF ¶ 85. During the time that Greystar managed the Clairmont, however, things were relatively quiet and there was not much, if any, crime on the property, other than periodic graffiti. PSAF ¶ 86.

On September 23, 2010, Greystar Maintenance Supervisor Scott Jervis reported to Tracy Hall that he had an encounter with a Hispanic male with the word "Zetas" tattooed on his chest, during which the individual called Jervis "Homes," asked what Jervis was doing, and when Jervis replied it was none of his business, revealed he had a gun tucked in the waistband of his pants. PSAF ¶ 88. Jervis walked away and had no further interaction with the individual. PSAF ¶ 89. It "didn't dawn on [Jervis] to call the police," because he "wasn't really that concerned" and did not believe the individual was actually going to "do something;" nevertheless, he cooperated with Hall when she contacted MNPD to make a police report documenting the incident.[11] PSAF ¶¶ 90-91. Without even knowing whether the Hispanic man whom Jervis encountered was a Clairmont resident, Hall took the opportunity to contact MNPD again to say that the Hispanic man had gang affiliations. PSAF ¶ 95. That same day, September 23, 2010, she met with MNPD Officer Curtis Watkins, and, among other things, reported to him not only that there were "gang issues" at the Clairmont, but also that the Clairmont was "currently 55% occupied," that Greystar

---

[11] The MNPD police report documenting the incident, which Jervis verified, states "[Jervis] stated suspect never pulled the weapon out and displayed it in a manner to make him feel in fear but he was concerned suspect did have the weapon." PSAF ¶ 92. Jervis also testified that he did not feel threatened during the encounter and that Hall's written incident report to Greystar characterizing the encounter as a threat was incorrect. PSAF ¶¶ 93-94.

was undertaking a variety of security measures, and that "management is cleaning house."[12] PSAF ¶¶ 96-97. That same day Hall met with Defendant Shaun Hardin, a Detective with MNPD and Hall communicated her goal of increasing police presence on the property. PSAF ¶ 98.

Shortly thereafter, on October 1, 2010, Federal Defendant Lee Worsham, a Deportation Officer with ICE Enforcement and Removal Operations ("ERO"), arrived at the Clairmont and demanded that Jervis give him access to the apartment of two residents without a warrant or the residents' consent, or he would kick the door in. PSAF ¶ 99. Jervis complied and opened the residents' apartment door for Worsham. PSAF ¶ 100. Worsham entered and removed two Hispanic residents from the property. PSAF ¶ 101. As Worsham was putting the two residents in his vehicle, Hall encountered Worsham and they spoke. PSAF ¶ 102. After speaking with Worsham, instead of instructing the Clairmont staff to request warrants before yielding to law enforcement requests regarding residents, Hall told Clairmont leasing associate Dorothy Duarte that she "had to cooperate" with law enforcement if they "needed anything."[13] PSAF ¶¶ 103-104.

On October 4, 2010, Hall spoke with Hardin, as well as other MNPD officers, and described an alleged "strong gang presence" at the Clairmont and further discussed her goals for the property. PSAF ¶ 106. That same day, Worsham contacted Hardin to discuss working together on activities at the Clairmont, because "he [had been] made aware of the issues in the complex." PSAF ¶ 107. Hardin, as well as other MNPD officers, visited the property that day

---

[12] The report made by Officer Watkins of his meeting with Hall and other police reports are admissible as business records. *See* Fed. R. Evid. 803(6). This report also is admissible as a present sense impression because it was drafted by Officer Watkins within thirty-five minutes after his meeting with Hall ended. PSAF ¶ 97. *See* Fed. R. Evid. 803(1).

[13] Though Hall testified that she reprimanded Jervis and told all of her onsite staff to request a warrant before ceding to officer requests, Clairmont staff members deny this occurred. PSAF ¶ 105.

and met with Hall and onsite Property Manager Stephanie Preciado.[14] PSAF ¶ 108. Despite Hardin finding Hall's report of a "gang war" at the Clairmont unreliable and the other information about a possible gang presence at the property something he had already known for quite some time and nothing new, Hardin immediately began collaborating with Hall and her staff members for a large-scale law enforcement action. PSAF ¶¶ 109-114.

Hall compelled other Greystar employees at the Clairmont to provide information to MNPD and ICE – even when the information they had to offer was speculative and unreliable.[15] PSAF ¶¶ 120, 134. On October 5, 2010, the Clairmont Defendants contend that the onsite management staff was threatened when an unidentified temporary groundskeeper reported to Jorge Flores, a maintenance technician, that someone said something to the effect of "if ICE picks up anymore of his guys, the office was going to get it and they were going to retaliate," *see* Clairmont Defs. Conspiracy Br. at 8, – an incident that Flores himself denies ever happened. PSAF ¶ 122. With regard to this "October 5, 2010 incident" (referred to in Clairmont Defendants' Exhibit 10, which, on its face, essentially describes a game of telephone between an unidentified person, a Clairmont groundskeeper, Flores, and Preciado),[16] Hall never bothered to

---

[14] During the visit, Preciado clarified that "most of the issues are consolidated to a few apartments at the complex." PSAF ¶¶ 118-119.

[15] TriMont authorized Greystar "to represent the property with the police department and cooperate with the police department;" Hall became the contact between TriMont and local law enforcement. PSAF ¶ 121.

[16] The Clairmont Defendants also entirely mischaracterize both the scope and nature of this alleged threat in their brief, even though it is documented in their own Exhibit 10 and the written version is confirmed in deposition testimony. No one threatened "if ICE picks up anymore of his guys, then the office was going to get it and they were going to retaliate." Instead, Preciado reported that she was told by Flores (who was told by the temporary groundskeeper, who was told by an unidentified individual) that "the Manager of the property 'was going to get it.'" *See* Exhibit 10 to Clairmont Defendants' Statement of Undisputed Material Facts. Flores, however, has testified that there never were any threats and that he never told anyone that there were threats. PSAF ¶¶ 76-77, 123. In fact, he has called some of Greystar's allegations "lies." PSAF ¶ 78. Preciado walked out of her deposition before it was concluded and Plaintiffs were unable to complete questioning her about this and other issues. Plaintiffs' Motion for an Order to Show Why Stephanie Preciado Should Not Be Held in

follow up with the Clairmont groundskeeper to obtain *any* information about what was said or who said it and no Greystar manager or supervisor ever put him in touch with law enforcement personnel.[17] PSAF ¶ 124. Instead, on October 5, 2010, Hall arranged for onsite Greystar personnel, including Flores, to attend a meeting at the Nashville ICE office with Defendants Worsham, Hardin, and Federal Defendant Patrick Hubbard, where they were shown photos of suspected gang members and discussed potential "target apartments" based on what Defendant Hardin described as the Greystar employees' "hunch" of where gang members "hung around." PSAF ¶¶ 130-132, 134.

From this point forward, Hardin and other MNPD officers and Worsham and other ICE officers collaborated closely with Greystar, through Hall, and each other and maintained an intensive presence at the Clairmont – all without making any real effort to investigate the threats alleged by the Clairmont Defendants. PSAF ¶ 79, 139, 176, 211. Even though both MNPD and ICE visited and focused on the Clairmont, they did not investigate any of the threats, conduct any interviews, or attempt to obtain particularized information about the threats. PSAF ¶¶ 79, 139, 176, 211. Indeed, Worsham testified that he conducted surveillance at the Clairmont in October 2010 "on multiple occasions, possibly not necessarily related to the gang investigation." PSAF ¶ 140.

On October 6, 2010, TriMont and Greystar, through Jarrell and Bowers, decided and agreed to close the onsite office at the Clairmont, leaving the residents without any onsite

---

Contempt and to Compel Her Appearance at Deposition, filed January 3, 2014 (Dkt No. 320), is still pending.

[17] Despite Hall's close contact with MNPD and ICE, no one from Greystar *ever* asked if the police had discovered any information about the alleged threats on the management staff or who was making them. PSAF ¶ 138.

property management personnel at all.[18] PSAF ¶ 80. Though the Clairmont Defendants contend the closure resulted from concern about employee safety, Clairmont Defs. Conspiracy Br. at 9, Greystar never even informed several of their own onsite employees that the office had been closed because of threats. PSAF ¶ 82. Greystar did not have any meetings with Clairmont residents to discuss any crime or security issues on the property, never distributed any written notices to residents about crime, and never posted any written notices to alert the residents to any crime problems. PSAF ¶ 142. Rather, the only notice provided by Greystar to the Clairmont residents was a single sign posted on the office door – in English only – stating that the office was temporarily closed and providing a telephone number to call with any questions.[19] PSAF ¶ 143.

What Greystar *did* do, with TriMont's approval, is pay $32,400 to immediately install Crime Suppression Services ("CSS"), an armed security force, on the property 24 hours per day 7 days per week, that did not have a single Spanish-speaking officer but *did* patrol the property in vehicles and uniforms that resembled MNPD.[20] PSAF ¶¶ 148-150. Before CSS began working on the property on October 6, 2010, Greystar did not conduct even the most fundamental vetting

---

[18] According to Hall, vacating the onsite office was "a collective decision from Greystar, TriMont and Fannie Mae." PSAF ¶ 81.

[19] Melanie Thomas, the Clairmont's Assistant Property Manager, had concerns about closing the office and moving offsite. She was not sure who would answer the telephone or watch over the property, but she "just did as I was told." Thomas testified that it is difficult to manage a property remotely, because resident rapport and communication suffers. PSAF ¶¶ 144-145. Indeed, after Greystar closed the office, Thomas received forty-five to fifty calls *a day* on her personal cell phone from residents complaining about repair problems and the office being closed. PSAF ¶146. Thomas was, therefore, eager to get back onsite because she "saw a lot of potential in the property … and saw that with proper resident connection, it could be a great running property." PSAF ¶ 147.

[20] Greystar and Trimont were the "decision-makers" for determinations about security issues at the property. PSAF ¶ 151.

of the company or its owner, Paul West.[21] PSAF ¶ 152. Once CSS got on the property, no one

ever explained to the Clairmont residents why CSS was there. PSAF ¶ 155.  Other than CSS,

however, the "property was abandoned." PSAF ¶ 156. TriMont Asset Manager, Jim Jarrell,

admitted that "we couldn't operate our property because we had an armed camp basically

there."[22] PSAF ¶ 157.

Though it was entirely unclear whether the individuals purportedly responsible for

making the alleged threats even lived at the Clairmont,[23] to the extent TriMont and Greystar

believed *any* "bad actors" were present on the property, they acknowledged the "problem" was

limited a "handful" of apartments. PSAF ¶ 163. Yet, despite the very limited nature of this

alleged "bad actor" problem, on October 7, 2010, Bowers decided *all* of the Clairmont's

Hispanic residents were potential gang members and informed Hall, Foster, and her superiors at

Greystar that she wanted to "delease"[24] the *entire* property, because "I don't think we will be

able to allow the existing employees to ever go back to the property as long as any existing

---

[21] Had Defendants conducted any research into CSS or West, they may have discovered that West's security license had expired months before (Exhibit 14 to Clairmont Defendants' Statement of Undisputed Facts, Deposition of Paul West at 53-54; PSAF ¶ 153), which runs afoul of Tenn. Code Ann. § 62-35-134(a), providing "[i]t is unlawful for any person knowingly to employ as a security guard/officer any individual who does not hold a valid registration card of the appropriate type." Tracy Bowers acknowledged that she did not even inquire whether West or CSS had valid security licenses before hiring them to engage in security services at Clairmont. PSAF ¶ 154.

[22] CSS also actively cooperated with MNPD and ICE. CSS provided information about Clairmont residents and activities to Defendant Hardin, Worsham, and/or Hubbard, including the license plate numbers, whereabouts, and comings and goings of Clairmont residents and guests. PSAF ¶ 158. West and Hardin specifically discussed how CSS could "help" with MNPD's efforts to "solve some of the problems" at Clairmont.  *See* Exhibit 11 to Clairmont Defendants' Statement of Undisputed Facts, Deposition of Shaun Hardin at 91-92. Though Hardin testified he only spoke to West on two occasions, telephone records demonstrate they placed calls to each other at least 10 times between October 5 and October 20, 2010. PSAF ¶ 161.

[23] As set forth more fully in Plaintiffs' Response to the Clairmont Defendants' Statement of Undisputed Facts ("Response to CDSUF"), there is substantial evidence in the record demonstrating that the threats alleged by the Clairmont Defendants *never* occurred. Response to CDSUF ¶¶ 31-32, 41, 43-44.

[24] "Deleasing" means "reducing occupancy on a property" or removing tenants from a property. PSAF ¶ 165.

residents are there. There is no way to know who is affiliated with these 2 gangs. By deleasing and then leasing up a stronger and better resident profile would . . . position the property to sell at a higher price."[25] PSAF ¶ 164. Foster agreed with Bowers' proposal to delease the entire property, and discussed it with Jarrell. PSAF ¶ 168. Following Bower's proposal, Hall contacted an "evictions" attorney about "deleasing" the Clairmont. PSAF ¶ 169.

Throughout October 2010, Hall actively cooperated with Defendants Hardin and Worsham and other MNPD and ICE officers, for what she referred to as a "sting operation," including providing keys to vacant apartments to law enforcement officers so they could conduct "surveillance" and "stakeouts" of Clairmont residents.[26] PSAF ¶¶ 170-171. At least one Greystar staff member observed Defendant Hall being "too close to the police:" "When the police would come, she [Hall] would get together with the police. She was hanging around with them all the time. Tracy [Hall] would go, and the police would go right behind her." PSAF ¶ 179. Despite the very limited number of alleged "bad actors" at the property, Hall gave Hardin the entire "rent roll" of all tenants at the Clairmont and met with both Hardin and CSS to discuss individuals to be "removed" from the property. PSAF ¶¶ 163, 180. Hall also provided specific and detailed information about Clairmont residents to Worsham and Hardin, information that she herself identified as confidential, including the identities, identification numbers, and vehicles of all

---

[25] Graffiti had been found on the property, some of which bore "MS13" markings. "MS13" is a gang. Bowers "Googled" MS13 and circulated an email to other Greystar managers with the information she discovered. PSAF ¶ 166. Greystar had no information indicating Clairmont residents were responsible for the graffiti, but to the extent they believed it was possible, those responsible presumably were among the "bad actors" living in a "handful" of apartments. PSAF ¶¶ 163, 167.

[26] Hall corresponded with Worsham and Hardin frequently over email and met with, or instructed her staff to meet with, Hardin or Worsham on at least five occasions. PSAF ¶¶ 98, 103, 120, 129, 130, 131, 136–137, 207. Hardin, Hubbard, and Worsham also met at least three times. *See* PSAF ¶¶ 194, 234, 235. In addition, Hardin and Hall were in frequent contact by phone, as were Worsham and Hall, and Hardin and Worsham. In fact, telephone records demonstrate that in the fifteen days from October 5, to October 20, 2010, Hall and Hardin placed at least 15 telephone calls to each other, Hall and Worsham placed at least 10 calls to each other, and Worsham and Hardin placed at least 20 telephone calls to each other. PSAF ¶ 161.

individuals who lived in various apartments, the apartments that she believed certain residents had visited, and apartments she believed "ha[d] a lot of activity." PSAF ¶ 183. Hall never obtained a copy of a subpoena or search warrant before furnishing Hardin and Worsham with this detailed resident information, nor would she have been able to even if she had requested one, because neither MNPD nor ICE ever obtained subpoenas or search warrants related to the Clairmont. PSAF ¶¶ 184-185. Hall did, however, document her close collaboration with Hardin and Worsham in written daily updates that she sent to Foster, Bowers, and Jarrell, among others, to ensure "the owner and Greystar management" were informed of "what was going on day-to-day." PSAF ¶¶ 172-174.

During the time that the Clairmont operated as an "armed camp," purportedly due to concerns about "threats of violence" that made the Clairmont unsafe for employees and residents, Clairmont Defs. Conspiracy Br. at 7-9, very little, if anything, was done by any of the law enforcement Defendants to obtain even basic information about the threats or the individuals allegedly making them. PSAF ¶¶ 79, 139, 211. What law enforcement did do was coordinate with CSS and each other about the comings and goings *not* of alleged gang members but of Hispanics *generally* on the property. Among other things, CSS reported to the law enforcement Defendants observations about Hispanics on the property, including a "group of Hispanic males standing by the back corner of building G," a resident's guest having been approached by a Hispanic man, and "three male Hispanics sitting in a Toyota Camry" for 30 minutes. PSAF ¶¶ 158, 187-189. Despite all their reports of "suspicious" behavior by Hispanics, CSS officers were never given any instruction about how to recognize gang members and had no particularized information about any individuals Greystar believed could be involved with gangs at the property. PSAF ¶ 190.

Nevertheless, Defendants Worsham and Hardin expanded the scope of activity at the Clairmont and began to develop a "plan of action" with Defendant Hubbard, a Special Agent with ICE Homeland Security Investigations ("HSI"), and Defendant Kemper, a Sergeant with MNPD and Hardin's supervisor. PSAF ¶ 192. Worsham and Hardin exchanged information, much of which was provided by Hall, about Clairmont residents who could be affiliated with a few apartments they speculated could be gang affiliated. PSAF ¶ 194. Hardin shared his information with Kemper. PSAF ¶ 195.

As a result of these communications, on October 6, 2010, Worsham wrote in an email to Hubbard the "perfect scenario" would be to hit "known" apartments with the gang task force and then move on to "all others with possible ICE targets" so they could "[f]ill the vans." PSAF ¶ 196. A few days later, Hardin told Hall that he stopped someone on the property and relayed "if anything happens to anyone from the [Clairmont] office, then the police will be after everyone in the community, not just the ones causing problems." Hall reported that information to TriMont and to her superiors at Greystar. PSAF ¶ 198.

**Defendants Plan the October 20, 2010 Raid at the Clairmont**

Around October 14, 2010, Defendant Worsham began to tell Hall that there would be some sort of law enforcement activity at the Clairmont in the near future. PSAF ¶ 200. Worsham anticipated "something to happen either this week or next" and promised that "as soon as something happens, [Hall] will be the first to know." PSAF ¶ 201. Around October 19 or 20, 2010, Worsham informed Hall that "something" was imminent. PSAF ¶ 202.

Apparently this was no secret to other Clairmont staff members. As noted, two weeks before October 20, 2010, Flores, the maintenance technician who had been forced by Hall to attend the meeting at the ICE office on October 5, informed Plaintiff Nuñez Escobar that "they

were trying to change [the Clairmont] from being Hispanic to being a complex with Americans." PSAF ¶¶ 83, 130, 203. Flores also told Nuñez Escobar that "in a short while, they were going to change, they were going to get all the Hispanics out of there, and they were going to remodel the buildings and convert them into apartments for Americans. They didn't want Hispanics there." PSAF ¶ 203. At about the same time, another Clairmont maintenance worker named Gregorio informed Nuñez Escobar that "they were going to put immigration people in the apartments to scare people off." PSAF ¶ 204. About two weeks prior to the Raid, Gregorio also cautioned Plaintiff Palencia Sarmiento that "the office had a list of all of the apartments where Immigration was going into and that they were going to take away people," and warned Plaintiff David Salgado Figueroa that he "should leave the apartments because Immigration was going to arrive" at the Clairmont. PSAF ¶¶ 205-206.

These warnings by the maintenance staff members proved to be highly accurate. On October 15, 2010 Worsham sent an email to Hardin suggesting that Flores may have fed the officers "BS" about potential gang activity on the property and Hardin responded, "O well…we're gonna heat up Clairmont on Wednesday anyway." PSAF ¶ 207. Several other actions – or lack of action – by ICE and MNPD indicate that they thought much of what they had heard about gangs and gang threats at the Clairmont were indeed "BS," or at the very least, not indicative of actual dangerous conditions or criminal activity. Hardin himself acknowledged that he did not take seriously information that had been relayed to MNPD, and, of course, MNPD and ICE had failed to conduct even the most cursory investigation into Greystar's reported "threats." PSAF ¶¶ 78, 112, 209, 211, 222-223, 289.

Nevertheless, on the same day that Hardin and Worsham agreed it did not matter if they had received "BS" intelligence, Worsham drafted a "Memorandum of Investigation"

("Memorandum") to be used as a basis for the operation that would "heat up" Clairmont. PSAF ¶¶ 207, 212. The Memorandum, which documented information collected from MNPD and ICE's investigation into the Clairmont, contained uncorroborated, speculative information much of which was unrelated to the Clairmont itself. PSAF ¶¶ 213, 215, 217. The Memorandum listed some apartments of interest but did not identify a specific criminal suspect. PSAF ¶ 214. Worsham explained the lack of information as "at that time, there wasn't really sufficient time to do. . .a lengthy investigation to try to establish names and complete identities and gather so much evidence that because there were active threats being made against people's lives."[27] PSAF ¶ 218. Again, at that time, no one from ICE or MNPD had so much as attempted to make a follow-up phone call to a witness of the alleged threats. PSAF ¶¶¶ 78, 112, 209, 211, 222-223, 289. Regardless, Defendant Kemper gave MNPD approval to proceed with a large-scale joint MNPD/ICE operation at the Clairmont, as did Federal Defendant Gaines from ICE ERO and, at Defendant Hubbard's recommendation, supervisors at ICE HSI did as well, pursuant to "Operation Community Shield." PSAF ¶¶ 224-226.

Operation Community Shield was a gang initiative within ICE that, among other things, placed specific limitations on gang-related operations and agents conducting them. PSAF ¶ 227. From the outset, the joint operation violated the program's requirements, which (among other things) specified that "gang enforcement operations are subject specific and designed to arrest only those previously identified by law enforcement personnel as promoting the unlawful

---

[27] Federal Defendant Gaines, the Supervisory Detention Deportation Officer, was not aware of *any* investigation into the alleged threats of "violence and murder" referenced in the Memorandum. PSAF ¶ 219. Defendant Hardin acknowledged that MNPD did not conduct an investigation into the incidents reported by Scott Jervis and Stephanie Preciado and he was not even aware that someone had entered Dorothy Duarte's apartment. PSAF ¶¶ 208, 220. With respect to the alleged threats to Greystar employees, including Scott Jervis and Stephanie Preciado, no investigation of any kind was conducted by Hardin, Kemper, or anyone at MNPD. PSAF ¶¶ 79, 208, 211. After having been given Jervis's telephone number, Hardin did not call him to follow up on the alleged threat. PSAF ¶ 222.

criminal activity of criminal street gangs," and that warrants for administrative arrest should be obtained in advance. PSAF ¶¶ 228-229. ICE obtained no administrative or judicial warrants (or even attempted to). PSAF ¶¶ 185, 231, 263. Relying on Worsham's Memorandum, Defendant Hubbard prepared an "enforcement operation plan" ("Operation Plan") for the ensuing Clairmont operation that listed only four apartments of interest: L-6, K-9, I-4, and C-101. PSAF ¶ 232.

Defendants Worsham, Hubbard, Gaines, Hardin, and Kemper proceeded with their plans to "heat up" Clairmont and "fill the vans" and secured additional agents and officers to participate. PSAF ¶¶ 196, 207, 234. On Wednesday, October 20, 2010, around 5:00 p.m., ICE and MNPD held a joint briefing in preparation for the Clairmont joint law enforcement operation (which Defendants call a "knock and talk" and Plaintiffs call a "raid"—the "Raid").[28] PSAF ¶ 235. A few hours prior to the briefing, Hardin and Hall spoke on the phone. PSAF ¶ 238. Shortly thereafter, Worsham spoke to Hall on the phone for nearly twenty minutes. PSAF ¶ 238. She had just told TriMont Asset Manager Jarrell, during a several hour, in-person meeting at the Clairmont, that he should "expect some sort of police action by [the] end of [the] month" – Worsham and Hardin's calls confirmed Jarrell would not have to wait that long. PSAF ¶¶ 239-240.

At the briefing and later throughout the Raid, Defendants Worsham, Hardin, and Hubbard served as the "leads" or lead agents for their respective agencies, PSAF ¶ 241; Federal Defendants Gaines, Koshar, and MNPD Defendant Kemper were participating unit supervisors, PSAF ¶ 242; Federal Defendants Abrahamson, Epley, and Lim, ERO Deportation Officers, Hastings, an ERO Immigration Enforcement Agent, and Dickey, Hendrix, Lane, and

---

[28] A properly conducted knock and talk is an investigatory technique where officers attempt to engage in "consensual encounters" by "[k]nock[ing on a residence door] and talk[ing] to the individual that you encounter. PSAF ¶ 236.

McCormick, HSI Special Agents, and a few other officers also participated. PSAF ¶ 243. At the briefing, Defendants Worsham, Hardin, Gaines, and Hubbard addressed the participating agents and officers and briefed them about the pending Raid. PSAF ¶ 244. It was a "quick," 25-30 minute meeting.[29] PSAF ¶ 245. They provided "the best intel that [they] had at the time," which did not include "so much evidence." PSAF ¶ 248. The only document provided to participants was the Operation Plan. PSAF ¶ 250. The Operation Plan noted four target apartments but did not contain identifying information about *any* individuals other than referencing that "young Hispanic males" had threatened Clairmont management since, as Hubbard later confirmed, they had not gathered enough information to include any specific targets in the Operation Plan.[30] PSAF ¶¶ 251-252. Indeed, no resident of the Clairmont was known to have committed any crime. PSAF ¶ 253. Even "Brian" and "Danilo", who were mentioned at the briefing, had not been observed by MNPD to be "blatantly causing any problems" or "breaking any laws." PSAF ¶ 254.

Defendants gave varying testimony about what exactly was discussed at the briefing but two things are clear: (1) Defendants Worsham, Hardin, and Hubbard did not relay much particularized information about the individuals at the Clairmont because, as they acknowledged, they did not have it;[31] and (2) based on what they were told at the briefing, twenty officers went

---

[29] Within that timeframe, they discussed several topics including the layout of the apartment complex, team assignments, "who was going where," and, in the time they had left, "the type of activity that [they] were looking for," and, to the extent they had them, descriptions of individuals they hoped to encounter. PSAF ¶ 246.

[30] In addition to violating the requirements of Operation Community Shield, the joint operation ran afoul of ICE HSI's "common rule" that investigations must be "slow and methodical[ ]" and agents cannot go "running off on every information that you get." PSAF ¶ 230.

[31] They did not relay information about any individual targets or unsolved crimes for which they had a suspect, detailed physical descriptions of individuals of interest, photographs or other pictures of any individuals, or knowledge of any people of interest known to live at Clairmont. PSAF ¶¶ 252-253. Indeed, Defendant Lim testified he was only told the operation was about "gangs" and "nothing

on to "heat up" the Clairmont by conducting multiple, coordinated, similar encounters where the law enforcement Defendants detained individuals and entered and searched homes without consent in a way that could not be reasonably described as the usual "knock and talk" operation.[32]

Indeed, the Clairmont operation was unusually large for both Nashville ICE and MNPD, perhaps the largest conducted at a single apartment complex. PSAF ¶ 255. It involved more officers than any "knock and talk" Defendant Hardin had ever been involved with during his career in law enforcement. PSAF ¶ 256. It was also the first and last time MNPD, ICE ERO, and ICE HSI *ever* conducted a joint operation in Nashville. PSAF ¶ 257. As later ICE reports indicated, it was a "significant incident" for all agencies involved.[33]

### According to Plan, the October 20, 2010 Raid "Heats up the Clairmont," "Fills the Vans" and "Scares People off the Property"

Immediately following the briefing, all the officers, led by Defendant Kemper, caravanned to the Clairmont to commence "fill[ing] the vans" and "scar[ing] people off the property." PSAF ¶¶ 196, 204, 258. Armed officers in bullet-proof vests, each with multiple pairs of handcuffs arrived at the property *en masse* – around 6:00 p.m. as residents were returning from work and children and others were congregated in the community courtyard.[34] PSAF ¶¶

---

else" and he had "no idea" about the target of the operation, other than understanding that the officers were looking "to arrest a whole bunch of aliens" and they weren't "looking for anything else. We're just looking for the aliens. That's it." PSAF ¶ 249.

[32] The specific actions of the individual law enforcement Defendants are detailed in the argument section of Plaintiffs' briefs in response to Defendants' summary judgment motions to specifically address Defendants' particularized arguments relating to their conduct.

[33] Following the Raid, ICE prepared a "Significant Incident Report" to notify headquarters that a significant event occurred, and that media attention could be expected. PSAF ¶ 290.

[34] Although Flores told officers Hardin, Hubbard, and Worsham that gang members were present at the Clairmont mostly on the weekends the ICE and MNPD Defendants conducted the operation at around 6:00 p.m. on a Wednesday. PSAF ¶¶ 259, 261.

259-260. The officers brought two transport vans (with the total capacity to hold 12-14 arrestees each) to the Clairmont as well about eight other vehicles to fill. PSAF ¶ 262. No Defendant or other officer had a single warrant authorizing the entry to or the search of any Clairmont residence or the arrest of any person at the Clairmont. PSAF ¶ 263.

Although real "knock and talks" are supposed to be "low key" to "keep the neighbors from knowing what's going on exactly," what happened at the Clairmont on October 20, 2010 was exactly the opposite of a "knock and talk" – the ICE and MNPD Defendants *wanted* "to let everybody know [they] were there" – they wanted to establish "an official presence." PSAF ¶¶ 264-267. In the course of "heating up" the Clairmont, the Federal Defendants and Defendants Hardin and Kemper, along with other ICE Agents and MNPD officers intimidated multitudes of residents and stopped, detained, and arrested more than twenty individuals. PSAF ¶ 269.

ICE and MNPD agents and officers, among other things, fanned out through the entire property, stopped numerous adults and even children for questioning, forced their way into apartments without any justification, kicked down doors, and held innocent residents at gunpoint. PSAF ¶ 270. Though some officers and agents had specific assignments to visit apartments listed in the operation plan, visits were made to multiple other residences and several officers and agents had no assignments at all—and essentially did nothing more than establish "an official presence," armed and in uniform, in visible areas of the property. PSAF ¶¶ 267, 271. And, once again, though the law enforcement operation was purportedly about the "gang problem" at the Clairmont, very little was done during the Raid to proactively uncover anything about gangs. PSAF ¶¶ 278- 280, 288-289. Defendant Christopher Lane, for example, entered Plaintiffs' Apartment F-106 and did not even look for any indications that any of the residents was affiliated with gangs, despite the fact that six F-106 residents were arrested. PSAF ¶¶ 274-275.

Defendant Hardin did not interview *any* of the twenty people ICE arrested to attempt to learn anything about their gang involvement; indeed, he admitted that he did not do *any* intelligence work related to gang membership at all. PSAF ¶¶ 279-280.

In conducting this Raid, however, the law enforcement Defendants repeatedly insulted the individuals they detained – *not* with remarks evincing gang membership or affiliation (or even immigration status), but, rather, with highly charged racial and ethnic slurs, calling Plaintiffs and other Hispanic residents "fucking wetbacks," "Mexican assholes," "Indians," "Mexican hillbillies," "Mexican sons of bitches," in some cases as they pointed firearms at Plaintiffs in close range or held them in other vulnerable positions, terrifying them. PSAF ¶ 281. Defendants made other degrading, intimidating comments such as (in response to the reasonable question as to whether Defendants had a warrant to enter Apartment F-106) "the warrant is coming from my balls," and "these fucking wetbacks didn't think we were going to be able to come in." PSAF ¶¶ 282-284. These comments were universally made to Hispanics – other individuals received far less attention; Defendant Worsham acknowledged that he did not ask African-American and Caucasian individuals with whom he spoke for identification or whether they were lawfully in the country. PSAF ¶ 285.

## Greystar, TriMont, MNPD, and ICE Hail the Raid as a Success Because It "Cleaned House" by Ridding the Hispanics from the Clairmont

The Raid resulted in 20 arrests, all Hispanics, including twelve of the fourteen Plaintiffs in this case. None of the Plaintiffs are or were gang members and no one arrested during the Raid was charged with a crime. PSAF ¶ 286. It did *not*, however, result in the discovery of any weapons, firearms, or narcotics at the Clairmont. PSAF ¶¶ 287, 396, 406, 419, 425. Moreover, neither MNPD nor ICE – nor even TriMont or Greystar – learned *any* information from the raid about the alleged threats made to Clairmont employees. Indeed, officers did not even make any

attempts to obtain such information during the raid or from the individuals apprehended at it. PSAF ¶ 289. And despite Greystar and TriMont's professed concern about the "death threats" made against their employees, no one from either company asked law enforcement whether the individuals responsible for the threats on the management staff had been apprehended. PSAF ¶ 293.

After the Raid concluded, the Federal Defendants violated ICE policy. PSAF ¶¶ 294-296, 298-299. For example, ICE ERO policies applicable to Defendants Worsham, Lim, Epley, Gaines, Abrahamson, and Hastings required them to obtain and document in detail "voluntary consent" for all entries or searches of a residence.[35] PSAF ¶ 294. Defendants Epley, Hendrix, Lane, McCormick and Worsham, who have claimed they received consent to enter and/or search Apartments E-101, I-4, and F-102 did not document *any* information regarding consent. PSAF ¶ 296. HSI policies regarding warrantless searches applicable to Defendants Lane, Hendrix, Hubbard, Koshar, Lane, and McCormick, regarding any claims of exigent circumstances, placed "the burden on the [agents] to show that exigency existed," meaning they "need[ed] to articulate in their reports why they deem[ed]" exigent circumstances required a warrantless search or, where consent is granted, obtain consent in writing. PSAF ¶ 298. The Federal Defendants, who have claimed their searches of apartments F-106, I-4, and F-102 were lawful due to exigent circumstances or properly obtained consent, failed entirely to document any such justifications. PSAF ¶ 299. And as previously noted, the raid failed to follow a number of Operation Community Shield's requirements: ICE obtained no warrants (or even attempted to), conducted a generalized large-scale operation that did not target a single specific subject, and arrested

---

[35] Documentation must include information such as the name of the person giving consent, the scope of consent, and witnesses to the granting of consent. PSAF ¶ 295.

individuals without any gang nexus.[36]

Nevertheless, both MNPD and ICE hailed the Raid as a success. Kemper told Hardin he did "outstanding work." PSAF ¶ 301. Gaines congratulated Worsham, saying he "did a great job" and should "keep up the good work" and also relayed to a senior ICE officer the exercise was an "excellent camaraderie builder." PSAF ¶ 302.

At the Clairmont, the Raid caused the Hispanic residents to vacate their apartments. By October 21, 2010, the day after the raid, multitudes of Hispanic residents vacated the property. "It was just like everybody was moving out. . . [I]t was truckloads full of people just moving out. . .all day during that day, people were just – truckloads full were just moving out everywhere." PSAF ¶ 303. When Greystar and TriMont senior management received reports after the "sting operation" that included information, among other things, that residents were in the process of moving out, entire buildings had been vacated, and "there is unrest on the property and many of the remaining residents are scared that immigration will return," they responded by stating it was "a lot of progress," "very good news," and "Woohoo." PSAF ¶ 304.

Greystar did nothing to stop these residents from moving. PSAF ¶ 305. Instead, Greystar had uniformed CSS officers who could not speak Spanish make door to door visits to those residents who remained. PSAF ¶ 306. Indeed, when a security officer came to plaintiff Nuñez Escobar's apartment after he returned to the Clairmont, he understood it was to "kick me out," and he immediately vacated his apartment. PSAF ¶ 307. Tennessee Fair Housing Council attorney Tracey McCartney explicitly told CSS, Hall, and Jarrell that the door-to-door visits were scaring the remaining residents who perceived the officers to be police or immigration, but the visits continued nonetheless. PSAF ¶ 308.

---

[36] The Raid also violated the Nashville ICE HSI rule prohibiting "collateral" arrests, that is arrests that departed from an operation's objective, which, in the case of the Clairmont, was to make arrests for "state violations" or "street gang members and their associates." PSAF ¶¶ 291-292.

During this time, Greystar Executive Director Stacy Hunt acknowledged to a Fannie Mae representative that Greystar had made "efforts to modify the resident base in an effort to provide a better living environment for the bulk of residents." PSAF ¶ 309. By this time, of course, the real "bulk" of the residents – the Hispanics – had left the Clairmont. By the end of October, occupancy at the Clairmont plummeted to 30% – a result that, in a report to TriMont, Greystar called the "de-leasing phase in October." PSAF ¶¶ 311-312. After this October de-leasing phase, which TriMont Asset Manager Jarrell described as "an exodus of tenants that were leaving because of the raid that had occurred and their fear that they would come back again," TriMont determined that "going forward, it will be important to diversify away from the almost 100% Hispanic profile that has been present in the immediate past at Clairmont." PSAF ¶¶ 313-314.

Jarrell, in particular, wanted "a more diverse tenant profile" and a "broader demographic pattern" than had previously existed at the Clairmont. PSAF ¶ 315. Jarrell further explained that "because of the police action" that happened at the Clairmont, TriMont began looking to the Coptic Christian community in Nashville. PSAF ¶ 316. Jarrell told the new property management company that took over in November 2010 (after Greystar resigned) to "attract some of the Coptic Christian Egyptians that were living in another property close by, . . . we'd of liked that tenant profile if we could get them." PSAF ¶ 317.

Greystar stopped managing the Clairmont on November 1, 2010. PSAF ¶ 318. Around this time, Worsham communicated to Hardin that Greystar was no longer managing the Clairmont "so the phone calls should subside." PSAF ¶ 310. TriTex, through TriMont, sold the Clairmont on December 27, 2011. PSAF ¶ 319.

## STANDARD

Summary judgment is only proper where the pleadings and discovery materials "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views evidence in the light most favorable to the nonmoving party, and draws all reasonable inferences in its favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 837 (6th Cir. 2013) (citations omitted). In ruling on a motion for summary judgment, the "evidence of the nonmovant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This Court need only find that Plaintiffs have "produced evidence from which a jury could reasonably conclude that [the Defendants] discriminated on the basis of race" or national origin. *Hidden Vill., LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 525 (6th Cir. 2013).

## ARGUMENT

I.  **Genuine Disputes of Material Facts Exist Regarding the MNPD Defendants' Participation in the Conspiracy to Violate Plaintiffs' Constitutional Rights, Precluding Summary Judgment.**

In moving for summary judgment, the MNPD Defendants fail to address the overwhelming evidence of a conspiracy among all Defendants, and, in particular, the evidence against Defendants Hardin and Kemper.[37] Instead, Defendants simply focus on a

---

[37] The MNPD Defendants spend several pages arguing that Plaintiffs have not properly pled their conspiracy claims against Defendant Kemper. *See* Memorandum in Support of Shaun Hardin and Gary Kemper's Motion for Summary Judgment (Dkt. No. 361) ("MNPD Defs. Br.") at 13-16. This Court, however, has already held that Plaintiffs adequately alleged the claims against him (including the three conspiracy claims) and previously denied Kemper's motion to dismiss presenting this same argument. *See* Dkt. Nos. 86, 87 ("Plaintiffs' Complaint sufficiently alleges a claim against Defendant Kemper"). There is no reason to disturb the Court's ruling at this stage in the litigation. In any event, what is now relevant at this summary judgment phase is whether there are genuine issues of material fact for trial. The record reveals substantial material disputes that must be resolved by a jury. As discussed in more detail above, Plaintiffs do not rely on Kemper's "mere presence" at the Raid, and the record shows that Kemper played an active role in the lead-up to the Raid and the Raid itself, and that questions of fact remain regarding the full scope of his role in the conspiracy.

few cherry-picked pieces of evidence that take their conduct out of context, ask that the Court make a factual determination to interpret their conduct as innocent, and then argue that Plaintiffs have failed to show that Defendants shared in the conspiratorial objective to rid the Clairmont of Hispanics. The movant's obligation on summary judgment is not to furnish the Court with any conceivable lawful explanation for their conduct, but, rather, to demonstrate that the undisputed evidence in the record requires, as a matter of law, that they are entitled to prevail on Plaintiffs' claims. The MNPD Defendants have utterly failed in this regard. Although Defendants address each of Plaintiffs' conspiracy causes of action separately, their argument regarding each is the same: that there is no evidence in the record from which a jury could infer that Hardin and Kemper conspired with the other Defendants to rid the Clairmont of Hispanics through conduct that would violate Plaintiffs' civil rights. *See* Memorandum in Support of Shaun Hardin and Gary Kemper's Motion for Summary Judgment (Dkt. No. 361) ("MNPD Defs. Br.") at 17 (§ 1983), 27 (*Bivens*), 31 (§ 1985(3)). Defendants are incorrect.

To prevail on a civil conspiracy claim, "[a]ll that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy," and "[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Id.* at 944. This is because "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, [and thus] circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks,* 229 F.3d 514, 528 (6th Cir. 2000) (citation omitted).

For summary judgment purposes, "the question of whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can 'infer from the circumstances [that the alleged conspirators] had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives," *Robinson v. Twp. of Waterford*, 883 F.2d 75, at *7 (6th Cir. 1989) (unpublished) (citations omitted).[38] *See also Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 548 (6th Cir. 2013) ("It is fundamental that a judge may not make credibility determinations or otherwise weigh the evidence when ruling on a summary judgment motion; such functions are for the finder of fact after a trial."). In ruling on a motion for summary judgment, the "evidence of the nonmovant is to be believed[.]" *Anderson*, 477 U.S. at 255. Here, when "view[ing] the facts in the light most favorable to the nonmoving party, [and] giving [Plaintiffs] the benefit of all reasonable inferences," the MNPD Defendants' motion for summary judgment must be denied. *Nelms*, 513 F. App'x at 544 (citing *King v Taylor*, 694 F.3d 650, 661(6th Cir. 2012)).

A. **There is significant circumstantial evidence that Hardin and Kemper conspired with the Clairmont and Federal Defendants to "get the Hispanics gone."**

The MNPD Defendants ignore significant evidence regarding the conspiratorial nature of their conduct in light of conduct by the other Defendants. The full conspiracy alleged by Plaintiffs must be considered to evaluate their claims.

From the outset, the Clairmont Defendants had a plan to rid the property of Hispanic residents, as evidenced by Greystar property manager Herskowitz's announcement to Clairmont onsite staff that "Greystar was brought in by the owners to

---

[38] Pursuant to Local Rule 7.01(e)(5), court decisions that are not reported in one of the publications of the West Publishing Company that are cited herein are attached as Exhibit A.

come in, clean house, and get the Hispanics gone."[39] PSAF ¶ 11. Soon afterwards, Defendant Hall began managing the property, and, in the months that followed, she took a variety of harsh measures aimed at drastically reducing Hispanic occupancy, including eventually collaborating with ICE and MNPD to arrest as many Hispanic residents as possible and scare many, many more off the property. *See e.g.*, PSAF ¶¶ 13, 36-52, 66, 117, 148-150, 170, 180-183.

The collaboration between the Clairmont Defendants, through Hall, and law enforcement officers began in late September 2010, after maintenance supervisor Scott Jervis had a relatively minor encounter with an unidentified Hispanic gang member. PSAF ¶ 88. Following that incident, Hall had Jervis make a police report and used the opportunity to solicit MNPD's assistance to install a substantial (and unwarranted) police presence on the property. PSAF ¶¶ 90-91, 95-96, 98. In making her overtures to MNPD, Hall cited to "gang issues" at the property, even though other than some graffiti, she was unaware of any other even arguably gang-related incidents at the Clairmont. PSAF ¶¶ 86-87, 95-96. Hall also focused on the Clairmont's occupancy rate when contacting MNPD, reporting to MNPD Officer Watkins on September 23 that the Clairmont was "currently 55% occupied" and, still, "management is cleaning house" – echoing Mr. Herskowitz's earlier discriminatory remarks of "clean[ing] house, and get[ting] the Hispanics gone." PSAF ¶ 96.[40] On the same day as Jervis's police report and Hall's discussions with Watkins,

---

[39] While Defendants Hardin and Kemper deny hearing this statement, disputes exist regarding whether the "message" was, in fact, conveyed, including Officer Watkins reporting to Defendant Kemper on October 4, 2010 that "Ms. Hall had advised them that the residents felt that management was enacting changes to remove 'illegal immigrants from the complex.'" PSAF ¶ 115; Ex. 85 to PSAF, METRO000191-192.

[40] Contrary to the MNPD Defendants' assertion, this email (drafted by Watkins within thirty minutes of meeting with Hall) is admissible as a present sense impression. *See* Fed. R. Evid. 803(1); *United States v. Davis*, 577 F.3d 660, 668 (6th Cir. 2009) (present sense impression exception applies to contents of 911 call made immediately after witnessing occurrence); *Miller v. Stovall*, 742 F.3d

Hall and Hardin spoke twice: first on the telephone and then in person at the police precinct. PSAF ¶ 98. Hall and Hardin soon began communicating often and in depth in furtherance of the goal of "cleaning house" at the Clairmont. PSAF ¶¶ 106, 108, 111, 117, 136-137.

At the same time, ICE agent Defendant Worsham also began collaborating with the Clairmont Defendants, generally through Hall, in furtherance of the plan to drive Hispanic tenants out of the Clairmont. On October 1, 2010, Defendant Worsham made a non-consensual entry into a Clairmont apartment using a key he demanded and received from Greystar employee Jervis without showing a warrant. PSAF ¶ 99. Hall was aware that Worsham had coerced Jervis into granting him access to an apartment. PSAF ¶ 105. Though she recognized that Worsham's actions violated the Fourth Amendment, she never reviewed the applicable laws and company policies concerning the requirement to obtain a warrant with her staff. PSAF ¶¶ 104-105. To the contrary, immediately following the October 1 incident, Hall began what would become regular and frequent communications with Worsham, instructed onsite employee Dorothy Duarte that she "had to cooperate" with law enforcement if they "needed anything," and voluntarily opened up the property and the resident files to both Worsham and Hardin. PSAF ¶¶ 103, 106, 111, 171, 180, 183. Also immediately following October 1, Worsham, understanding the extraordinary nature of the cooperation the Clairmont Defendants were providing, called Hardin to discuss working together at the property. PSAF ¶ 107.

---

642, 650 (6th Cir. 2014) (applying present-sense impression and stating, "Statements are more likely to be accurate the closer they are in time to the events they describe."); *United States v. Price*, 58 F. App'x 105, 106 (6th Cir. 2003) ("The exception for present sense impression permits the introduction into evidence of a 'statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.'"). The email is also not subject to the hearsay rule because it is a business record, *see* Fed. R. Evid. 803(6), and a past recollection recorded, *see* Fed. R. Evid. 803(5).

Hardin wasted no time putting his part of the plan to rid the Clairmont of Hispanics into motion, and alerted Kemper of his intentions. PSAF ¶¶ 106, 117, 192, 195. On October 4, 2010, just over a week after his first conversation with Hall, Hardin spoke with her again. PSAF ¶ 106. Hall repeated her goal of increasing police presence on the property. PSAF ¶ 106. Hardin then spoke again with Worsham to discuss working together on the Clairmont. PSAF ¶ 107. Later that day, Hardin led a group of fellow Gang Unit detectives on a walk-through of the property and had a meeting with Hall and Preciado. PSAF ¶ 108. None of these experienced gang detectives, including Hardin, were surprised or deterred by the relatively small amount of graffiti at the Clairmont, which was largely concentrated on playground equipment and from which they could only conclude individuals associated with gangs may have been present at some point. PSAF ¶ 109. Other than the graffiti, they did not see anything else at the property of interest, and they did not even bother to walk through the entire property. PSAF ¶ 110. At some point during this visit, Hall reported to Hardin that the Clairmont was going to have a "gang war." PSAF ¶ 111.[41]

Hardin believed Hall's report of a "gang war" was unreliable and he and the other Gang Unit detectives had learned little, if anything, about the alleged gang presence or other criminal activity at the Clairmont during their visit to the property. PSAF ¶¶ 112-114. On the same day as his Gang Unit's visit to the Clairmont, Kemper was cautioned that Clairmont residents felt Greystar had "enacted changes to remove the illegal immigrants from the complex." PSAF ¶ 115. Just hours after the unremarkable visit to the property – and apparently not bothered by the complaint that Greystar was targeting certain residents – Kemper instructed the Gang Unit to pay close attention to the area. PSAF ¶ 116. With Kemper's encouragement and approval, Hardin intensified his collaboration with Hall and

---

[41] Property manager Stephanie Preciado, however, clarified that "most of the issues are consolidated to a few apartments at the complex." PSAF ¶ 119.

her staff members toward the goal of a large-scale law enforcement action that would remove Hispanic residents from the property. PSAF ¶¶ 116-117, 137.

Defendants' collaborative efforts included an October 5, 2010 meeting at ICE headquarters, where at Hall's direction, Greystar employees, including maintenance technician Jorge Flores (a/k/a "George"), met with Hardin and Federal Defendants Worsham and Hubbard. PSAF ¶¶ 130-31. At this meeting, Flores and the other Clairmont employees were shown photos of suspected gang members and discussed with Defendants Hardin, Worsham and Hubbard potential "target apartments" based on what Defendant Hardin described as the Greystar employees' "hunch" of where gang members "hung around." PSAF ¶¶ 132, 134.

Following this meeting (and with a clear impression as to what the meeting was actually about), Flores informed one of the Plaintiffs that "they were trying to change [the Clairmont] from being Hispanic to being a complex with Americans. . . [and that] in a short while they were going to change, they were going to get all the Hispanics out of there. . . They didn't want Hispanics there." PSAF ¶ 203. This fact alone provides significant evidence that the Clairmont Defendants, the ICE Defendants and the MNPD Defendants were indeed working together to take action designed "to get all the Hispanics out of there."[42]

Despite the almost complete lack of evidence of an actual gang or crime *problem* at the Clairmont, from October 4, 2010 through the day of the Raid, Hall, Worsham, and Hardin were in near-constant contact, during which time Hardin and Worsham provided Hall with unusually detailed information of their broad-based investigation into the residents of the Clairmont. Between October 5, 2010 and October 20, 2010, Hall and Hardin

---

[42] Further, right around the same time, on October 7, 2010, Greystar Senior Manager Tracy Bowers proposed "deleasing" the entire property because "leasing up a stronger and better resident profile would . . . position the property to sell at a higher price." PSAF ¶ 164.

placed at least fifteen calls to each other, Hall and Worsham placed at least ten calls to each other, and Hardin and Worsham spoke at least twenty times. PSAF ¶ 175. In addition, though Hardin testified he only spoke to Paul West, the owner of CSS, on two occasions, telephone records demonstrate they placed calls to each other at least ten times between October 5 and October 20, 2010.[43] PSAF ¶¶ 160-161. Hardin, Worsham and Hall exchanged detailed, confidential information about numerous Hispanic residents and their guests, and Hall and Hardin met to discuss individuals to be "removed" from the property. PSAF ¶¶ 179-181, 183. Hardin visited the Clairmont often, sharing information with Hall and making the presence of law enforcement known. *See* PSAF ¶¶ 176. Hall provided the rent roll of all Clairmont residents to Hardin, and CSS (at Hardin's direction) reported on residents' comings and goings at the Clairmont (which were relayed to Hall and then on to law enforcement), even though there were, at best, only a handful of residents *anyone* suspected of criminal activity. PSAF ¶¶ 158-159, 163, 180, 187-189. Hardin shared what he learned from Hall and Worsham with Kemper. PSAF ¶ 195. Hall also provided Hardin with keys to several vacant apartments and the office so he could contact "surveillance" and "stakeouts" for a "sting operation", which Kemper approved, and Hardin reported to Hall that there were undercover officers monitoring the property.[44] PSAF ¶¶ 170-171, 177. Indeed, Hall and Hardin were in such close and constant contact that it drew the attention of at least one Greystar staff member. PSAF ¶ 179.

This near-constant contact relaying a broad array of information about the Clairmont's residents provides, as do other facts, compelling evidence from which a jury

---

[43] Plaintiffs and Defendants Paul West and Crime Suppression Services have settled and they have been dismissed from this action. Dkt. No. 413.

[44] Hardin denies telling Hall any of these things, PSAF ¶ 178, but these communications and Hardin's denial of them add to the web of circumstantial evidence demonstrating conspiratorial intent. *Weberg*, 229 F.3d at 528 ("obfuscatory" efforts demonstrate evidence of conspiracy).

could infer the existence of a conspiracy. *See Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO,* 361 F.3d 898, 905-06 (6th Cir. 2004) (reversing district court grant of motion to dismiss where law enforcement and private defendants "continuously conferred" before officers confronted plaintiff union's members in intimidating manner); *Bazzi v. City of Dearborn*, 658 F.3d 598, 606 (6th Cir. 2011) (circumstantial evidence from which a reasonable jury could infer conspiracy included series of phone calls between co-conspirator defendants).

Nevertheless, there is still more evidence of the MNPD Defendants' true motivations for so readily collaborating with the Clairmont Defendants. Though neither the MNPD Defendants nor the Federal Defendants were looking into the Clairmont Defendants' allegations of threats, PSAF ¶¶ 79, 139, 186, the MNPD and Federal Defendants began planning an extraordinary, large-scale raid at the complex – entirely disproportional to the Clairmont Defendants' allegations of so-called "threats" (even if they had been true, which now been largely discredited, *see* PSAF ¶¶ 125-127). Defendants Hardin and Worsham, along with their supervisors, Defendants Kemper and Gaines, enthusiastically began to develop a "plan of action" with Defendant Hubbard, a Special Agent with ICE Homeland Security Investigations ("HSI") and Defendant Koshar, Hubbard's supervisor.

This growing group of law enforcement officials specifically designed the Raid to "fill the vans" with Hispanic residents, without regard to whether they had committed crimes or were ICE fugitives, and to send a clear message to other Hispanics at the Clairmont that they were not welcome on the property. As designed by Hardin, Worsham and Hubbard, and approved by Kemper and Gaines, the Raid was to involve a staggering – and unprecedented – twenty law enforcement officers, including several who were not assigned to a particular apartment but would instead merely increase the visible law enforcement presence. PSAF ¶¶ 255-257, 271-272. The Federal and MNPD Defendants set the Raid to

take place in the early evening on a Wednesday, even though they were well aware, as Flores had told them, any gang presence (to the extent it existed) was most pronounced on weekend nights. PSAF ¶¶ 235, 261.

As to the almost utter lack of information justifying such a massive Raid, Defendant Worsham's excuse that "there wasn't really sufficient time to do…a lengthy investigation to try to establish names and complete identities and gather so much evidence that because there were active threats being made against people's lives," rings entirely hollow, given the MNPD or Federal Defendants' complete lack of interest in investigating those purported "active threats" at all. PSAF ¶¶ 79, 211, 221. There is no real rational for why there would not have been "sufficient time to do…a lengthy investigation," when there was no exigency whatsoever that would justify bypassing obtaining proper, particularized information (or even valid warrants). By the time that Defendants Hardin and Worsham began planning the Raid, the Clairmont Defendants had already shut down the onsite office, removed all staff from the property, and Preciado (the only person to whom the alleged threats were actually directed) had moved out of state to Atlanta. PSAF ¶¶ 80, 141, 156. The much more likely explanation (and one that a reasonable jury could infer), of course, is that the reason for this hasty, over-expansive action was the immediacy of the Federal and MNPD Defendants' agreement with the Clairmont Defendants to rid the Clairmont of Hispanics. *See Weberg,* 229 F.3d at 527 ("abnormal and deceitful" conduct related to investigation allowed inference that co-conspirators shared racial animus).

Worsham confirmed as much in his October 6, 2010 email, where he describes the "perfect scenario" – ICE and MNPD would hit the limited "known" apartments (about which only the vaguest gang-related information was known) and then move on to "all others with possible ICE targets" so they could "[f]ill the vans." PSAF ¶¶ 196. Only a few

days later, Hardin stopped Castro Garcia's car just outside the Clairmont gates and warned him that MNPD would be casting a wide net over the entire community.[45] PSAF ¶ 198.

Then, on October 15, 2010, Worsham informed Hardin that Flores, probably the main source of information about alleged gang members at the Clairmont, may have fed the officers "BS" about potential gang activity on the property; yet, once again in spite of the possible "BS," Hardin decided it did not matter because, "we're gonna heat up Clairmont on Wednesday anyway." PSAF ¶ 207. *See Robinson v. Twp. of Waterford*, No. 84-1579, 883 F.2d 75, at *6-7 (1989) (unpublished) (evidence that included co-conspirator defendants discussing arresting individual before arriving at the scene would allow reasonable people to conclude conspiracy to violate constitutional rights existed). Had gang members been the true focus of the Raid, the possibility that Flores was unreliable surely would have been cause for genuine concern. Moreover, Hardin's eager anticipation for "heat[ing] up" a residential apartment complex directly contradicts his own testimony, and that of other Defendants as well, that this operation was merely a "knock and talk." PSAF ¶¶ 207, 236, 256, 264-268.[46]

---

[45] The email and report from which this evidence derives are admissible as present sense impressions, then existing state of mind or business records. Fed. R. Evid. 803(1), (3), (6); *see* n. 4, *supra*. Moreover, for the first time, in his declaration submitted in support of his motion for summary judgment, Hardin proposes an alternate interpretation for his warning to Castro Garcia, asserting that he meant that if the Clairmont staff were harmed, the law enforcement presence at the Clairmont would increase and "affect gang members and criminals who were not involved with making the threats." Declaration of Hardin (Dkt No. 363) ¶ 11. Hardin is free to make that claim; however, which interpretation of Hardin's statement to accept is for the jury to decide. *See Anderson*, 477 U.S. at 255 (court does not make credibility determinations or otherwise weigh the evidence when ruling on a summary-judgment motion; such functions are for the finder of fact after a trial); *see also Toins v. Ignash*, 534 F. Supp. 452, 453 n.6 (E.D. Mich. 1982) ("[E]ven in a summary judgment motion, the adverse party is given the strong benefit of the doubt as to contested facts.") (citing Wright & Miller, § 2727).

[46] The Court should reject Hardin's self-serving, "perfectly lawful" and harmless explanation that his October 15 email meant that the Raid would go forward regardless of whether Flores was sharing information with gang members. *See* MNPD Defs. Br. at 22 n.7. Again, such determinations must be left to a finder of fact and are improper on summary judgment. *Anderson*, 477 U.S. at 255; *Toins*, 534 F. Supp. at 453. Additionally, Plaintiffs did not have the opportunity to question Hardin about

On Wednesday, October 20, 2010, all of the law enforcement Defendants as well as other participating officers attended the pre-Raid briefing conducted by Defendants Worsham, Hubbard, and Hardin. PSAF ¶ 235, 242-244. Though each Defendant gave widely varying testimony about the content of information relayed at the briefing, what is clear is that very little – if any – specific law enforcement intelligence or particularized information about what officers should look for was conveyed. PSAF ¶¶ 245, 248, 250. Many participating officers testified that they did not know who or what they were looking for at the Clairmont, undermining any assertion that this was a typical "knock and talk" intended to further develop intelligence regarding specific gang members and crimes. PSAF ¶¶ 248-249, 250-251, 256, 264-268.[47] It is difficult, if not impossible, to imagine how an officer could conceivably (and legitimately) use the "knock and talk" technique to effectively develop intelligence relevant to an investigation about which he knows nothing or next to nothing.

To the contrary, several of the participating MNPD officers recognized that the Raid was a significant departure from their typical practice and that it was not a real "knock and talk" operation during which it is important be unobtrusive and non-confrontational, PSAF ¶¶ 264-268, but rather was specifically structured to "let everybody know [law enforcement officers] were there" and to "establish an official presence" to intimidate all Hispanic

this email exchange at his deposition because the MNPD Defendants never produced these documents. Instead, Plaintiffs received them several months later in response to their discovery requests to the Federal Defendants.

[47] A typical "knock and talk" is a "low key" consensual encounter intended to investigate a particular report or complaint, such as that drugs are being sold out of a home. PSAF ¶ 265. One or two officers, often dressed in plain clothes, approach a residence, knock on the door, and ask the person who answers if the officers may come in to talk and also make clear if he or she does not want to talk, "that's cool." PSAF ¶¶ 265-266. In stark contrast, the Raid was not designed to confirm or deny reports of a specific crime; it conducted pursuant to a plan to have four teams of MNPD officers and ICE agents approach multiple residences in full raid gear and other officers, who were not assigned to a particular apartment, visibly patrol the grounds, to ensure their "official presence" was felt. PSAF ¶ 267, 270-272.

residents of Clairmont. PSAF ¶¶ 267. Hardin and the Federal Defendants entered Plaintiffs' homes without a warrant or consent, unlawfully seized and detained many of the Plaintiffs, arrested and removed from the property twenty men, and, in the process, with Kemper helping to establish an "official presence," purposefully scared off scores of Hispanic residents. PSAF ¶¶ 267-270. *See also* Sections I.B and II *infra,* detailing Defendants' unlawful conduct.[48]

That, at a minimum, Kemper agreed at the briefing (tacitly, through a mutual understanding or otherwise, *see United States v. Barger*, 931 F.2d 359, 369 n.6 (6th Cir. 1991)), to conduct the Raid in a manner that would result in violations of Plaintiffs' civil rights under the Fourth, Fifth and Fourteenth Amendments is something that a reasonable jury certainly could infer – especially given the unmistakable departure from well-established MNPD knock and talk practices and the multiple, coordinated intimidating encounters and arrests at a purported information-gathering "knock and talk." *See Weberg*, 229 F.3d at 528 (jury could fairly infer existence of conspiracy from timing of occurrences and deviation from usual course of action under the circumstances, precluding summary judgment); *Merritt v. Hawk*, 153 F. Supp. 2d 1216, 1225 (D. Colo. 2001) ("conspiracy can be shown by a sequence of events from which a reasonable juror could infer there was a meeting of the minds") (citations omitted). The law does not require significant participation in a conspiracy for liability to attach, and it is immaterial that Kemper may

---

[48] Storming the Clairmont in a twenty officer raid was a highly disproportionate response to the minimal, unparticularized information Defendants had about gang members, criminals, or even crime on the property. Further, it was ill-designed to actually obtain intelligence, but precisely designed to arrest and scare the Hispanic residents. Defendants' justifications for their actions plainly do not square with the facts and provide further inferences of the conspiracy at play. *See, e.g.*, *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000) (proffered reason for conduct is pretextual where it "was insufficient to warrant the challenged conduct")*; Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 648 F. Supp. 2d 805, 814-19 (E.D. La. 2009) (city's proffered justifications for its actions were factually unsupported and thus pretextual, and thus invidious motive could be inferred).

have been less active in the pre-Raid investigation and planning than Hardin, or that he did not enter any apartments or seize any of the Plaintiffs during the Raid. *See In re Cottingham*, 473 B.R. 703, 711 (B.A.P. 6th Cir. 2012) (quoting *Int'l Telecomm. Satellite Org. v. Colino,* Nos. 88-1266, 87-2749, 1992 WL 93129 at *12 (D.D.C. 1992) ("A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action ... so long as the purpose of the tortious action was to advance the overall object of the conspiracy.")); *United States v. Lanham*, 617 F.3d 873, 886 (6th Cir. 2010) (quoting *United States v. Gresser*, 935 F.2d 96, 101 (6th Cir. 1991)) (a conspirator "need not have personally performed the deed for which he is being held liable. A conspirator can be held criminally liable for the actions of his co-conspirators committed during and in furtherance of the conspiracy.") Moreover, it is undisputed that Kemper participated in the large-scale, coordinated Raid, during which multiple law enforcement Defendants simultaneously seized, detained and arrested Plaintiffs and others, in a way designed to intimidate the Clairmont's entire Hispanic populace and violate the constitutional rights of Plaintiffs and others.

Defendants' conduct during the Raid is also highly suggestive of the Raid's true purpose. Once at the Clairmont, teams of officers approached multiple apartments across the complex simultaneously, and there were at least four extra officers, including Kemper,[49] who were not assigned to a particular apartment but instead visibly patrolled the grounds, thus ensuring that "everybody knew they were there." PSAF ¶ 267, 272. During the Raid, Hardin and Kemper repeatedly forewent opportunities to seek out information regarding the supposed gang presence or criminal activity, or to find the perpetrators of the alleged

---

[49] The MNPD Defendants assert that Kemper's only action during the Raid was his conversation with a minor in the courtyard of the complex who claimed to be a gang member. MNPD Defs. Br. at 18. Hardin, however, contradicts this, testifying that immediately after arriving at the Clairmont, Kemper and he, along with Worsham and Hubbard, knocked on the door of an apartment but received no answer. PSAF ¶ 273.

threats. Most notably, Hardin was the officer who initially seized and detained "Brian" (a/k/a Bryant Escobar). PSAF ¶ 276. Rather than interviewing him or making any attempt to determine whether there was probable cause to arrest him for a crime, however, Hardin immediately turned Escobar over to Worsham, who also made no attempt to gather any intelligence from Escobar. PSAF ¶ 277-280. Moreover, during Hardin's search of the bedroom where Escobar had been found, Hardin discovered a picture of what appeared to be gang members. PSAF ¶ 278. Remarkably, Hardin did not even take the photo to be used in his purported gang investigation. The utter failure of Hardin and Kemper to take even the most basic steps to gather the supposed intelligence regarding gangs, crimes, and threats on which the entire Raid was premised is strong evidence from a jury could infer pretext intended to disguise the underlying conspiracy.

From all these facts (and more), a jury could determine that the MNPD Defendants (and the Federal Defendants) were not actually motivated to storm the Clairmont on October 20, 2010 because of alleged crimes, gangs or threats, but, instead, because of a conspiratorial agreement between each other and/or the Clairmont Defendants, through Hall, Worsham, and Hardin, to "clean house" and rid the Clairmont of Hispanics. *See Nelms*, 513 F. App'x at 548-49 (2013) (reversing district court's grant of summary judgment because it "required too much of [plaintiff] and took an overly narrow view of conspiracy" between landlord and defendant police officers, noting "[t]hat [the defendants] might have had different motives for [violating the Fourth Amendment] makes no difference, for subjective motivations are 'irrelevant' under the Fourth Amendment"). *See also Barger,* 931 F.2d at 369 n.6. These facts demonstrate, through both direct and circumstantial evidence, that Kemper and Hardin each entered into an agreement to rid the Clairmont of Hispanic residents through conduct that resulted in violations of Plaintiffs' civil rights, or, at the

very least, an agreement that was reached to conduct the Raid without regard to whether it would violate Plaintiffs' Fourth Amendment rights.[50]

**B.    The MNPD's Proffered Explanations Are Pretextual**.

It is undisputed that no Defendant, including Hardin or Kemper, took the alleged (and now discredited and unsubstantiated) "gang war" and threats against the Clairmont Defendants' onsite staff seriously. However, in an attempt to sanitize their conduct as a legitimate response to genuine concern regarding activities at the Clairmont, the MNPD Defendants list eight pieces of "intelligence" they purportedly gathered prior to the Raid. MNPD Def. Br. at 3-4.[51] This "intelligence," however, is either highly disputed or the MNPD Defendants' purported reliance on it in the planning and execution of the Raid is belied by their conduct. *See Dews*, 231 F.3d at 1021 (proffered reason is pretextual if it "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct").

The first, second, and fourth purported pieces of intelligence cited by the MNPD Defendants are related: (a) a confidential informant reported to Hardin that the MS-13 street gang and the Sur-13 street gang were joining together in Nashville; (b) Hardin's conclusion that the graffiti that officers observed at the Clairmont on October 4 indicated

---

[50] Plaintiffs need only point to facts "sufficient to permit a jury to infer the existence" of a conspiracy." *Nelms,* 513 F. App'x. at 549. "The possibility that other inferences could be drawn that would provide an alternate explanation for the [Federal Defendants'] actions does not entitle them to summary judgment." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1303 (9th Cir. 1999) (internal citations omitted) (citing cases for the propositions that "inference need not be most likely but merely a 'rational' or 'reasonable' one" and "that 'all of the evidence . . . does not point in one direction and different inferences might reasonably be drawn from it' does not justify judicial intrusion into the jury's role in determining whether a civil conspiracy existed.").

[51] Though the MNPD Defendants outline these pieces of "intelligence" in their "Statement of Facts," they do not actually rely on (or even mention) any of these facts in the "Legal Analysis" section of their brief. These facts, therefore, could not be material to the resolution of the MNPD Defendants' motion for summary judgment. To the extent the MNPD Defendants reference these facts in their reply brief, Plaintiffs have demonstrated how each piece of so-called "intelligence" could not advance Defendants' arguments.

the joining together of the two gangs; and (c) Hardin received a report in early 2010 of a gang fight at the Clairmont. MNPD Defs. Br. at 3. As an initial matter, it is only logical that Hardin's conclusion that two gangs had become partners entirely negated any possible significance of the alleged earlier "gang fight" (about which Hardin admitted he was aware of no investigation). PSAF ¶¶ 112, 114, 139, 208, e210. Regarding Hardin's assertion that the gangs were joining together, there is no reference to this notion anywhere in Hardin's extensive pre-Raid correspondence or his reports. PSAF ¶ 210. Hardin did not testify about it at his deposition, even though he was asked extensively about information received from the confidential informant and gang presence at Clairmont. PSAF ¶ 210. Instead, the assertion appears for the first time in Hardin's declaration attached to the MNPD Defendants' motion for summary judgment. Self-serving affidavits without factual support in the record should not be considered on summary judgment. *See, e.g., Holdcroft v. Hetzel*, No. 3:01CV7386, 2002 WL 31059363 (N.D. Ohio Aug. 12, 2002), *aff'd in part, vacated in part*, 68 F. App'x 555 (6th Cir. 2003); *LVN Corp.v. Gebhardt*, No. 3:12-cv-468, 2014 WL 1092109, *4 (E.D. Tenn. Mar. 18, 2014). More importantly, Hardin does not suggest – nor does anything else in the record suggest – that the gangs' purported partnership posed any danger to the Clairmont staff or its residents.

The third piece of intelligence that the MNPD Defendants reference is that twice, in 2010, individuals approached Hardin and "told him that gang members had robbed them at the Clairmont." MNPD Defs. Br. at 3. Hardin, however, gathered no intelligence about these alleged robberies. PSAF ¶ 209. He did not generate a report about these incidents, get a description of the robbers, or even learn the names of the alleged victims. PSAF ¶ 209. Hardin did not investigate these incidents any further, and the Raid resulted in neither the arrest of anyone who was charged with these robberies or any intelligence regarding these robberies. PSAF ¶¶ 279-280.

The fifth, sixth[52], and seventh items referenced by the MNPD Defendants are related to Greystar reports of purported threats against staff members and Greystar's closing of the onsite office, allegedly in response to those threats. MNPD Defs. Br. at 3-4. The assertion that these alleged threats animated and justified the investigation and the Raid is severely undermined by the MNPD Defendants' admission they did not follow up on or investigate details of any of the threats that were reported to them, including failing to conduct any formal investigation regarding these alleged threats. PSAF ¶ 211. Moreover, although the MNPD Defendants fail to acknowledge it, there are stark disputes regarding many of these alleged threats.[53] For example, Flores, who the Greystar Defendants assert reported several of the threats, testified that there never were any threats, that he never told anyone that there were threats, and that Greystar's allegations are "lies." PSAF ¶¶ 76-79. The MNPD Defendants, however, never asked him what he knew about the supposed threats. PSAF ¶¶ 79, 139, 211. Similarly, neither Kemper nor Hardin was even aware of the MNPD report of the "Jervis incident" until after this litigation began. PSAF ¶ 333. As discussed above, Hardin and Kemper did not even attempt during or after the Raid to gather information about the threats.

The eighth and final piece of intelligence the MNPD Defendants assert establishes that they were motivated by legitimate law enforcement objectives is Jorge Flores' identification of certain photographs of known gang members as individuals he had seen at the Clairmont. MNPD Defs. Br at 4. Hardin himself, however, questioned Flores's reliability, PSAF ¶¶ 207-208, and admitted that Flores did not have specific reasons to believe certain people were involved in reported unlawful activity "other than just he had

---

[52] The MNPD Defendants number two items "5."

[53] *See* Plaintiffs' Response to the Clairmont Defendants' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment on Plaintiffs' Conspiracy Claims ¶¶ 31-32, 41, 43-44, concurrently filed, showing disputes regarding these events.

seen them around, heard their names, all that of – basically that was just it." PSAF ¶ 134. Hardin also acknowledged that other Greystar employees were only able to provide vague "hunches" of where alleged Hispanic gang members "hung around." PSAF ¶ 134. The MNPD Defendants did not know of anyone who was currently living at the Clairmont on October 20, 2010 and who had any criminal convictions. PSAF ¶ 334. As the MNPD Defendants' own testimony makes clear, the MNPD's entire investigation boiled down to only hunches and conjecture.

Accordingly, an evaluation of this evidence in the light most favorable to Plaintiffs makes clear that the MNPD Defendants had very little, if any, reliable, specific intelligence regarding the alleged gang and crime activities at the Clairmont, and that the MNPD Defendants made no genuine effort to further investigate what information they did have. Viewing the MNPD Defendants' actions in concert with the Federal and Clairmont Defendants through the lens of their limited, questionable intelligence, a reasonable jury could easily infer that their purported legitimate law enforcement objections were mere pretext for their conspiracy. *See Weberg*, 229 F.3d at 527 (defendant's failure to investigate and verify information was evidence from which conspiracy to deprive plaintiff of equal protection of the laws could be inferred); *Vakilian v. Shaw*, 335 F.3d 509, 519 (6th Cir. 2003) (Defendants' failure to collect relevant information by interviewing Plaintiff before charging him with Medicaid fraud constituted act in furtherance of § 1985(3) conspiracy).

## II. Defendants Hardin and Kemper Acted Under Color of Both State and Federal Law and are Therefore Liable under Plaintiffs' *Bivens* Conspiracy Claim.

The MNPD Defendants argue that they cannot be liable under a *Bivens* conspiracy claim because they were not acting "under color of federal law." MNPD Defs. Br. at 11. Defendants Hardin and Kemper do not contest that they *can* be liable under a *Bivens* conspiracy claim – they only claim that they were not, in fact, operating under color of

federal law at any point during the lead-up to and execution of the Raid. *Id.* However, Plaintiffs have shown that that the MNPD Defendants and federal officers *jointly* planned, conspired, and executed the Raid with all Defendants that resulted in constitutional violations. Hardin and Kemper were not, as they claim, solely at the Clairmont for purposes of investigating gang activity. Rather, they engaged in activities by which they were acting under color of *both* federal and state law, precluding summary judgment in favor of the MNPD Defendants on Plaintiffs' *Bivens* conspiracy claim. At the very least, the question of whether Hardin and Kemper were acting under color of federal law is rife with material, disputed facts that preclude summary judgment.

It is well established that non-federal actors may be liable under *Bivens* for constitutional violations where they work in tandem with federal officers to commit those violations. *See, e.g., Bender v. Gen. Servs. Admin.,* 539 F. Supp. 2d 702, 707-08 (S.D.N.Y. 2008) (holding that privately contracted security guard acted under color of federal law where guard cooperated and worked in tandem with federal officers to arrest plaintiff); *Arias v. U.S. Immigration & Customs Enforcement Div. of Dep't of Homeland Sec.*, CIV. No. 07-1959, 2008 WL 1827604, at *4 (D. Minn. Apr. 23, 2008) (finding based on allegations that city police officers who took part in ICE operation were acting under color of federal authority); *Askew v. Bloemker,* 548 F.2d 673, 677 (7th Cir. 1976) (stating that "the mere assertion that one is a state officer does not necessarily mean that one is acting under color of state law"). The question of whether a state employee is acting under color of state or federal law is not a formalistic one, as the MNPD Defendants suggest. In *Rowe v. State of Tenn.*, the Sixth Circuit cautioned courts not to inquire "*only*" whether "the wrongdoer is clothed with the authority of state law," especially in "a federal system where state and national action is often parallel . . . ." 609 F.2d 259, 262-263 (6th Cir. 1979) (emphasis

added); *see also Johnson v. Orr*, 780 F.2d 386, 397 (3d Cir. 1986) (citation omitted) (finding that it is "not unusual in modern society, and especially in state government, for a versatile person to serve in two capacities or wear 'two hats.' . . . State or municipal police officers are at times assigned to federal investigations, and for that limited purpose act under color of federal law, even though for other purposes they remain accountable to their respective hiring employers").

A close examination of the record reveals that while Hardin and Kemper at times acted under state authority during the Raid, they also acted pursuant to federal authority while working jointly with ICE to "fill the vans." For example, when Hardin encountered "Brian" – who he said he suspected of being a gang member – Hardin immediately turned him over to Defendant Worsham. PSAF ¶¶ 217, 276-277. Then, while searching the bedroom where Brian was found, Hardin discovered a picture of what appeared to be gang members, but did not keep it. PSAF ¶ 278. Similarly, Hardin saw Castro Garcia – who Hardin stated he suspected of gang activity and the alleged threats against Clairmont staff – in an ICE van. PSAF ¶ 335. Rather than seeking to interview him regarding the threats or his gang associations, Hardin merely asked Defendants Hubbard and Worsham if they "needed any help." PSAF ¶ 335. Indeed, Hardin did not interview a single arrestee regarding gang associations or other gang members. PSAF ¶ 279-280. Of the twenty people arrested during the Raid, none was so much as investigated after the Raid in connection with any crimes or gang affiliation. PSAF ¶ 289. No guns or drugs were found at the Clairmont; indeed MNPD did not locate any evidence of criminal activity. PSAF ¶ 336. These facts show that Hardin and Kemper's claim that their role "was to address state law

violations, while ICE's role was to address violations of federal criminal or immigration law" is implausible, and that they acted, at least in part, under color of federal law.[54]

Especially where plaintiffs have alleged a conspiracy, as they have here, the excessive entanglement of state authority with federal authority counsels in favor of finding that the MNPD Defendants acted both under color of state and federal law. Civil conspiracy is a procedural mechanism that extends liability for a substantive claim to *additional* defendants. Conspiracy "does not enlarge the nature of the claims asserted by the plaintiff," but may "enlarge the pool of responsible defendants by demonstrating their causal connections to the violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired." *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (discussing conspiracy in analogous § 1983 context) (citations omitted).

In any event, whether and when the MNPD Defendants were acting under color of state and federal law (and, conversely, whether and when the Federal Defendants were operating under color of federal and state law), is a fact-intensive question, and the record contains conflicting characterizations of the Raid from the planning to execution such that summary judgment is inapplicable. *See Barkovic v. Hogan*, 505 F. App'x 496, 500 (6th Cir. 2012) (whether sheriff was acting under color of state law was jury question preluding summary judgment). *See also Chapman v. Higbee Co.*, 319 F.3d 825, 835 (6th Cir. 2003); *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980); *Rowe*, 609 F.2d at 265 (suggesting issue

---

[54] Hardin and Kemper's argument that they were not "deputized" as federal agents is irrelevant. Under 8 U.S.C. § 1357(g)(10), no formal agreement is necessary for a state officer "otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." Additionally, any officer acting under color of authority under 8 U.S.C. § 1357(g), "shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8). Questions of fact remain as to whether and when Hardin and Kemper were acting "under color of authority" pursuant to 8 U.S.C. § 1357(g).

of whether a person acted under color of state or federal law may present a jury question if there remain "unanswered questions of fact regarding the proper characterization of the actions"). The actual conduct of the MNPD officers during the Raid, in conjunction with this intentional show of force using both state and federal authority, raises questions of fact that warrant allowing Plaintiffs' *Bivens* claim against Hardin and Kemper to proceed.

### III. Genuine Disputes of Material Facts Exist Regarding Plaintiffs' § 1983 Equal Protection Claim Against Defendant Hardin.[55]

Plaintiffs' Ninth Cause of Action alleges that, pursuant to § 1983, and with the Clairmont Defendants' assistance, encouragement, participation and facilitation, Defendant Hardin seized Plaintiffs (in this case, Plaintiff David Salgado Figueroa) on the basis of his race, ethnicity and national origin in violation of the Equal Protection Clause of the Fourteenth Amendment. Third Amended Complaint (Dkt No. 329) at 37. Thus, Plaintiffs' Ninth Cause of Action alleges joint action between the Clairmont Defendants and Defendant Hardin to violate Plaintiff Salgado Figueroa's equal protection rights. *See, e.g., Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) ("The joint action test asks whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights. . . This requirement can be satisfied either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents.") (internal citations and quotations omitted); *Barrett v. Outlet Broad., Inc*., 22 F. Supp. 2d 726, 735-36 (S.D. Ohio 1997) (denying summary judgment to private parties where "Plaintiffs have submitted evidence which supports their allegation that the [private] Media Defendants participated in joint activity with the police officers.").

---

[55] Plaintiffs voluntarily dismiss their Fourteenth Amendment claim against Defendant Kemper in their Ninth Cause of Action.

Defendant Hardin argues that Plaintiffs cannot show for purposes of the § 1983 Equal Protection Claim that he stopped, searched, seized, or arrested any Plaintiff, or that he acted with the requisite racial animus. MNPD Defs. Br. at 33-34. Defendant is incorrect.

First, Hardin participated in the seizure of Plaintiff Salgado Figueroa in Apartment E-101, which Defendants essentially admit. *See* MNPD Defs. Br. at 34. "In order to determine if a seizure has occurred, [courts] look to 'all of the circumstances surrounding the incident' and consider whether 'a reasonable person would have believed that he was not free to leave.'" *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see also United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (encounter is not consensual if under totality of circumstances a reasonable person would believe compliance is compelled). The Sixth Circuit has long recognized the following factors indicate a seizure has occurred: "'the threatening presence of several officers, the display of a weapon by an officer . . ., the use of language or tone of voice indicating that compliance with the officer's request might be compelled,'" and an officer's "blocking" of an individual's egress. *Gross*, 662 F.3d at 399-400 (quoting *Mendenhall*, 446 U.S. at 554); *see also United States v. Baldwin*, 114 F. App'x 675, 678-79 (6th Cir. 2004) (presence of three officers was "intimidat[ing]" and created an "overwhelming police presence," and officers' "tone and compulsory language" made it clear individual was not free to "disregard the police and go about his business" (citation omitted)).

Here, Hardin entered Apartment E-101, accompanied by two ICE agents, with his hand on his weapon. PSAF ¶ 337. One or more of the three officers seized all of the adults in the living room, including Plaintiff Salgado Figueroa. Plaintiff Salgado Figueroa's mother, Lucina Figueroa Reyes, one of the people seized in this manner, testified that Hardin issued the order to stand against the wall. PSAF ¶ 338. Even if Hardin was not the

officer who personally ordered everyone to stand against the wall, he, along with the ICE agents, effectuated the seizure by creating an intimidating and coercive law enforcement presence in the living room. *See Baldwin*, 114 F. App'x at 678-79. No one, including Plaintiff Salgado Figueora, felt they were free to leave the apartment as long as Hardin and the ICE agents were present. PSAF ¶ 339.

Second, there is significant evidence in the record from which a reasonable jury could infer that Defendant Hardin, in concerted activity with the Clairmont Defendants, seized Plaintiff Salgado Figueroa on the basis of his race, ethnicity or national origin, in clear violation of the Equal Protection Clause of the Fourteenth Amendment. As discussed above, Jorge Flores, the maintenance technician at the Clairmont, who was forced by Hall to attend the October 5, 2010, meeting at ICE headquarters Hardin, Worsham, Hubbard and two other Greystar employees, relayed Defendants' discrimination to Plaintiff Nuñez Escobar within a matter of a day or two following the meeting – telling Plaintiff Nuñez Escobar, among other things, that "they were going to get all the Hispanics out of there. . . They didn't want Hispanics there." PSAF ¶ 68. Flores' warning to Plaintiff Nuñez Escobar made clear that the actions during the Raid, which was planned and executed by Hardin, Kemper, and the ICE agents, were based on Plaintiffs' ethnicity and national origin.[56]

---

[56] In light of this evidence that Plaintiff Salgado Figueroa was targeted because of his race, ethnicity or national origin, Plaintiffs need not show that there were similarly situated non-Hispanics who were treated differently. *Whren v. United States*, 517 U.S. 806, 813 (1996) ("We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. . . the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause"); *Young v. Mahoning Cnty., Ohio*, 418 F. Supp. 2d 948, 958 (N.D. Ohio 2005) (citing *Henry v. Metropolitan Sewer Dist.*, 922 F.2d 332, 341 (6th Cir.1990) ("In order to state a claim under the Equal Protection Clause of the Fourteenth Amendment pursuant to Section 1983, a plaintiff averring discrimination must ordinarily allege that a state actor intentionally discriminated against her because of her membership in a protected class."). The Sixth Circuit has found that where "explicit racial criteria" or "racially-motivated decision making" is involved, "plaintiffs would not need to establish the existence of a similarly situated class that was not investigated." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534, n.4 (6th Cir. 2002). By setting out to only go after the Hispanics during the Raid and to remove them from

Accordingly, in light of this evidence, questions of fact remain, which necessarily precludes summary judgment in favor of Defendant Hardin on Plaintiffs' Ninth Cause of Action.

## IV. Defendants are Not Entitled to Qualified Immunity on any of Plaintiffs' Claims.

The MNPD Defendants argue that they are entitled to qualified immunity as to Plaintiffs' claims that they have engaged in an unlawful conspiracy under § 1983, § 1985(3), and *Bivens*, and have directly violated the Equal Protection Clause under the Fourteenth Amendment. But Defendants misconstrue the standard on qualified immunity. Plaintiffs have alleged and set forth sufficient evidence to establish violations of fundamental and long-established constitutional rights of which no reasonable officer would have any doubt as to whether such rights are clearly established.

First, Defendants misconstrue the standard by arguing that Plaintiffs must set forth case law providing that Defendants had "notice that *on the facts of this case*" that they could be found liable for unconstitutional conduct. MNPD Defs. Br. at 24-25; 32 (emphasis added). But to defeat qualified immunity, "[i]t is not necessary to have 'a case directly on point' for a right to be 'clearly established.' It is sufficient that existing precedent place the question 'beyond debate.'" *Nelms*, 513 F. App'x at 547-48 (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011)); *see also Hope v. Pelzer,* 536 U.S. 730, 741 (2002). The Supreme Court has made clear that a right can be clearly established even if there is no case involving "fundamentally similar" or "materially similar" facts. *See id.* (recognizing that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). The ultimate question is whether the officer had "fair warning" that his conduct deprived the plaintiff of a constitutional right. *Id.* at 740.

---

the property, Plaintiffs need not provide evidence of non-Hispanic residents who were treated differently.

Second, and more importantly, Defendants mistakenly argue that Plaintiffs must set forth precedent that would put Defendants on notice that their specific actions "could be deemed a part of an unlawful *conspiracy*."[57] MNPD Defs. Br. at 25. This is simply false, and dooms Defendants' argument. The issue on qualified immunity is not whether an officer would know that his actions would be sufficient to constitute an agreement to enter into a conspiracy, but instead whether the constitutional *right* that was ultimately violated was clearly established. *See Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (stating standard as: (1) whether the facts alleged, when viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional *right*," and (2) "whether the *right* was clearly established").[58]

Thus, the question is not whether an officer would know that all of his individual actions would subject him to liability for *conspiracy*, but whether the rights that were ultimately violated were clearly established. Plaintiffs must only prove the deprivation of the underlying specifically-protected constitutional right, as conspiracy is simply the vehicle by which they have sought to assert that right. *See Bazzi*, 658 F.3d at 607 (reversing district court's granting of summary judgment on conspiracy to violate plaintiff's Fourth

---

[57] Specifically, Defendants attempt to argue that there must be a Supreme Court or Sixth Circuit case that would put them on "notice that their participation in [a] knock and talk operation and their communications with fellow police officers, ICE agents, and others concerning issues and events at the Clairmont . . . could constitute an unlawful conspiracy." MNPD Defs. Br. at 25.

[58] Furthermore, if Defendants were correct – that there needed to be a case on point to make officers aware that certain specific actions may make them liable as part of a conspiracy to violate or that resulted in the violation of a clearly established right – then the rule on co-conspirator liability would cease to exist. It is well-established that a co-conspirator is liable for *all* acts taken in by another co-conspirator in furtherance of the conspiracy. *Hooks*, 771 F.2d at 944; *see also Hamilton v. City of Romulus*, 409 F. App'x 826, 836 (6th Cir. 2010) ("As to damages, a conspirator is liable for all of the acts taken in furtherance of the conspiracy, regardless of whether the conspirator participated directly in the act.") This is because "[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Hooks*, 771 F.2d at 944. If Defendants' view of the law were correct, officers could never be held liable for violations of constitutional rights committed by other officers found to have been engaged in a conspiracy because the officer would not have been on notice of such possible liability. That certainly cannot be the case.

Amendment rights, and focusing for qualified immunity purposes on the underlying Fourth Amendment right violated); *Vakilian*, 335 F.3d 509, 551 ("Having determined that the facts alleged in . . . the complaint would, if proven, establish an equal protection violation [under Section 1985(3)], we must now ask whether the *right* was clearly established at the time of [defendant's] action.") (emphasis added). For example, in *Pritchard v. Hamilton Twp. Bd. of Trustees*, the Sixth Circuit found that while certain actions that formed the basis of the conspiracy may not be unconstitutional in themselves (*e.g.*, placing a fictitious noise complaint) that conduct was undertaken "in furtherance (to justify) the unconstitutional conduct." 424 Fed. App'x. 492, 508 (6th Cir. 2011). In determining whether qualified immunity applied, the Sixth Circuit did not look at whether the specific way in which the conspiracy was formed was clearly established, but rather whether there was "underlying constitutional harm" and whether a "constitutional violation could be proven." *Id.*[59]

As discussed above, Plaintiffs have adequately set forth evidence that the MNPD Defendants entered into a conspiracy resulting in the violation of clearly established rights under the Fourth Amendment. Fifth and Fourteenth Amendments, and that Defendant Hardin directly violated Plaintiffs' equal protection rights under the Fourteenth Amendment. Notably, the MNPD Defendants do not argue that the law was not clearly established regarding Plaintiffs' underlying rights under the Fourth, Fifth, or Fourteenth Amendments, or their rights to equal protection – nor could they. A long-standing and well-developed line of cases makes clear that warrantless entries into and searches of a home are *per se* unreasonable and bear heightened scrutiny. *Mincey v. Arizona,* 437 U.S. 385, 390

---

[59] And to the extent Defendants, for purposes of qualified immunity, repeat their factual argument that "Plaintiffs cannot show that Det. Hardin or Sgt. Kemper were even aware of an alleged conspiratorial objective," such an argument is irrelevant. "Qualified immunity is a question of law, but 'where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.'" *McKenna v. Edgell,* 617 F.3d 432, 437 (6th Cir. 2010) (quoting *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 900 (6th Cir.2004)).

(1978); *Payton v. New York,* 445 U.S. 573, 586 (1980). Long before October 2010, the right to be free of unreasonable seizures was a "clearly established right[] of which a reasonable officer would know." *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995) (citing *Graham v. Connor*, 490 U.S. 386, 392–93 (1989)). Additionally, it is clear that "the enforcement of an otherwise valid law can be a *means* of violating constitutional rights by invidious discrimination." *Vakilian*, 335 F.3d at 521. With respect to claims of a racially-motivated conspiracy the law was also clearly established that government officials may not conspire together to violate civil rights *on basis of race. See Griffin v. Breckenridge,* 403 U.S. 88 (1971).[60]

## **CONCLUSION**

Defendants have not – and cannot – establish a record that entitles them to judgment as a matter of law on any of Plaintiffs' claims, and, accordingly, their motion should be denied in its entirety. Defendants' motion for summary judgment as to Plaintiffs' request for declaratory judgment should be denied as well.

Dated: May 16, 2014                                      Respectfully submitted,

                                                                          /s/ José J. Behar
                                                                          One of the Attorneys for Plaintiffs

---

[60] The law was also clear at the time these events transpired that government officials violate equal protection rights when they intentionally treat a person differently from others based upon racial animus or ill-will, because when that occurs, there is no rational basis for the difference. *See Village of Willowbrook v. Olech,* 528 U.S. 562 (2000); *Herron v. Harrison,* 203 F.3d 410 (6th Cir.2000). In *Farm Labor Org. Cmte. v. Ohio State Hwy. Patrol*, for example, the Sixth Circuit upheld the denial of qualified immunity with respect to plaintiffs' equal protection claims on the basis that precedent has clearly established that "the Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures" and "[i]t is a venerable rule under the Equal Protection Clause that the state may not choose to enforce even facially neutral laws differently against different portions of the citizenry solely out of an arbitrary desire to discriminate against one group." 308 F.3d 523, 533, 542 (6th Cir. 2002).

Elliott Ozment
Tricia Herzfeld
Law Offices of Elliott Ozment
1214 Murfreesboro Pike
Nashville, TN 37217
T: (615) 321-8888
*elliott@ozmentlaw.com*
*tricia@ozmentlaw.com*

Andre Segura
Justin Cox
Lee Gelernt
ACLU Foundation Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, New York 10004
T: (212) 549-2660
*asegura@aclu.org*
*jcox@aclu.org*
*lgelernt@aclu.org*

Cecillia D. Wang
ACLU Foundation Immigrants' Rights Project
39 Drumm Street
San Francisco, California 94111
T: (415) 343-0775
*cwang@aclu.org*

Thomas H. Castelli
ACLU Foundation of TN
P.O. Box 120160
Nashville, TN 37212
T: (615) 320-7142
*tcastelli@aclu-tn.org*

ATTORNEYS FOR JAVIER ORLANDO DERAS, JUAN BAUTISTA MENDEZ MARTINEZ, ISAIAS RAXCACO CAJBON, EDUARDO CAHUEC GARCIA, MARVIN BENJAMIN LOPEZ RAXCACO, COSMER JUAREZ CAJBON, CARLOS ROBERTO MENDEZ MARTINEZ, KIMBERLY CUSTIS, AND SHANNON NORIEGA LUCAS, as parent and next friend of her child, B.B.

Matthew J. Piers
José J. Behar
Jenna L. Miara
Caryn C. Lederer
Hughes, Socol, Piers, Resnick & Dym, Ltd.
70 W. Madison St., Suite 4000
Chicago, IL 60602
T: (312) 580-0100
*mpiers@hsplegal.com*
*jbehar@hsplegal.com*
*jmiara@hsplegal.com*
*clederer@hsplegal.com*

Elliott Ozment
Tricia Herzfeld
Law Offices of Elliott Ozment
1214 Murfreesboro Pike
Nashville, TN 37217
T: (615) 321-8888
*elliott@ozmentlaw.com*
*tricia@ozmentlaw.com*

ATTORNEYS FOR ANGEL ENRIQUE NUNEZ ESCOBAR, DAVID SALGADO FIGUEROA, GERARDO MORTEO MENDEZ, JESUS ANTONIO SANCHEZ VILLALOBOS, AND JORGE PALENCIA SARMIENTO

<u>**CERTIFICATE OF SERVICE**</u>

       I, José J. Behar, one of the attorneys for the Plaintiffs, certify that I caused a copy of the foregoing document to be served by CM/ECF on counsel listed below on May 16, 2014.

Michael L. Roden
S. Delk Kennedy
Office of the United States Attorney
(MDTN)
110 Ninth Avenue, S., Suite A-961
Nashville, Tennessee 37203
delk.kennedy@usdoj.gov
michael.roden@usdoj.gov

Richard C. Mangelsdorf, Jr.
D. Randall Mantooth
Leighann D. Ness
Brian Walthart
Leitner, Williams, Dooley, and Napolitan
414 Union Street, Suite 1900
Nashville, TN 37219
Chuck.mangelsdorf@leitnerfirm.com
randy.mantooth@leitnerfirm.com
leighann.ness@leitnerfirm.com
brian.walthart@leitnerfirm.com

Allison L. Bussell
James Robinson
R. Alex Dickerson
Metropolitan Legal Department
P.O. Box 196300
Nashville, TN 37219
Allison.bussell@nashville.gov
James.robinson@nashville.gov
Alex.dickerson@nashville.gov

                           /s/ José J. Behar
                           One of Plaintiffs' Attorneys